# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

KATHLEEN L. ALEXANDER, DANIEL O. HUGHES, PATRICIA S. HUGHES, KRISTINE A. ZITNY, CHARLES E. ADKINS, VELVET L. ADKINS, SHEILA G. GOOD, SUZANNA L. AUSBORN, MITCHELL M.W. MALOY, SUMMER L. MALOY, MAGGIE M. BILYEU, ARIELL S. TAYLOR, individually, and for the estate of CHRISTOPHER L. BROWN, ERNEST L. BROWN II, JIM ARTHUR JACOBS, GLADYS M. VEREEN, CHRISTOPHER BAPTIST, DOMINIC JACOBS, JIM AUGUSTINO JACOBS, LAGUANDA S. JACOBS, CYNTHIA C. CAMPBELL, PHOUTHASITH DOUANGDARA, CAREY G. DUVAL, C.F., by and through his next friend Stephanie J. Fisher, K.F., by and through his next friend Stephanie J. Fisher, STEPHANIE J. FISHER, THOMAS A. FOGARTY, L.C.D., by and though his next friend Bridget L. DeHoff, KIRK A. GOLLNITZ, TYLER GOLLNITZ, CEDRIC F. GORDON, CONCHETTA M. DIAZ, CEDRIC D. GORDON SR., ADRIAN K.A. SHERROD, SHELBY IUBELT, V.I., by and through her next friend Shelby Iubelt, MICHAEL IUBELT, CHARLOTTE LOQUASTO, J.A.L., by and through his next friend Charlotte Loquasto, A.J.J., by and through her next friend Paul E. Jayne, ALISON R. POHN, JOHN C. MCCARTHY, DAVID W. H. LAU, HAMIDE LAU, K.L., by and through his next friend David W. H. Lau, M.L., by and through her next friend David W. H. Lau, ALEXANDER LAU, VIVIAN PERRY, HOLLY L. ABRAHAM, LEROY W. LAU JR.,

**COMPLAINT UNDER THE ANTI-TERRORISM ACT (18 U.S.C. § 2333)**

JURY TRIAL DEMANDED

No. 21-cv-2351

MICHELLE L. RAUSCHENBERGER,
JAMMIE J. SMITH, ANNIE L. MCBRIDE,
CHESTER R. MCBRIDE SR., CHARLETTE
GILBERT, WILLIAM R. NEVINS, MARY R.
HAMMERBACHER-NICHOLS, MONTE D.
NICHOLS, NICOLE A. ROBLES, BRUCE K.
NICHOLS, M.G.N., by and through her next
friend Bruce K. Nichols, JEANNE M.
NICHOLS, JULIANNE GOOD PERRY,
G.W.P., by and through his next friend Julianne
Good Perry, L.R.P., by and through her next
friend Julianne Good Perry, KATHLEEN
PERRY, STEWART L. PERRY, A.T.P., by
and through her next friend Stewart L. Perry,
IDA B. PITTMAN, JOHN T. PITTMAN SR.,
GAIL PROVOST, MEGHAN J.
HOLLINGSWORTH, SARAH T.
PETERSON, BRIAN PROVOST, SPENCER
D. PROVOST, GERTRUDE PROVOST,
LOUIS PROVOST, JUDITH L. ASHLEY,
LOUISE P. CONLON, MARYJANE G.
MEDEIROS, JOHN A. PROVOST, PAUL
PROVOST, SCOTT P. PROVOST, KATRINA
M. REEVES, SUMMER REEVES DUNN,
HANNAH MASON, JENNIFER K. REEVES,
MALLORY T. WILLIAMS, CHARLOTTE A.
REEVES, VICTORIA J. REEVES, JOYCE A.
TULLOCH, MICHELLE RILEY, RODNEY
RILEY, NATHAN J. RIMPF, DANIEL M.
ROBINSON, CHRISTOPHER J.
ROSEBROCK, ALEX J. ROZANSKI,
NATALIE SCHMIDT, A.L.S., by and through
his next friend Natalie Schmidt, TAMMIE S.
SCHOONHOVEN, A.M.S., by and through her
next friend Tammie S. Schoonhoven, A.R.S.,
by and through her next friend Tammie S.
Schoonhoven, DEBORAH F.
SCHOONHOVEN, CHRISTOPHER S.
SCHOONHOVEN, S.M.P., by and through her
next friend Deborah F. Schoonhoven, SARAH

ii

M. SCHWALLIE, CHARLES W. STRANGE,
C.E.S., by and through her next friend Charles
W. Strange, CHARLES W. STRANGE III,
KATELYN M. STRANGE, CATHERINE
KIMBERLY VAUGHN KRYZDA, C.C.V., by
and through her next friend Catherine
Kimberly Vaughn Kryzda, R.C.V., by and
through his next friend Catherine Kimberly
Vaughn Kryzda, HORTENSE K.W.
VICKERS, K.E.F.V., by and through her next
friend Hortense K.W. Vickers, K.M.G.V., by
and through her next friend Hortense K.W.
Vickers, K.N.V., by and through his next friend
Hortense K.W. Vickers, MARY J. VICKERS,
ROBERT M.K. VICKERS SR., MARK M.K.
VICKERS, ROBERT M.K. VICKERS JR.,
VANCE M.K. VICKERS, MICHELLE J.K.
YARBOROUGH,  MAKAHEA XHELILI,
JEFFREY L. WHITE SR., PAULA K.
WHITE, KYLE WHITE, MICHAEL WHITE,

Plaintiffs,

v.

HABIB BANK LIMITED,

Defendant.

Ryan R. Sparacino
 (pro hac vice forthcoming)
SPARACINO PLLC
1920 L Street, NW, Suite 535
Washington, DC 20036
Tel: 202.629.3530
Ryan.sparacino@sparacinopllc.com

Tejinder Singh
 (SDNY Bar No. TS0613)
GOLDSTEIN & RUSSELL, P.C.
7475 Wisconsin Ave., Suite 850
Bethesda, MD 20814
Tel: 202.362.0636
Fax: 866.574.2033
tsingh@goldsteinrussell.com

iii

# TABLE OF CONTENTS

NATURE OF THE ACTION.................................................................... 1

THE PARTIES ..................................................................................... 7

JURISDICTION AND VENUE.............................................................. 7

FACTUAL ALLEGATIONS.................................................................. 8

    I.    The al-Qaeda Terror Syndicate ............................................... 9

        A.    Al-Qaeda ...................................................................10

        B.    Taliban and the Haqqani Network...................................12

        C.    Lashkar-e-Taiba .........................................................30

        D.    Jaish-e-Mohammed......................................................41

        E.    The Kabul Attack Network ...........................................50

    II.    Habib Bank Limited (HBL) Knowingly Provided Material and
        Substantial Support to Terrorists and Terrorist Organizations ...............53

        A.    HBL Knowingly Provided Material Support to Members of the
            al-Qaeda Terror Syndicate and Their Agents ....................53

        B.    HBL Acted With the Requisite Scienter for Primary and
            Secondary Liability.........................................................80

        C.    HBL's Assistance to the al-Qaeda Terror Syndicate Was
            Substantial, and Caused Terrorist Attacks......................102

        D.    HBL's Assistance to the al-Qaeda Terror Syndicate Had a
            Substantial Nexus to the United States...........................107

    III.    Al-Qaeda Committed, Planned And Authorized The Terrorist Attacks
        That Injured Plaintiffs .........................................................117

        A.    Al-Qaeda Led the Syndicate .........................................118

        B.    Al-Qaeda Authorized and Planned Taliban Terrorist Attacks..........125

        C.    Al-Qaeda Directly Participated in Taliban Terrorist Attacks...........145

    IV.    The Plaintiffs ....................................................................151

CLAIMS FOR RELIEF .....................................................................200

PRAYER FOR RELIEF......................................................................205

Plaintiffs, by their attorneys, allege the following:

## NATURE OF THE ACTION

1.     This is an action under the Anti-Terrorism Act ("ATA") as amended by the Justice Against Sponsors of Terrorism Act ("JASTA"), 18 U.S.C. § 2333(a) and (d), brought on behalf of Americans injured and the families of Americans killed in a series of terrorist attacks in Afghanistan from mid-2010 through early 2019. The attacks were perpetrated by members of a syndicate of terrorist organizations led by al-Qaeda—referred to in this Complaint as the "al-Qaeda Terror Syndicate" or the "Syndicate."

2.     The attacks were planned, authorized, and committed by al-Qaeda, typically in conjunction with one or more other members of the Syndicate. These members include al-Qaeda, which was designated a Foreign Terrorist Organization ("FTO") by the U.S. government in 1999; Lashkar-e-Taiba ("LeT" or "LT"), a Pakistani terrorist organization designated an FTO in 2001; Jaish-e-Mohammed ("JeM"), a Pakistani organization designated an FTO in 2001, and its alter-ego Al-Rehmat Trust ("ART"), which was designated an FTO in 2010; the Tehrik-i-Taliban Pakistan ("Pakistani Taliban"), designated an FTO in 2010; and the Afghan Taliban ("Taliban"), which includes the Haqqani Network, a part of the Taliban designated an FTO in 2012. The Syndicate also used joint operational cells that fused al-Qaeda, Taliban (including the Haqqani Network), and LeT operatives

in Kabul and the surrounding provinces, which joint cells the Department of Defense labeled the Kabul Attack Network.[1]

3.      Defendant Habib Bank Limited ("HBL") provided financial support to the al-Qaeda Terror Syndicate by providing banking services and payments to terrorists, terrorist groups, and terrorist fundraisers that were part of or affiliated with the Syndicate. HBL provided accounts and facilitated essential transactions that allowed the Syndicate to obtain and move money to terrorists committing attacks on Americans.

4.      HBL is the largest commercial bank in Pakistan. It is also a bank of choice for terrorists and terrorist organizations in the region. As just a few examples, Hafiz Muhammad Saeed and Zafar Iqbal, the co-founders of LeT, have accounts at HBL. Both Saeed and Iqbal have been designated Specially Designated Global Terrorists ("SDGTs") by the U.S. Office of Foreign Assets Control ("OFAC"), an office within the U.S. Department of the Treasury that administers sanctions against terrorists.[2] Jalaluddin Haqqani, the founder of the Haqqani

---

[1] Providing material support to a designated FTO is a federal felony. It is also a predicate for civil liability under the ATA.

[2] An SDGT designation is issued pursuant to Executive Order 13224, which was issued in response to the September 11, 2001 attacks. It is reserved for individuals and organizations that OFAC finds have committed or pose a risk of committing acts of terrorism, or who provide support or otherwise associate with terrorists and terrorist organizations. An SDGT designation results in a freeze of the designee's assets in the United States and prohibits U.S. persons from dealing with the designee.

Network, published a magazine listing on its front page an account number at HBL so that donors could send money to the group. Al Rashid Trust, which was a major front for al-Qaeda, openly solicited donations to its accounts at HBL. Al-Rehmat Trust, a front for JeM, likewise used an account at HBL. HBL also facilitated money laundering for Dawood Ibrahim, an SDGT with ties to al-Qaeda and LeT, as well as his criminal enterprise, known as D-Company, which engages in drug trafficking, terrorism, and other crimes. And Osama bin Laden had an account at HBL, too.

5.    These are but a few examples. In fact, HBL structured its business to be welcoming to terrorists. Most strikingly, HBL maintained a "good guy" list, which was a list of account holders whose transactions could be processed with little or no scrutiny. For a customer to make it onto this list, HBL had to affirmatively determine that the customer's transactions posed a very low risk of illicit activity. But on that list were at least 154 entries corresponding to identical entries on OFAC's Specially Designated Nationals and Blocked Persons ("SDN") list. SDNs are people and companies whose assets are blocked, and who U.S. persons are generally prohibited to deal with because of their links to terrorism or crime. The vast majority of SDNs based in Pakistan are blocked for terrorism-related reasons. In other words, they are people and entities that the United States government regards as the *bad guys*—yet HBL went out of its way to clear the path

3

for their transactions. HBL's improper use of its "good guy" list resulted in over $250 million of transactions being cleared through HBL's New York branch office without any meaningful scrutiny.

6.     Even when HBL did not forgo screening altogether, it implemented practices that made it easy for terrorists to move money. For example, HBL permitted customers to make wire transfers with incomplete SWIFT messages that omitted key information about either the sender or the beneficiary of the transaction, effectively allowing money to move around in the dark. In some cases, HBL engaged in "wire stripping," removing such information at a customer's request to conceal the source or destination of the funds.

7.     HBL is also the unofficial bank of the Pakistani Inter-Services Intelligence ("ISI"), a rogue intelligence agency that uses the bank to funnel money to terrorist groups in violation of Pakistani law and policy. Among others, the ISI supports LeT and the Taliban (including the Haqqani Network) because it perceives these terrorists as a counterweight to Indian and American influence in the region. Thus, the ISI has provided direct support to terrorists, including resources for attacks that killed Americans. HBL assists those efforts by providing financial services and facilitating funds transfers to the ISI's favored terrorist groups.

8.      HBL's shocking misconduct is a matter of public record. Starting in 2006, U.S. banking regulators, including the New York Department of Financial Services ("NYDFS") and the Federal Reserve, determined that HBL presented significant risks in connection with customer due diligence and internal controls. HBL promised to implement better procedures—but broke that promise and failed to do so. Consequently, in 2015, the regulators entered a consent order with HBL requiring it to take additional actions. But again, HBL did not comply. Thus, in 2017, NYDFS filed charges against HBL, specifically describing how HBL facilitated terror financing. In response, HBL agreed to pay $225 million, surrender its license to operate in New York, and close its New York branch.

9.      While not all of HBL's misconduct relates directly to the terrorist organizations that committed the attacks at issue in this case (because HBL also went out of its way to help other terrorists and criminals), a substantial portion of it does. It is apparent that HBL was a bank of choice for sophisticated terrorists in the region, and the members of the al-Qaeda Terror Syndicate fit that description precisely. Given the documented instances of HBL opening accounts for senior terrorists in al-Qaeda, LeT, JeM, and the Haqqani Network, it is a certainty that HBL provided significant resources and support to the terrorist organizations that injured Plaintiffs, before and while those injuries were occurring.

10.     HBL's repeated and flagrant misconduct supports the allegation that the bank funded terrorism either knowingly or with deliberate indifference to the consequences of its actions. By the numbers, HBL decided to treat more than 150 bad guys as "good guys." It cleared thousands upon thousands of suspect transactions, either by exempting them from scrutiny altogether or dismissing red flags that arose in connection with those transactions. Those transactions were for millions of dollars (at least). And it did all of this in violation of U.S. banking and terrorism laws, Pakistani banking and terrorism laws, and United Nations requirements. Indeed, HBL flagrantly violated the law even while U.S. regulators were watching the bank closely. And it did so even though its own policies require it to know its customers and perform close diligence on risky customers.

11.     By knowingly providing funds and financial services to terrorist organizations that authorized, planned, or committed the attacks in this case, HBL violated the ATA's primary and secondary liability provisions. Congress sought to combat terrorism by creating civil liability for anybody who provides—directly or indirectly—material support to violent terrorists and terrorist organizations that kill Americans. The legislature was especially concerned with stopping the flow of funds to terror groups, which need financial conduits and infrastructure to carry out violent attacks. HBL violated the law by knowingly supplying these very conduits

and infrastructure. Accordingly, HBL is liable to the victims of the attacks and their families.

## THE PARTIES

12.     Plaintiffs are 127 individuals, comprising American nationals injured and the family members of American nationals killed in attacks planned, authorized, and/or committed by FTO members of the al-Qaeda Terror Syndicate in Afghanistan. Plaintiffs were injured, or their loved ones killed, in a number of terrorist attacks detailed in Part III, *infra*. The Plaintiffs are listed in Part IV, *infra*.

13.     Defendant is Habib Bank Limited, headquartered in Karachi, Pakistan. At all times relevant to the events in this case, and at least until March 2020, HBL had a branch in New York City.

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, 18 U.S.C. § 2333(a) and (d), and 18 U.S.C. § 2338, as a civil action brought by nationals of the United States who have been injured by reason of acts of international terrorism, and/or their estates, survivors, or heirs.

15.     Venue is proper pursuant to 28 U.S.C. § 1391.

16.     HBL is subject to personal jurisdiction pursuant to 18 U.S.C. § 2334(a), N.Y. C.P.L.R. § 302, and Fed. R. Civ. P. 4(k). That is because, as explained *infra* ¶¶ 258-288, HBL purposefully availed itself of U.S. jurisdiction to

commit its tortious acts, and its conduct had a substantial nexus to the United States, including significant activities at HBL's New York Branch.

17.    Moreover, HBL entered the United States voluntarily, maintained a branch here for decades, and has claimed the benefit of U.S. law by initiating litigation in New York State. Thus, HBL should be charged with knowledge of United States law, including the Congressional finding, incorporated in Section 2(a)(6) of JASTA, that companies that "contribute material support or resources, directly or indirectly, to persons or organizations that pose a significant risk of committing acts of terrorism" should "reasonably anticipate being brought to court in the United States to answer for such activities."

18.    Jurisdiction in this venue is also appropriate because jurisdiction exists as to HBL's terrorist customers discussed herein, who purposefully directed their conduct at the United States by targeting Americans and American foreign policy. HBL conspired with these customers to facilitate the maintenance of accounts and transfers of funds that supported these terrorist attacks. *See infra* ¶¶ 289-292, 654-660.

## FACTUAL ALLEGATIONS

19.    The allegations in this Complaint are based on information and belief after consulting authoritative sources about the events described herein, including

mainstream news publications, reports by knowledgeable experts, government sources, and confidential informants.

20.     The ensuing Parts describe (1) the terrorist organizations in the al-Qaeda Terror Syndicate that perpetrated the attacks that injured Plaintiffs and/or killed their family members; (2) HBL's knowing provision of material support to these organizations; (3) the ensuing terrorist attacks; and (4) the Plaintiffs.

## I.     The al-Qaeda Terror Syndicate

21.     Since the U.S.-led overthrow of the Taliban-controlled government in Afghanistan in 2001, terrorists have repeatedly attacked American service members and civilians there. While the terrorist groups in question have different names and distinct identities, they have also shared resources, personnel, and operational plans. Given such coordination, the consensus view of the U.S. government at the time was that America was threatened by the resulting terrorist superstructure a "syndicate," composed of al-Qaeda, the Taliban, LeT, and other allied terrorist groups.[3]

---

[3] Bruce Riedel, *Deadly Embrace: Pakistan, America, and the Future of the Global Jihad* 1 (2011).

22.     Indeed, the existence of a terrorist syndicate was contemplated by Osama bin Laden himself, who conceived of al-Qaeda as the leader of a broad coalition of terrorists across Pakistan and Afghanistan.[4]

23.     The al-Qaeda Terror Syndicate used indiscriminate violence against American service members and civilians alike to achieve political ends. The Syndicate's primary goal was to affect U.S. foreign policy and expel coalition personnel from Afghanistan. Syndicate members also used violence and intimidation to further their longstanding domestic political agenda of imposing a severe form of Islamic law throughout Pakistan and Afghanistan.

24.     None of the members of the al-Qaeda Terror Syndicate adhered to the Geneva Conventions or the law of war. They refused to wear uniforms or otherwise distinguish themselves from civilians; they intentionally slaughtered civilians; and they used indiscriminate weapons.

### A. Al-Qaeda

25.     Osama bin Laden formed al-Qaeda in the late 1980s in Afghanistan in response to the Soviet occupation of Afghanistan. For decades, al-Qaeda has been a Sunni Islamic terrorist organization intent on destroying the United States.

---

[4] *See* Bill Roggio & Thomas Joscelyn, *The al Qaeda – Taliban Connection*, Wash. Exam'r (July 4, 2011).

26.     Following the Soviet withdrawal from Afghanistan, Osama bin Laden began to transform al-Qaeda into a global terrorist group with the capability of launching attacks around the world.

27.     Bin Laden declared war on the United States in a published fatwa (religious decree) in 1996.[5] In 1998, he declared a global jihad calling on all Muslims to kill Americans at any opportunity.[6]

28.     On August 7, 1998, al-Qaeda suicide bombers in explosives-laden trucks attacked the U.S. embassies in Kenya and Tanzania, killing more than 200 people and wounding more than 5,000 others.

29.     As a result of these and other terrorist attacks, the U.S. State Department designated al-Qaeda as an FTO on October 8, 1999.[7] It remains designated as such to this day.

---

[5] Anne Stenersen, *Al-Qaida in Afghanistan* 62-63 (2017); Counter Extremism Project, *Osama bin Laden* (last visited June 4, 2020), https://www.counterextremism.com/extremists/osama-bin-laden; National Commission on Terrorist Attacks Upon the United States, *The 9/11 Commission Report*, at 48 (2004) (hereinafter "*9/11 Commission Report*").

[6] *9/11 Commission Report* at 47; Stenersen, *Al-Qaida in Afghanistan*, *supra* note 5, at 71.

[7] U.S. Dep't of State, *Foreign Terrorist Organization, Designations by the Secretary of State*, (Oct. 8, 1999), https://2001-2009.state.gov/s/ct/rls/rpt/fto/2682.htm.

30.     On September 11, 2001, al-Qaeda attacked the World Trade Center in New York and the Pentagon, killing thousands.[8] A third attack, possibly aimed at the White House, was thwarted by passengers aboard United Flight 93.[9]

31.     The United States demanded that the Taliban turn over bin Laden, and the Taliban refused. A U.S.-led coalition invaded Afghanistan in October, and bin Laden and Taliban leaders eventually fled to Pakistan.[10] Thereafter, bin Laden and his Syndicate allies reconstituted their efforts to one of a joint jihad against Americans in support of the Taliban's efforts in Afghanistan.

**B. Taliban and the Haqqani Network**

32.     The Taliban is a Sunni Islamic terrorist organization composed originally of former mujahideen fighters who had expelled the Soviet Union from Afghanistan. In July 2002, President George W. Bush amended Executive Order 13224 to designate the Taliban and its leader Mohammed Omar as Specially Designated Global Terrorists.[11] In doing so, President Bush terminated President Clinton's Executive Order 13129, which had observed that the Taliban had "de facto control over the territory of Afghanistan,"[12] finding instead that the situation

---

[8] *9/11 Commission Report* at 285-311.

[9] *Id.* at 10-14.

[10] *Id.* at 332-334; Stenersen, *Al-Qaida in Afghanistan*, *supra* note 5, at 177.

[11] *See* Exec. Order No. 13,268, 67 Fed. Reg. 44,751 (July 3, 2002).

[12] Exec. Order No. 13,129, 64 Fed. Reg. 36,759, 36,760 (July 7, 1999).

12

"has been significantly altered given the success of the military campaign in Afghanistan."[13] President Bush found that the Taliban's designation was necessary to guard against "grave acts of terrorism and threats of terrorism committed by foreign terrorists."[14]

33.      Even before that designation, which followed the September 11 attacks and the beginning of Operation Enduring Freedom, the U.S. government considered the Taliban a terrorist group and never recognized it as the government of Afghanistan. Pakistan, Saudi Arabia, and the United Arab Emirates alone recognized the Taliban as the government following its capture of Kabul in 1996; no other country followed suit.

34.      Following its capture of Kabul, the Taliban continued to focus on terrorism and imposing strict Sharia law, rather than rebuilding the country. As the Assistant Secretary of State for South Asian Affairs Christina Rocca testified, the Taliban demonstrated "no desire to provide even the most rudimentary health, education, or other social services expected of any government. Instead, they have

---

[13] Exec. Order No. 13,268, 67 Fed. Reg. 44,751 (July 3, 2002).

[14] *Id.*

13

chosen to devote their resources to waging war on the Afghan people, and exporting instability to their neighbors."[15]

35.     After 1996, the government of President Rabbani retained Afghanistan's seat at the United Nations, despite repeated attempts by the Taliban to gain U.N. recognition. The United States opposed the Taliban's attempts to gain recognition from the United Nations.

36.     Within weeks of the September 11 attacks, the United Arab Emirates and Saudi Arabia severed diplomatic relations with the Taliban. Shortly thereafter, the U.S. military launched Operation Enduring Freedom and quickly expelled the Taliban from much of Afghanistan. By November 2001, Pakistan withdrew its diplomatic recognition of the Taliban, leaving the Taliban with no international recognition.

37.     Around the same time, in November 2001, the United Nations met in Bonn, Germany to discuss the future of Afghanistan. The Bonn Conference included delegates from multiple Afghan groups, but not the Taliban. The delegates agreed to an interim government led by Hamid Karzai and called for international peacekeepers to provide security.

---

[15] *Afghanistan's Humanitarian Crisis: Is Enough Aid Reaching Afghanistan?*: Hr'g Before S. Comm. On Foreign Relations, Subcomm. On Near East & South Asian Affairs, S. Hr'g 107-235, at 18 (Oct. 10, 2001) (statement of Christina Rocca, Asst. Sec'y, South Asia, Dep't of State).

38.     The United States recognized the interim government in Afghanistan on December 22, 2001. It re-opened the American Embassy in Kabul on January 17, 2002.

39.     Hamid Karzai was elected President of the Afghan Transitional Administration in June 2002 by the *loya jirga*, a traditional Afghan assembly of tribal leaders, which did not include any members of the Taliban. President Karzai addressed the U.N. General Assembly as the President of Afghanistan in September 2002. In December 2002, the U.N. Security Council recognized "the Transitional Administration as the sole legitimate Government of Afghanistan, pending democratic elections in 2004" and reaffirmed its "commitment to assist the Transitional Administration in its efforts to ensure security, prosperity, tolerance and respect for human rights for all people of Afghanistan, and to combat terrorism, extremism and narco-trafficking."[16]

40.     In May 2003, the United States declared an end to major combat operations in Afghanistan, with Secretary of Defense Donald Rumsfeld marking the beginning of "a period of stability and stabilization and reconstruction activities."[17] NATO assumed command of the ISAF in August, and in October the

---

[16] U.N. Security Council Resolution 1453 (Dec. 24, 2002).

[17] *Rumsfeld: Major Combat Over in Afghanistan*, CNN (May 1, 2003).

U.N. Security Council expanded the ISAF's mandate to allow it "to support the

Afghan Transitional Authority and its successors in the maintenance of security."[18]

41.   A special constitutional *loya jirga* approved a new Constitution for the

new Islamic Republic of Afghanistan on January 4, 2004. The Taliban did not

participate. Under the new Constitution, in October 2004, the Afghan people

elected President Karzai to a five-year term as president. The Taliban threatened to

disrupt that election by attacking polling places.

42.   The U.S. military and ISAF continued to operate in Afghanistan at the

invitation of the Afghan government. On May 23, 2005, President Bush and

President Karzai issued a Joint Declaration of the United States-Afghanistan

Strategic Partnership in order to strengthen "Afghanistan's long-term security,

democracy and prosperity," which provided for continued U.S. military operations

in Afghanistan. [19] In September 2005, the Minister for Foreign Affairs of

Afghanistan told the United Nations that Afghanistan "welcome[d] the prospect of

ISAF continuing to operate in Afghanistan until our Security Forces are fully able

---

[18] U.N. Security Council Resolution 1510, ¶ 1 (Oct. 13, 2003).

[19] Joint Declaration of the United States-Afghanistan Strategic Partnership, 1 Pub. Papers 853 (May 23, 2005).

to provide security to our nation."[20] The U.N. Security Council reauthorized the ISAF later that month.[21]

43.     On December 26, 2007, Congress enacted a law declaring that, for purposes of "section 212(a)(3)(B) of the Immigration and Nationality Act, . . . the Taliban shall be considered to be a terrorist organization."[22] As a State Department official explained, the U.S. government treats the Taliban "as a Foreign Terrorist Organization for immigration purposes."[23]

44.     At all relevant times, the U.S. government viewed the Taliban as a terrorist group, not as the legitimate armed force of any nation.

45.     Although the Taliban had local chapters throughout Afghanistan, it operated as a top-down hierarchy through which the Quetta Shura (the seat of Taliban political power) and the Peshawar Shura (the seat of its so-called "military" power) exerted command and control over rank-and-file Taliban fighters. The degree of control exerted by Taliban leadership is also evident in the

---

[20] Letter from Secretary-General to the President of the Security Council, U.N. Doc. S/2005/574, at 2 (Sept. 12, 2005).

[21] U.N. Security Council Resolution 1623 (Sep. 13, 2005)

[22] Consolidated Appropriations Act of 2007, § 691(d), Pub. L. No. 110-161, 121 Stat. 1844, 2365.

[23] U.S. Dep't of State, *Senior Administration Officials on the Terrorist Designation of the Haqqani Network* (Sept. 7, 2012).

results of the February 2020 U.S.-Taliban agreement.[24] Since that agreement,

entered into by Taliban leadership, Taliban rank-and-file fighters throughout the

country have complied with leadership's directive to desist from all large-scale

attacks on U.S. forces.

46.     The Taliban's principal goal has long been to expel Americans from

the country and undermine the democratically elected government of Afghanistan.

To that end, the Taliban began ramping up attacks on U.S. forces during the mid-

2000s. The Taliban also began to use new attack types during this timeframe,

including suicide bombings. For example, the Taliban committed six suicide

bombings in Afghanistan in 2004, and 141 in 2006. Remotely detonated bombings

also more than doubled between 2005 and 2006.

47.     In 2008 and 2009, the growing Taliban-led insurgency attacked U.S.

forces throughout Afghanistan, with a particular emphasis on the southern

provinces, especially Helmand and Kandahar. In 2009, responding to the Taliban's

growing threat, U.S. Marines launched counterinsurgency operations focused on

"restoring government services, bolstering local police forces, and protecting

civilians from Taliban incursion."[25] The Taliban, in turn, responded with escalating

---

[24] Agreement For Bringing Peace To Afghanistan Between The Islamic Emirate Of Afghanistan which is not recognized by the United States as a state and is known as the Taliban and the United States of America (Feb. 29, 2020).

[25] Council on Foreign Relations, *Timeline: The U.S. War in Afghanistan: 1999 – 2020.*

violence. By 2010, the Taliban's power and influence was growing, and it had regained much of the territory it had lost after September 11.

48.     The Taliban often attacked American military forces, contractors, and Afghan forces. But it also targeted civilian aid workers and non-governmental organizations. In recent years, the Taliban has increased attacks on civilians by placing explosives in public locations and using suicide bombers. It routinely used improvised explosive devices that included passive detonation devices that would be triggered by any nearby movement (including by civilians). It has also used civilians to attract Coalition forces before detonating a bomb, frequently killing more civilians than Coalition forces. In doing so, the Taliban would have violated the laws of war if it was subject to them, and did not comply with the Geneva Conventions. It neither wore uniforms nor otherwise distinguished its fighters from civilians. It conscripted children into committing attacks. The Taliban also regularly targeted teachers, children, doctors, and clerics. And it engaged in widespread kidnapping and torture in an effort to intimidate its enemies.

49.     In addition, the Taliban summarily executed Afghan civilians without a trial if they were suspected of aiding the Coalition. According to a Taliban *fatwa* (an authoritative religious decree), "[d]uring the attack by America, if any Muslim—regardless of whether they are Afghan or non-Afghan—cooperates with

19

the infidels, or if he helps and spies for them, then that person will be just like the

foreign invaders and killing him becomes mandatory."[26]

50.    The Taliban carried out the terrorist attacks that killed or injured the

Plaintiffs in this case. To effectuate those attacks, it employed a number of

different terrorist tactics. Most prominently, the Taliban relied heavily on IEDs,

including Explosively Formed Penetrators ("EFPs"), designed to destroy American

armored vehicles and inflict heavy casualties. Many Plaintiffs, or their family

members, were killed or injured by a Taliban-planted IED or EFP, including Staff

Sergeants Thomas Fogarty and Mecolus C. McDaniel, and Specialists Brittany

Gordon and Ryan P. Jayne. *See infra* ¶¶ 410, 423, 452, 480.

51.    The Taliban also has attacked U.S. forces and U.S. government

contractors using suicide bombers with increased frequency. Many Plaintiffs, or

their family members, were killed or injured in Taliban suicide-bomber attacks,

including Charles Adkins and Carey Greggory DuVal. *See infra* ¶¶ 351, 402.

52.    The Taliban (often through the Haqqani Network), also employed

insider attacks carried out by members of the Afghan Army. According to an

August 2012 statement by Mullah Omar, Taliban terrorists "cleverly infiltrated in

---

[26] Alex Strick Van Linschoten & Felix Kuehn, *Resolution and Fatwa of a Big Gathering of Clerics* in The Taliban Reader: War, Islam and Politics (2018).

the ranks of the enemy according to the plan given to them last year."[27] He similarly encouraged Afghan officers to "defect and join the Taliban."[28] These attacks took place in all areas of Afghanistan, and the Taliban regularly claimed responsibility for them.[29] Many Plaintiffs in this case, or their family members, were killed or injured in Taliban-insider attacks, including Jeffrey Ausborn, Tara Brown, and Liam Nevins. *See infra* ¶¶ 357, 375, 480.

53.     The Haqqani Network is a Sunni Islamic terrorist organization that has been operating in Afghanistan since the 1970s. It was founded by Jalaluddin Haqqani and is now led by his son, Sirajuddin Haqqani. The Haqqani Network is part of the Taliban and is closely allied and interdependent with al-Qaeda.

54.     On September 19, 2012, the U.S. State Department designated the Haqqani Network as an FTO.[30]

55.     The United States previously designated multiple Haqqani leaders as SDGTs. On February 29, 2008, the U.S. State Department designated Sirajuddin Haqqani for "acts of terrorism that threaten the security of U.S. nationals or the

---

[27] Bill Roggio, *Mullah Omar Addresses Green-on-Blue Attacks*, Long War J. (Aug. 20, 2012).

[28] *Id.*

[29] *See* Bill Roggio, *2 More ISAF Troops Wounded In Latest Green-On-Blue Attack*, Long War J. (Aug. 13, 2012).

[30] U.S. Dep't of State, *Country Reports on Terrorism 2017*, at 294 (Sept. 2018).

national security, foreign policy, or economy of the United States."[31] In 2010 and

2011, the U.S. Treasury Department designated three other members of the

Haqqani family—Nasiruddin, Khalil Al-Rahman, and Badruddin—as fundraisers

and commanders of the Haqqani Network. By February 2014, the U.S. State

Department and the U.S. Treasury Department had designated fourteen leaders in

the Haqqani Network under Executive Order 13224.

56.     The Haqqani Network began supplying weapons to the Taliban in the

mid-1990s, when the Taliban was in its infancy. It has operated as part of the

Taliban since approximately 1995, when its founder Jalaluddin Haqqani swore

allegiance to the Taliban. Jalaluddin Haqqani was the Minister of Tribal Affairs for

the Taliban until the U.S. invasion.

57.     The Haqqani Network was especially active in the southeastern parts

of Afghanistan, particularly in the Paktia, Paktika, and Khost ("P2K") Provinces. It

also developed a significant presence in the surrounding Provinces of Kabul,

Logar, Wardak, Ghazni, and Zabul. Because of the Haqqani Network's

longstanding tribal connections to the southeastern region of Afghanistan, the

Taliban often acts through the Haqqani Network in those areas. Sirajuddin Haqqani

---

[31] Public Notice, *In the Matter of the Designation of Sirajuddin Haqqani, aka Sirajuddin Haqani, aka Siraj Haqqani, aka Siraj Haqani, aka Saraj Haqqani, aka Saraj Haqani, as a Specially Designated Global Terrorist Pursuant to Section 1(b) of Executive Order 13224, as Amended*, 73 Fed. Reg. 12,499 (Mar. 7, 2008).

explained in 2010 that the Haqqani Network is "assigned by the Islamic Emirate in the southeastern front of Afghanistan (Paktia, Khost, Paktika) and we have mujahideen members who are carrying out jihad in the north (provinces in northern Afghanistan) and in the south (provinces in southern Afghanistan), and they are operating under the Amirs of the provinces they are under."[32]

58.    The Taliban's terrorist commanders and shadow governors in the P2K area are often members of the Haqqani Network. As the U.S. State Department explained when it announced the designation of Mullah Sangeen Zadran as a Specially Designated Global Terrorist, Sangeen Zadran served as the "Shadow Governor for Paktika province, Afghanistan and a commander of the Haqqani Network, a Taliban-affiliated group."[33] Similarly, Abdul Aziz Abbasin is a "key commander in the Haqqani Network" who simultaneously functions as the broader Taliban organization's shadow governor for the Orgun District in Paktika Province.[34]

59.    The Haqqani's influence is not limited to the southeastern provinces. There is also significant overlap between the broader leadership of the Taliban and

---

[32] Bill Roggio, *Taliban Cooperation With al Qaeda 'Is At The Highest Limits' – Siraj Haqqani*, Long War J. (Apr. 15, 2010).

[33] Press Release, U.S. Dep't of State, *Designation of Haqqani Network Commander Sangeen Zadran* (Aug. 16, 2011).

[34] Bill Roggio, *US Adds 5 al Qaeda, Taliban, Haqqani Network, And IMU Facilitators To Terrorist List*, Long War J. (Sept. 29, 2011).

the Haqqani Network. Sirajuddin Haqqani (Jalaluddin's son and successor) has been a member of the Taliban's governing council since at least 2010. Since 2015, he has been the Deputy Emir of the Taliban, which is the second in command in the Taliban's leadership.

60.     In particular, the Haqqani Network has overseen the Taliban's terrorist attacks on U.S. and Coalition forces in Afghanistan. After September 11, Jalaluddin Haqqani effectively served as the Taliban's secretary of terrorism and planned many of the Taliban's attacks on U.S. forces in the early days following the overthrow of the Taliban government. In October 2001, a purported Jihadist publication (as published online) described Jalaluddin as the "chief of the Taliban army."[35] Indeed, in an interview with Sirajuddin published by Gulf News UAE, the interviewer identified Jalaluddin as "the commander-in-chief of the Taliban's southern military command"—akin to the Taliban combat chief—"[and] Mullah Omar's top military strategist and commander."[36] As for his son, Sirajuddin is now Deputy Emir of the Taliban and oversees its terrorist operations throughout the country.

---

[35] Karachi Jasarat, *Chief of Taliban Army Contacts Jamaat-i-Islami Chief* (Oct. 11, 2001).

[36] Aslam Khan, *Taliban Leader Warns of Long Guerilla War*, Gulf News UAE (Oct. 20, 2001).

61.     Similarly, according to Brigadier General Charles H. Cleveland, the chief spokesman for U.S. and NATO forces in Afghanistan, as of 2016 Sirajuddin Haqqani "increasingly runs the day-to-day military operations for the Taliban, and, we believe, is likely involved in appointing shadow governors."[37]

62.     In 2016, *the New York Times* reported that, according to a senior Taliban commander in southern Afghanistan, Sirajuddin Haqqani was in "constant contact" with Taliban field commanders throughout Afghanistan, including outside the Haqqani Network's area of particular influence in the southeast.[38] According to the commander, all field commanders had to contact Sirajuddin Haqqani for permission before launching a terrorist offensive.

63.     The Haqqani Network also influenced Taliban decisions about which types of attacks to employ. The Haqqani Network was the first to use suicide bombings in Afghanistan, an innovation that al-Qaeda taught it. The Haqqani Network also was involved in the rising number of Taliban-insider attacks—which strategically undermined relations between U.S. and Afghan forces. By 2007, Army Lieutenant Colonel Dave Anders, the director of operations for Combined Joint Task Force-82, explained that "Siraj[uddin Haqqani] is the one dictating the

---

[37] Mujib Mashal, *Haqqanis Steering Deadlier Taliban In Afghanistan, Officials Say*, N.Y. Times (May 7, 2016).

[38] *Id.*

new parameters of brutality associated with Taliban senior leadership" employing "[k]idnappings, assassinations, beheading women, indiscriminate killings and suicide bombers."[39]

64.    The Haqqani Network's influence within the broader Taliban organization is not limited to planning and authorizing attacks. Even outside of the Haqqani's traditional stronghold, its members often commit attacks alongside other Taliban terrorists. For example, in early 2009 the Haqqani Network was operating in the southern provinces of Helmand and Kandahar. A spokesman for the Taliban reportedly confirmed that the Haqqani Network was operating in "Kandahar as well as nearby Helmand province to provide training, support—particularly in bomb-making—and to carry out attacks."[40]

65.    In 2013, "[a] combined force in . . . Kandahar . . . arrested a Haqqani network facilitator who managed supply routes from [Kandahar City] to other provinces" and was "also . . . believed to have been instrumental in the acquisition and distribution of lethal aid to Haqqani fighters for attacks against Afghan and coalition forces."[41] And a successful 2017 Taliban attack in Kandahar against the

---

[39] Bill Roggio, *Targeting Taliban Commander Siraj Haqqani*, Long War J. (Oct. 20, 2007).

[40] Murray Brewster, *Fanatical Taliban Wing Moves Into Kandahar*, Star (Feb. 8, 2009).

[41] U.S. Dep't of Defense, *Afghan, Coalition Forces Kill Insurgents in Logar Province* (Feb. 20, 2013).

United Arab Emirates ambassador to Afghanistan was attributed to the Haqqani Network.

66.     Both Sirajuddin and Jalaluddin Haqqani have confirmed that the Haqqani Network operates as part of the Taliban.[42] The Taliban has rejected claims that the Haqqani Network is separate from the Taliban.[43]

67.     The Haqqani Network also has significant links to al-Qaeda, dating back to the 1980s when Osama bin Laden established a training camp for his nascent terrorist group in Haqqani-controlled territory. After September 11, the Haqqanis provided sanctuary to bin Laden after he fled Afghanistan; Jalaluddin Haqqani himself announced that the Taliban would "retreat to the mountains and begin a long guerrilla war to reclaim our pure land from infidels" and stated that "Osama bin Laden . . . [is] safe and sound and carrying out [his] duties."[44]

68.     The Haqqani Network's close relationship with other terrorist groups has helped to develop the modern terrorist syndicate operating in Afghanistan. In furtherance of that goal, the Haqqani Network provides protection to al-Qaeda so that it can launch attacks in Afghanistan and plan acts of international terrorism

---

[42] *See* Bill Roggio, *US Military Searches For Kabul Attack Network Members*, Long War J. (Apr. 27, 2016).

[43] *See* Bill Roggio, *Taliban Call Haqqani Network A 'Conjured Entity'*, Long War J. (Sept. 9, 2012).

[44] Aslam Khan, *Taliban Leader Warns Of Long Guerilla War*, Gulf News UAE (Oct. 21, 2001).

abroad. Senior Haqqani Network officials also have publicly indicated that the

Haqqani Network and al-Qaeda are one.[45] And in July 2008, Jalaluddin Haqqani's

son—18 year old Muhamman Omar Haqqani—was killed alongside a top al-Qaeda

commander in southeast Afghanistan. The Haqqani Network also maintains

training camps and safe houses that have been used by al-Qaeda and Taliban

operatives.

69.    More recently, Sirajuddin Haqqani has welcomed al-Qaeda members

to join and fight with the Haqqani Network and the rest of the Taliban.[46] According

to U.S. intelligence officers, Sirajuddin Haqqani acts as a member of al-Qaeda's

military council.[47] U.S. officials have described him as al-Qaeda's top facilitator in

Afghanistan.[48] And when the U.S. Treasury Department designated Sirajuddin

Haqqani's uncle Khalil Al-Rahman Haqqani as an SDGT, it noted that he "has also

acted on behalf of al-Qa'ida and has been linked to al-Qa'ida military

---

[45] *See* Bill Roggio, *An Interview With Mullah Sangeen*, Long War J. (Sept. 17, 2009).

[46] Roggio, *Taliban Cooperation*, *supra* note 32.

[47] *Id*.

[48] Hindustan Times, *Al Qaeda Very Active In Afghanistan, Preparing for Attacks* (Apr. 14, 2016) ("The Taliban's current deputy commander, Siraj Haqqani, is head of the Haqqani Network and al Qaeda's top facilitator in Afghanistan, according to US officials.").

operations."[49] The U.S. Treasury Department likewise has repeatedly recognized links between Haqqani Network leaders and al-Qaeda.[50]

70.    The Haqqani Network is often considered the most radical part of the Taliban. Like the Taliban, it relies on terrorist attacks—including suicide bombings, IED and EFP attacks, insider attacks, and complex attacks—rather than open combat.[51] The Haqqani Network routinely would violate the laws of war if it were subject to them, and it does not comply with the Geneva Conventions.

71.    Many Plaintiffs, or their family members, were killed or injured in attacks by the Haqqani Network. For example, the Haqqani Network conducted the Taliban's terrorist attacks that killed Christopher Campbell, John Douangdara, and Bryan J. Nichols. *See infra* ¶¶ 388, 395, 484.

72.    HBL has longstanding ties to the Haqqani Network. For example, going as far back as the 1990s, Jalaluddin Haqqani advertised an HBL account as a destination for donations to the organization in his magazine.[52]

---

[49] Press Release, U.S. Dep't of Treasury, *Treasury Targets the Financial and Support Networks of Al Qa'ida and the Taliban, Haqqani Network Leadership* (Feb. 9, 2011).

[50] *See*, *e.g.*, Press Release, U.S. Dep't of Treasury, *Treasury Department Targets Key Haqqani Network Leaders* (Feb. 5, 2014).

[51] Bill Roggio, *Haqqani Network Promotes Suicide, IED Attacks, and Ambushes In 'Caravan of Heroes'*, Long War J. (Apr. 10, 2015).

[52] Gretchen Peters, *Haqqani Network Financing: The Evolution of an Industry*, Combating Terrorism Center at West Point, at 16 (2012), https://ctc.usma.edu/wp-content/uploads/2012/07/CTC_Haqqani_Network_Financing-Report__Final.pdf.

## C. Lashkar-e-Taiba

73.    "The staying power of al-Qaeda became rooted in its ability to draw from and coordinate with allied groups embedded in multiple networks on both sides of the border. Its key affiliates include the Afghan and Pakistani Taliban, the Haqqani Network, and Lashkar-e-Taiba."[53]

74.    Lashkar-e-Taiba, also known as LeT or LT, means "Army of the Pure," and was founded in Pakistan in the early 1990s. Since its inception, the group has been engaged in terrorist activities, causing the United States to designate it as an FTO on December 26, 2001—and to subsequently renew that designation and to expand it to include LeT's aliases and affiliates.

75.    At all relevant times, LeT has been known to be a terrorist group that targeted Americans in Afghanistan for attack. As one terrorism scholar observed, "[w]hen viewed from the perspective of the United States, it is safe to say that LeT has long undermined U.S. interests in the global war on terror" and "threaten[ed] U.S. soldiers and civilians in Afghanistan."[54]

---

[53] Lauren McNally & Marvin G. Weinbaum, *A Resilient al-Qaeda in Afghanistan and Pakistan*, MEI Policy Focus 2016-18, at 4 (Aug. 2016).

[54] Ashley J. Tellis, *The Menace That Is Lashkar-e-Taiba*, Carnegie Endowment for International Peace Policy Outlook (2012).

76.    At all relevant times, LeT has been led by Hafiz Saeed, "a very public figure in Pakistan" who was known for "advocat[ing] a truly extreme vision" as the "head of one of the world's most dangerous terrorist organizations."[55]

77.    Saeed was well known in Pakistan for his specific affiliation with al-Qaeda founders Abdullah Azzam and Osama bin Laden. As a former senior U.S. official explained:

> Saeed and Azzam were close partners with Osama bin Laden in the 1980s. Azzam was the intellectual guru who created the modern Islamic extremist movement. One former head of the Mossad, Israel's top intelligence service, told me that Azzam should properly be seen as the "father of the global jihad." Saeed stayed in close contact with bin Laden until his death a year ago, according [to] the material found in the al Qaeda leader's hideout in Abbottabad, Pakistan. Saeed openly mourned bin Laden in a bitter eulogy the Friday after the SEALs delivered justice to bin Laden.[56]

78.    "Over the last two and a half decades, [al-Qaeda's core] has maintained close working relationships" with LeT, which is "hardly surprising, since some of al-Qaeda's top lieutenants have long used South Asia as an operational hub."[57] "Al-Qaeda ties with LeT go back to the anti-Soviet war. One of LeT's founders, Abdul Rehman Sareehi, had close ties with both Abdullah Azzam

---

[55] Bruce Riedel, *Hafiz Saeed, Pakistani Extremist with a $10 Million Price on his Head, is al Qaeda's Ally*, Brookings (Apr. 3, 2012).

[56] *Id*. at 2.

[57] The Soufan Center, *Al-Qaeda in the Indian Subcontinent: The Nucleus of Jihad in South Asia*, at 12 (2019).

and Osama bin Laden," and LeT therefore has a long history of providing "material and logistical support to individual al-Qaeda members."[58]

79.     As an example of LeT's closeness with al-Qaeda, when the Clinton Administration fired a Tomahawk missile salvo to destroy al-Qaeda camps in Afghanistan in 1998 in an attempt to kill Osama bin Laden in response to the African embassy bombings, our attack missed bin Laden but did "kill many LeT operatives and trainers who had been bivouacked in these facilities."[59]

80.     Throughout this time, LeT was also a beneficiary of the Pakistani Inter-Services Intelligence ("ISI"), which uses the group to counter Indian and, after 9/11, American, interests in the region.

81.     Consistent with its close ties to the ISI, in its early days, LeT focused on the regions of Jammu and Kashmir, and directed its terrorist activity principally at India. For example, on December 13, 2001, LeT joined an attack on India's Parliament building, killing nine innocents and injuring at least twenty-two others. This attack brought India and Pakistan to the brink of war.

82.     "LeT began contributing to al-Qaeda's global jihad against the United States and its allies after 9/11."[60] "As al-Qaeda operatives fled Afghanistan in the

---

[58] *Id*. at 14.

[59] Tellis, *Menace*, *supra* note 54.

[60] Stephen Tankel, *Lashkar-e-Taiba: Past Operations and Future Prospects*, New America Foundation, at 1 (2011).

wake of the U.S. counter-attack, LeT's leadership directed its members to provide safe haven in Pakistan for some and to facilitate emigration to the Middle East or other safe destinations for others. The group arranged fake passports, safe houses, guards and fixers, and provided medical support for Arabs wounded during the U.S. invasion."[61]

83.     As the insurgency targeting Americans in Afghanistan "gained strength in 2005-2006, … [LeT] began facilitating access" to Afghanistan for LeT members to fight under al-Qaeda and the Taliban's banner.[62] One terrorism scholar explained LeT's close operational ties with al-Qaeda, the Taliban, and the Haqqani Network as follows:

> [L]ike al-Qaeda, LeT has demonstrated a remarkable ability to forge coalitions with like-minded terrorist groups. These alliances are most clearly on display within South Asia, where, in addition to al-Qaeda, LeT cooperates with other militant groups, such as the Afghan Taliban, in the areas of recruiting, training, tactical planning, financing, and operations. . . . In Pakistan, LeT cooperates actively with the Afghan Taliban . . . and also coordinates operations against Afghanistan with al-Qaeda and the Haqqani Network.[63]

84.     As LeT ramped up its support for jihad targeting Americans in Afghanistan, it continued to target Indians and Westerners for attack in India. Perhaps most infamously, LeT carried out the 2008 Mumbai attacks. Ten LeT

---

[61] *Id*. at 16.

[62] *Id*. at 6.

[63] Tellis, *Menace, supra* note 54.

members carried out a dozen coordinated shooting and bombing attacks lasting four days across Mumbai, killing at least 160 innocents (including 6 Americans). The attacks focused on international hotels, a busy railway station, and a café popular with tourists.

85.     "Approximately one year after Mumbai, U.S. President Barack Obama wrote a letter to his Pakistani counterpart, President Asif Ali Zardari, in which he specifically mentioned LeT as one of the militant groups against which the government should act. A chorus of U.S. diplomats, security officials and military officers reiterated this call for action, pressuring Pakistan publicly as well as privately to move against LeT."[64]

86.     After the Mumbai attacks, LeT decided "to lay low when it came to operations against India." Instead, it grew its presence in the al-Qaeda strongholds of the Nangarhar, Nuristan, Kunar and Laghman ("N2KL") and P2K Provinces, as well as Kabul and the strategically crucial provinces around Kabul in which the Kabul Attack Network committed attacks. "This served a dual purpose: The Afghan front provided a pressure release valve, while the influx of Lashkar-e-Taiba members yielded additional intelligence to the security establishment about the militant state of play across the border. This practice of encouraging the group's participation in Afghanistan continues: enabling it to

---

[64] Tankel, *Lashkar-e-Taiba*, *supra* note 60, at 1.

wage jihad against U.S. and Afghan forces, as well as to launch occasional attacks against Indian interests; and putting its members in a position to gather intelligence on other groups."[65]

87.     Collaboration between LeT and its al-Qaeda, Taliban, and Haqqani Network partners in the Syndicate "was centered on the jihad in Afghanistan" and "included the joint recruitment and infiltration of fighters into Afghanistan; sharing safe houses and resources, including weapons, explosives and information; and joint training and fighting in Afghanistan."[66]

88.     As the U.S. government repeatedly recognized, LeT played a vital role in the al-Qaeda Terror Syndicate throughout the period relevant to this case. Terrorism scholars drew a similar conclusion. For example, in February 2010, one scholar observed that "[t]oday," al-Qaeda and LeT "cooperate on training and recruitment for the Afghan jihad against coalition forces, equipping fighters and infiltrating them across the Durand Line separating Pakistan and Afghanistan."[67] Similarly, in March 2012, another scholar noted that "[w]ith recruitment, fundraising, and operations extending to Afghanistan, Iraq, Central Asia, Europe,

---

[65] Stephen Tankel, *Ten Years After Mumbai, the Group Responsible Is Deadlier than Ever*, War on the Rocks (Nov. 26, 2018), https://warontherocks.com/2018/11/ten-years-after-mumbai-the-group-responsible-is-deadlier-than-ever/.

[66] Tankel, *Lashkar-e-Taiba*, *supra* note 60, at 19.

[67] Stephen Tankel, *The Long Arm of Lashkar-e-Taiba* at 1-2, Washington Institute for Near East Policy, Policy Watch # 1361 (Feb. 17, 2010).

Africa, and Australia, LeT has rapidly become a formidable global threat. Today, LeT has close ties with al-Qaeda in Pakistan and supports the Taliban's military operations."[68]

89.     As a "key affiliate[]" of al-Qaeda,[69] LeT provided critical support to the al-Qaeda-led syndicate by sourcing foreign fighters, including Pakistanis and others from outside Afghanistan, for purposes of the fighters receiving training by al-Qaeda in order to be ultimately deployed in Afghanistan on behalf of the joint al-Qaeda/Taliban (including Haqqani Network) cells operating in the key provinces there. In this way, al-Qaeda leveraged its historical relationship, and religious doctrinal affinity, with LeT to find a partner whom it can trust to find the right terrorist "talent" for purposes of being trained by al-Qaeda to commit attacks in Afghanistan. LeT's "lane" in this Syndicate effort is "Pakistani and foreign talent recruitment" from madrassas and other social networks controlled by LeT operatives and LeT fronts throughout Pakistan.

90.     LeT, and its front organizations, also provide essential logistical support to facilitate the operation of al-Qaeda-run training camps in Waziristan by providing funding, safe houses, travel support, and recruits, for the camps.

---

[68] Tellis, *Menace*, *supra* note 54.

[69] McNally & Weinbaum, *Resilient al-Qaeda*, *supra* note 53, at 4.

91.     An example of LeT's logistical support for the network of al-Qaeda camps in Waziristan occurred in 2005, when several al-Qaeda suspects "traveled to work in JuD relief camps after [an earthquake in Pakistan] before making their way to militant training camps in Waziristan."[70] "This was not the first or the last time that LeT was believed to have acted as a gateway organization to al-Qaeda. It is an article of faith among the American and British security establishments that the group has played this role on numerous occasions."[71]

92.     LeT's direct support of al-Qaeda was an essential component of the latter's fundraising and recruiting efforts in the Afghan-Pakistan region. As two terrorism scholars explained:

> [LeT] has a particularly strong relationship with al-Qaeda, with some reports predicting that LeT could become "the next al-Qaeda." Al-Qaeda has utilized LeT safehouses while in Pakistan, and LeT has proven to be the strongest ideological ally of al-Qaeda in the region. LeT has also been among the groups working with al-Qaeda to carry out operations in Afghanistan. LeT has become known for "technological sophistication, [broad] global recruiting and fundraising network, its close ties to protectors within the Pakistani government, and the fact that it is still a less high-profile target of Western intelligence," all of which afford [LeT] an advantage over nationally-focused groups in the region.[72]

---

[70] Tankel, *Lashkar-e-Taiba*, *supra* note 60, at 1.

[71] *Id.*

[72] McNally & Weinbaum, *Resilient al-Qaeda*, *supra* note 53, at 10-11 (internal citations omitted).

93.     LeT was uniquely well positioned to source terrorist talent for al-Qaeda and its allies because LeT, like the terrorist group Lebanese Hezbollah, built an extensive social welfare infrastructure that served the express purpose of identifying suitable candidates for terrorist indoctrination, as well as generally improving the terrorist group's reputation and capacity for attracting new recruits. LeT's "standing" in certain Pakistani circles thus "heightened its ability to raise money for missionary outreach and to recruit members from other sects, who were promptly converted upon joining. In other words, its militancy and missionary activities reinforced one another."[73]

94.     While LeT helped source thousands of fighters for the joint al-Qaeda/Taliban (including Haqqani Network) cells in Afghanistan, as described above, LeT also played the key role in sourcing nearly all of the suicide bombers who were ultimately trained by al-Qaeda and deployed as suicide attackers on behalf of the joint al-Qaeda/Taliban (including Haqqani Network) cells operating in N2KL, P2K, and the Kabul Attack Network-related Provinces. "[R]ecruitment for suicide bombings conducted by other groups" was a particular "LeT specialty."[74] LeT furnished the large majority of suicide bombers who were

---

[73] Tankel, *Lashkar-e-Taiba*, *supra* note 60, at 5.

[74] Tellis, *Menace*, *supra* note 54.

38

ultimately trained to become al-Qaeda operatives and used in nearly every attack in this case.

95.     With rare exceptions, LeT terrorists do not openly participate in attacks in Afghanistan under LeT's banner. Instead, LeT terrorists were (and remain) embedded alongside the relevant Taliban and al-Qaeda terrorists who committed attacks together as part of joint al-Qaeda/Taliban cells in Afghanistan. This was an operational manifestation of al-Qaeda's syndicate strategy, which facilitated the efficient embedding of LeT terrorists in the terrorist cells that were of greatest importance to the shared al-Qaeda/Taliban enterprise. As terrorism scholar Stephen Tankel explained:

> Lashkar need not take the lead role in order for its training apparatus and transnational networks to be used against the US or its Western allies. Indeed, the current threat to Western interests comes from a conglomeration of actors working in concert. Notably, working as part of a consortium provides cover for [LeT], since shared responsibility makes it easier for Lashkar to conceal its fingerprints. One could imagine a scenario in which would-be Western jihadis looking to fight in Afghanistan linked up with a facilitator connected with Lashkar to access a training camp in territory controlled by the Haqqani Network where al-Qaeda convinced them to launch a terrorist attack in a Western country and Lashkar trainers provided some of the instruction.[75]

96.     LeT terrorists were sometimes dual-hatted, meaning that they were operatives working on behalf of two (or more) jihadist group. James McLintock,

---

[75] Stephen Tankel, *Storming the World Stage: The Story of Lashkar-e-Taiba* 266 (2011).

for example, was a triple-hatted operative of al-Qaeda, LeT, and the Taliban. LeT and al-Qaeda terrorists were often dual-hatted, as LeT was the Pakistani jihadist group that most closely adhered to al -Qaeda's interpretation of Islam.

97.     **Nangarhar, Nuristan, Kunar and Laghman (N2KL) Provinces.**

LeT terrorists forward-deployed terrorists to the N2KL Provinces to provide embedded support to the joint al-Qaeda/Taliban cells in the N2KL Provinces. LeT fighters "turned up in Kunar and Nuristan provinces in Northeastern Afghanistan, where LeT had historical connections."[76] In N2KL, "[a]lthough [LeT] did not have a substantial footprint in terms of manpower, its members were among the most proficient in terms of small-unit tactics, so even a small number of men could have an impact."[77] As one think tank observed in 2011:

> LeT involvement in Afghanistan has picked up since 2006. LeT members apparently trained at camps in Kunar and Nuristan provinces in the 1990s but did not fight alongside the Taliban at that time. In the last four years, however, as the Taliban has regained influence in Afghanistan, the LeT has supported the insurgents by recruiting, training, and housing fighters and facilitating their infiltration into Afghanistan from the tribal areas of Pakistan. LeT fighters were also likely part of the group that attacked a U.S. outpost in Wanat, Afghanistan in 2008 that killed nine U.S. soldiers."[78]

---

[76] Tankel, *Lashkar-e-Taiba*, *supra* note 60, at 18.

[77] *Id*. at 19.

[78] Lisa Curtis, *Pakistan*, The Heritage Foundation (Jan. 26, 2011), https://www.heritage.org/middle-east/commentary/pakistan.

98.    LeT's numbers in Kunar Province were so extensive that the joint al-Qaeda-Taliban cells were ordinarily augmented by LeT terrorists. As a result, every attack in Kunar Province alleged herein was jointly committed by al-Qaeda, the Taliban, and LeT.

99.    **Paktia, Paktika, and Khost (P2K) Provinces.** LeT terrorists forward deployed inside Afghanistan to provide embedded support to the joint al-Qaeda/Haqqani Network cells operating in the P2K Provinces. By 2009 and 2010, "[t]he integration of the group's members with the Taliban and Haqqani Network also accelerated, … [which] enable[ed] LeT fighters to expand their presence to"[79] the P2K Provinces, where LeT operatives embedded in joint al-Qaeda/Haqqani Network cells to commit attacks against Americans.

100.    **Kabul Attack Network-Related Provinces.** LeT terrorists also forward deployed in and around Kabul, including the other provinces of the Kabul Attack Network, to provide embedded support to the joint al-Qaeda/Haqqani Network/Taliban cell that jointly committed Kabul Attack Network attacks.

**D. Jaish-e-Mohammed**

101.    JeM is a Sunni extremist group founded by Masood Azhar with funding and support from Osama bin Laden. The organization is based in Pakistan, and its original goal was to unite Kashmir with Pakistan. In June 2008, however,

---

[79] Tankel, *Lashkar-e-Taiba*, *supra* note 60, at 22.

JeM reportedly began shifting its focus from Kashmir to Afghanistan in order to step up attacks against U.S. and Coalition forces.

102.   JeM has long served as one of the Taliban's Punjabi allies in both Afghanistan and Pakistan.

103.   JeM has openly declared war against the United States, which designated JeM an FTO in 2001.[80]

104.   After the Taliban and al-Qaeda were routed by U.S. forces in the fall of 2001, "the Taliban and al-Qaida . . . receiv[ed] help from . . . Jaishe-Mohammed"[81] in addition to the help the Taliban and al-Qaeda received from LeT and the Haqqani Network.

105.   In June 2008, JeM began shifting its focus from Kashmir to Afghanistan in order to escalate its support for attacks against U.S. and Coalition forces.

106.   JeM has a history of helping al-Qaeda and the Taliban commit spectacular suicide bombing attacks in Afghanistan and Pakistan. For example, U.S. officials suspected that a successful suicide attack in Pakistan that killed a U.S. diplomat in 2006 was probably the work of terrorists associated with

---

[80] National Counterterrorism Center, *Jaish-e-Mohammed (JEM)* (last updated Sept. 2013), https://www.dni.gov/nctc/groups/JEM.html.

[81] Associated Press, *Pockets of Taliban, al-Qaeda Fighters are Said to be Regrouping in Afghanistan*, St. Louis Post Dispatch, 2002 WLNR 1220832 (Mar. 2, 2002).

al-Qaeda, the Taliban, and JeM. And in Afghanistan, JeM "was a close ally" of the Taliban, with JeM's leader, Masood Azhar, being a "frequent visitor of Taliban leader Mullah Mohammed Omar."[82]

107.   JeM also has a history of working jointly with Lashkar-e-Taiba as a force multiplier for al-Qaeda and its Taliban and Haqqani Network allies. For example, JeM provided logistical support for a sophisticated suicide truck bombing attack against the civilians at the Marriott Hotel Pakistan on September 20, 2008, which was committed by al-Qaeda, Haqqani Network, and Lashkar-e-Taiba, resulting in the deaths of dozens and injuries of hundreds. Similarly, "there is evidence to suggest the main suspects [of the 2008 Mumbai attack], Lashkar-e-Toiba and its smaller ally Jaish-e-Mohammed, . . . may have co-ordinated the attack with elements from the Taliban and al-Qa'ida, operating out of Pakistan's tribal territories."[83]

108.   As one analyst put it in late 2008, "[o]ne plausible theory" is that JeM, LeT, al-Qaeda, the Taliban, Haqqanis, and Pakistani Taliban "have forged an alliance that is executing a strategy in the region to defend themselves against a

---

[82] Kathy Gannon, Associated Press, *Islamic militants threatened attacks on Bhutto if she returned to Pakistan*, Canadian Press (Oct. 18, 2007).

[83] Richard Beeston, *Washington crucial as attack exposes terror groups' deadly strategies*, Australian (Dec. 2, 2008).

new US-led strategy" in the Afghanistan/Pakistan theater.[84] Similarly, while

discussing the failed Times Square bombing, the CNN international correspondent

Nic Robertson observed in 2009 that "Jaish-e-Mohammed" had "ties to the Taliban

and al Qaeda" through which JeM, the Taliban and al-Qaeda were engaged in

"cooperation … at quite an effective level at the moment."[85] Indeed, by 2009, it

was "now accepted" by elements of the Pakistani military "that Al Qaeda, the

Taliban and their allies among the Punjabi jihadis operate as a syndicate," and that

such allies "included the Jaish-e-Mohammed."[86]

109.    JeM's participation in the al-Qaeda-led syndicate continued at all

relevant times. For example, one security expert, addressing the state of play of

al-Qaeda's global jihadist ambitions as of July 2012, testified as follows:

> al Qaeda's Senior Leadership is back on their heels. Key leaders have
> met their demise including, of course, Usama Bin Laden …
> Nevertheless, the ideology that Bin Laden and others … have
> propounded lives on. This ideology is the lifeblood that continues to
> sustain the vitality and growth of the global jihadist movement. Make
> no mistake: while the core of al Qaeda may be seriously and
> significantly diminished, … the threat now comes in various sizes,
> shapes and forms. There are still many and varied al Qaeda affiliates
> that continue to thrive, most notably in Yemen and the Sahel, and in
> Somalia. … At the same time, a veritable witch's brew of jihadists
> exists in Pakistan, including for example, the Haqqani network,

---

[84] *Id.*

[85] Highlights of U.S. Broadcast News Coverage of the Middle East from May 8, 2010 (Full Transcripts) Federal News Service Transcripts, 2010 WLNR 27829208 (May 9, 2010).

[86] Nirupama Subramanian, *Pakistan: two questions, multiple realities*, Hindu, 2009 WLNR 23938767 (Nov. 27, 2009).

Lashkar-e-Taiba (LeT), Tehrik-i-Taliban Pakistan …, Harkat-ul-Jihad al-Islami (HuJI), Jaish-e-Mohammed, and the Islamic Movement of Uzbekistan. We have seen in the past and continue to see ***substantial evidence of cooperation and collaboration between these latter groups and al Qaeda***.[87]

110.   Indeed, the U.S. designated JeM as an FTO in substantial part because of the role JeM plays in augmenting the power of al-Qaeda and other al-Qaeda linked terrorists operating in Afghanistan and Pakistan as part of the syndicate. As the terrorist scholar Bill Roggio has explained, "[t]he US government has listed Jaish-e-Mohammed (JeM) as a Foreign Terrorist Organization and its leader, Massod Azhar, as a specially designated global terrorist for their ties to al Qaeda and other jihadist groups."[88]

111.   JeM supported al-Qaeda attacks by acting as an agent and proxy for al-Qaeda. JeM did this by directly seconding its fighters to al-Qaeda, for the latter to jointly deploy with the Taliban in eastern Afghanistan as part of al-Qaeda's Brigade 313. As a Pakistani newspaper editorialized in 2010:

> Brigade 313 is al Qaeda's military organisation in Pakistan, and is made up of Taliban and allied jihadist groups. Members of Lashkar-e-Jhangvi, Harkat-ul-Jihad-al-Islami, Lashkar-e-Taiba,

---

[87] U.S. Senate Committee on Homeland Security & Governmental Affairs, *Hearing: The Future of Homeland Security: Evolving and Emerging Threats* (July 11, 2012) (Prepared Statement of Frank J. Cilluffo, Director, Homeland Security Policy Institute, George Washington Univ.) (emphasis added), https://www.hsgac.senate.gov/imo/media/doc/Testimony-Cilluffo-2012-07-11.pdf.

[88] House Foreign Affairs Subcommittee on Asia and the Pacific and Terrorism, Nonproliferation, and Trade, *Hearing: Pakistan: Friend or Foe in the Fight Against Terrorism*, U.S. Cong. News, 2016 WLNR 21268984 (Jul. 12, 2016) (testimony of Bill Roggio).

Jaish-e-Mohammed, Jandullah (the Karachi-based, al Qaeda-linked group), and several other Pakistani terror groups are known to have merged with al Qaeda in Pakistan, and the group operates under the name of Brigade 313.[89]

112.  Like its ally LeT, another of JeM's key roles is to serve as a talent scout for al-Qaeda, Taliban, and Haqqani terrorists in Afghanistan. The U.S. government itself recognized the key role that Masood Azhar and Jaish-e-Mohammed has played in recruiting suicide bombers to support the Taliban and al-Qaeda's shared jihad in Afghanistan. Specifically, according to the U.S. Treasury Department, "[i]n 2008, JEM recruitment posters in Pakistan contained a call from Azhar for volunteers to join the fight in Afghanistan against Western forces."[90] As a former senior Indian official summarized in March 2009, "[i]t is now established that while the Taliban's cadres in Afghanistan are primarily Afghans nationals, a substantial number of suicide bombers in Afghanistan are from militant groups drawn from Pakistan's Punjab province, like the Lashkar-e-Taiba and Jaish-e-Mohammed."[91]

113.  JeM plays a special role in al-Qaeda's syndicate as the terrorist group responsible for taking the lead in collecting and paying out so-called "martyr

---

[89] *Al Qaeda and Terror in Karachi*, The Express Tribune (Pakistan), 2010 WLNR 27040331 (Nov. 17, 2010).

[90] U.S. Dep't of Treasury, *Treasury Targets Pakistan-Based Terrorist Organizations Lashkar-E Tayyiba and Jaish-E Mohammed* (Nov. 4, 2010).

[91] G. Parthasaraty, *Pakistan Under Jihadi Threat*, Business Line (Mar. 5, 2009) (author is former High Commissioner to Pakistan).

payments" to the al-Qaeda-aligned suicide bombers who blow themselves up in Afghanistan. On information and belief, JeM facilitated martyr payments to all or nearly all of the suicide bombers who committed the attacks in this case.

114.   After the United States designated JeM an FTO in 2001, the Pakistani government banned the organization in 2002. JeM subsequently changed its name to "Khuddam-ul-Islam." The Pakistani government banned Khuddam-ul-Islam in 2003, and it rebranded itself as Al Rehmat Trust ("ART"). Since then, ART has been involved in fundraising for JeM, including for militant training and indoctrination at its mosques and madrassas, as well as providing support to the families of terrorists who had been arrested or killed. Like JeM before it, ART was headed by Mohammed Masood Azhar, along with his associate Ghulam Murtaza.

115.   ART was known to be a terrorist organization. For example, in 2006, Pakistani government forces raided an ART camp in Mansehra, Pakistan, arresting 15 people and seizing funds. Then, on November 4, 2010, the U.S. Treasury Department designated ART as an FTO, stating: "Al Rehmat Trust, an operational front for JEM was designated for providing support to and for acting for or on behalf of JEM, and Mohammed Masood Azhar Alvi, JEM's founder and leader, was also designated today for acting for on behalf of JEM."[92] As such, ART was

---

[92] *Treasury Targets Pakistan-Based Terrorist Organizations*, *supra* note 90.

47

and is also a member of the al-Qaeda Terror Syndicate. ART remains a designated FTO today.

116.   The Treasury Department publicly stated that in ART's capacity as "operational front" for JeM, ART "has provided support for militant activities in Afghanistan and Pakistan, including financial and logistical support to foreign fighters operating in both countries. In early 2009, several prominent members of al Rehmat Trust were recruiting students for terrorist activities in Afghanistan."[93] "As of early 2009, al Rehmat Trust had initiated a donation program in Pakistan to help support families of militants who had been arrested or killed. . . . Al Rehmat Trust has also provided financial support and other services to the Taliban, including financial support to wounded Taliban fighters from Afghanistan."[94]

117.   In addition to this "operational" role, ART was designated for raising funds for JeM. As part of the public designation, the then-Under Secretary for Terrorism and Financial Intelligence described the action as "an important step in incapacitating the operational and financial networks of these deadly organizations."[95] The Australian Government's current designation of JeM as a

---

[93] *Id.*

[94] U.S. Dep't of the Treasury, *Protecting Charitable Organizations – P*, https://www.treasury.gov/resource-center/terrorist-illicit-finance/Pages/protecting-charities_execorder_13224-p.aspx.

[95] *Treasury Targets Pakistan-Based Terrorist Organizations*, *supra* note 90.

"terrorist organisation" states: "the Al-Rehmat Trust is the principal source of income for JeM and continues to operate despite being sanctioned by several countries."[96]

118.    ART has a banking relationship with HBL. According to reports in the Indian press, which quoted Indian terrorism investigators speaking in 2016, ART had an account at HBL.[97]

119.    ART's account is handled by Ghulam Murtaza, who is known to be a close associate of JeM founder Masood Azhar, and is a high-ranking member of JeM and a high profile terrorist in his own right. Prior to managing ART, Murtaza was head of the Punjab chapter of Harakat ul-Mujahidin, which has been an FTO since 1997. Indian media reported that Murtaza was put in charge of ART in 2010, and he has remained active in that capacity.[98] For example, when JeM carried out a deadly terror attack on India's Pathankot Air Force Station in 2016, one of the

---

[96] Australian National Security, *Jaish-e-Mohammad* (last visited June 4, 2020), https://www.nationalsecurity.gov.au/Listedterroristorganisations/Pages/Jaish-e-Mohammad.aspx.

[97] Rajesh Ahuja, *Pathankot Attackers Called Head of Jaish Charity Organisation*, Hindustan Times (Jan. 18, 2016).

[98] Praveen Swami, *With Backing of ISI, Jaish-e-Muhammad Rises Like a Phoenix in Pakistan*, Indian Express (Jan. 11, 2016).

attackers allegedly dialed Murtaza.[99] In 2018, Indian media reported that Ghulam Murtaza was still heading ART.[100]

120.   In addition to this connection, JeM also receives and has long received financial support from the ISI.[101] As explained in greater detail below, HBL is one of the ISI's preferred banks for financing terrorists.

### E. The Kabul Attack Network

121.   The Kabul Attack Network is an operational manifestation of the terrorist syndicate led by al-Qaeda and the Taliban, including the Haqqani Network. Specifically, the Kabul Attack Network is a set of terrorist cells, which includes members from each of the terrorist groups involved in the syndicate, and focuses on attacks against targets in Kabul and extending outward into the provinces of Logar, Wardak, Nangarhar, Kapisa, Kunar, Ghazni, and Zabul.[102] It is active around key waypoints and transit routes on the way to Kabul, including Wardak, Ghazni City, and areas of Logar Province. The Kabul Attack Network

---

[99] Ahuja, *Pathankot Attackers Called Head of Jaish Charity Organisation*, *supra* note 97.

[100] Ankit Kumar, *Masood Azhar's Jaish-e-Mohammad Sells Medicines to Collect Funds from Pakistan*, Hindustan Times (May 21, 2018).

[101] Swami, *Jaish-e-Muhammad Rises Like a Phoenix*, *supra* note 98.

[102] Bill Roggio, *Karzai Assassination Plotters Part of Kabul Attack Network*, Long War J. (Oct. 5, 2011).

was responsible for suicide bombings and other attacks on Americans in Kabul and the surrounding areas.[103]

122.   The Kabul Attack Network's members include the Taliban (including the Haqqani Network), as well as al-Qaeda, Lashkar-e-Taiba, and other terrorist organizations active in the Kabul area. Each of these terrorist groups participates in Kabul Attack Network attacks and contributes personnel and resources to such attacks. Attacks committed by the Kabul Attack Network are committed jointly by al-Qaeda, Taliban, Haqqani Network, and LeT personnel. And funding for any of the involved terrorist groups contributed to the attacks.

123.   The Kabul Attack Network is led by Mullah Dawood, the Taliban's shadow governor for Kabul who is also a Taliban and Haqqani Network commander, and Taj Mir Jawad, a top commander in the Haqqani Network with a long history of high-profile attacks. On information and belief, both Dawood and Jawad reported to Sirajuddin Haqqani, the dual-hatted al-Qaeda-Taliban terrorist ultimately responsible for the Kabul Attack Network's attack strategy.

124.   According to an ISAF public affairs officer, the "Haqqani Network is deeply entrenched in the Kabul Attack Network specifically with the facilitation of

---

[103] Bill Roggio, *Afghan Intel Captures Taliban Commander Involved In Targeting 'Foreigners' In Kabul*, Long War J. (Mar. 31, 2015).

weapons and fighters into the area south of Kabul in Logar and Wardak."[104]
Additionally, senior Haqqani leaders operating from their traditional strongholds
often planned and executed terrorist attacks by the Kabul Attack Network,
sometimes even giving tactical advice during attacks.

125.   Many Plaintiffs, or their family members, were killed or injured in
attacks by the Kabul Attack Network. For example, the Kabul Attack Network
carried out the attacks that killed civilians Michael A. Hughes and Alexis
Kamerman. *See infra* ¶¶ 426, 454.

* * *

126.   Each of the terrorist organizations identified above participated in
terrorist attacks, including those described in this Complaint, to intimidate or
coerce local populations; influence the policies of various governments, including
the United States; and affect the conduct of those governments by mass destruction
and assassination.

---

[104] Bill Roggio, *Senior Taliban Commander Killed in Eastern Afghanistan*, Long War J.
(Aug. 20, 2010).

## II.   Habib Bank Limited (HBL) Knowingly Provided Material and Substantial Support to Terrorists and Terrorist Organizations

### A.   HBL Knowingly Provided Material Support to Members of the al-Qaeda Terror Syndicate and Their Agents

127.   As explained in greater detail below, HBL knowingly provided material financial support to the members of the al-Qaeda Terror Syndicate, which perpetrated the attacks in this case.

**Government Investigations of HBL Reveal a Pattern of Terror Financing Going Back Over a Decade**

128.   In 2006, HBL entered into a written agreement with the Federal Reserve Board of Governors and NYDFS. The agreement was prompted by an investigation, which raised concerns that HBL's New York Branch exhibited deficiencies relating to its anti-money laundering ("AML") "policies and procedures, customer due diligence practices, risk management processes, and internal control environment."[105] This included deficiencies relating to HBL's correspondent banking services for non-U.S. banks, and its U.S. dollar funds transfer clearing services—*i.e.*, the services that would come into play when transferring U.S. dollars to Pakistan and Afghanistan or engaging in currency exchanges in connection with donations to terrorist groups in Pakistan.

---

[105] *See* Written Agreement by and Among Habib Bank Limited, Habib Bank Limited New York Branch, Federal Reserve Bank of New York and New York State Banking Department (Dec. 19, 2006), *available at* https://www.federalreserve.gov/newsevents/pressreleases/files/enf20061221a1.pdf.

129.   In the agreement, HBL agreed to augment its AML controls, including policies and procedures designed to identify account holders and transactors, and to ensure compliance with all requirements relating to correspondent accounts for non-U.S. persons. HBL further agreed to conduct appropriate diligence about customers and their transactions, and to monitor and report all suspicious activity.

130.   On December 15, 2015, NYDFS and HBL entered into a consent order.[106] The order referenced the 2006 written agreement, and noted that the Bank and the Branch had not abided by that agreement. Under the consent order, HBL was required to take a number of additional concrete steps to reduce the risk of its participation in money laundering and other illegal financial transactions.

131.   In the consent order, HBL agreed to engage an independent third party to review its U.S. dollar clearing activity from October 1, 2014 to March 31, 2015 to determine whether it had properly identified and reported transactions that violated OFAC regulations, or suspicious activity involving high risk customers or transactions. HBL also agreed not to take any action that would result in a growth in its U.S. dollar clearing activities.

132.   Again, HBL did not comply. On August 24, 2017, after conducting an investigation of HBL's activities in New York, NYDFS filed a Notice of Hearing

---

[106] *See* Order Issued Upon Consent Pursuant to Section 39 of the New York Banking Law, *In re: Habib Bank Limited* (Dec. 15, 2015), *available at* https://www.dfs.ny.gov/system/files/documents/2020/04/ea151215_habib.pdf.

54

and Statement of Charges ("Notice") against HBL.[107] The Notice stated "that compliance failures found at the New York Branch are serious, persistent, and apparently affect the entire Habib banking enterprise. They indicate a fundamental lack of understanding of the need for a vigorous compliance infrastructure, and the dangerous absence of attention by Habib Bank's senior management for the state of compliance at the New York Branch." Indeed, NYDFS "determined that the Bank's compliance function is dangerously weak. Head Office screening, which the Branch has repeatedly relied on as an excuse for its own lax attitude regarding BSA/AML safeguards, appears to be as weak as that of the Branch itself—if not even more inadequate." This "misconduct has produced grave risks to [HBL], to banking institutions in New York State and the U.S., and to the financial system as a whole." Moreover, although HBL had "been given more than sufficient opportunity to rectify its deficiencies, it has utterly failed to do so."[108]

133.   The Notice provided specifics about HBL's misconduct. It noted that one of HBL's "largest U.S. dollar clearing accounts has been Al Rajhi Bank," which "has been linked through negative media to Al Qaeda and terrorism

---

[107] *See* Notice of Hearing and Statement of Charges, *In re: Habib Bank Limited* (Aug. 24, 2017), *available at* https://www.dfs.ny.gov/system/files/documents/2020/03/ ea170824_habib_notice.pdf.

[108] All of the quotations in this paragraph are on pages 1-2 of the Notice.

financing."[109] In fact, a report released on July 17, 2012 by the U.S. Senate

Permanent Subcommittee on Investigations stated that after the September 11

attacks, evidence emerged that Al Rajhi Bank and some of its owners had links to

organizations associated with financing terrorism, including that one of the bank's

founders was an early financial benefactor of al Qaeda.[110] The report details Al

Rajhi Bank's links to terrorism, including "that some Al Rajhi family members

were major donors to al Qaeda or Islamic charities suspected of funding terrorism,

established their own nonprofit organizations in the United States that sent funds to

terrorist organizations, or used Al Rajhi Bank itself to facilitate financial

transactions for individuals or nonprofit organizations associated with

terrorism."[111] Al Rajhi Bank also had a significant number of suspicious clients,

including SDNs accused of financing terrorism.

134.   Notwithstanding the evidence linking Al Rajhi Bank to terrorism,

HBL not only did a massive volume of business with Al Rajhi Bank, but did so in

a way that ensured that Al Rajhi Bank and its customers could continue to support

terrorism undetected. In the 2017 Notice, NYDFS noted that the "Al Rajhi

correspondent account presented Habib Bank with a significant risk of being used

---

[109] *Id*. at 6.

[110] *See* U.S. Senate Permanent Subcomm. on Investigations, *U.S. Vulnerabilities to Money Laundering, Drugs, and Terrorist Financing: HSBC Case History* 194 (2012).

[111] *Id*.

for terrorist financing and money laundering," and that since 2014, Al Rajhi

transactions represented "approximately 24 percent of the total number of

transactions conducted through the New York Branch."[112] Notwithstanding this

level of risk and high volume of transactions, HBL's "customer due diligence file

did not include sufficient information about Al Rajhi's own customers, or a

thorough review of Al Rajhi's expected versus actual transactional activity."[113]

HBL also claimed not to be aware that Al Rajhi's affiliates in Malaysia and Jordan

were running transactions through Al Rajhi's head office's account at HBL.[114] This

practice, known as "nesting," is a way to conceal suspicious transactions by

obscuring the identity of the originating bank.

135.   NYDFS also found evidence that HBL deliberately avoided obtaining

information about Al Rajhi Bank's risky use of HBL correspondent accounts.

Although HBL went through the motions of regularly meeting with Al Rajhi Bank

to discuss its HBL activity, NYDFS "determined that bi-weekly calls administered

between Branch and Compliance senior management and Al Rajhi senior

---

[112] Notice, *supra* note 107, at 6. For reference, the total volume of correspondent banking transactions conducted through the branch in the year ending December 31, 2015 was $287 billion. Assuming Al Rajhi's share of the dollar volume was proportionate to its share of the number of transactions, that means that HBL helped Al Rajhi Bank clear approximately $70 billion in 2015 alone.

[113] *Id.*

[114] *Id.* at 6-7.

management for purposes of maintaining compliance were not meaningful. Examiners' review of the minutes and agenda for these calls indicate that they are primarily administrative and do not address current BSA/AML related risks or issues posed by the customer relationship."[115]

136.   Even more disturbing, HBL created elaborate and non-routine policies and procedures designed to shield suspicious terrorism-related customers and transactors from scrutiny. This assistance took at least three forms.

137.   *First*, HBL created a **"good guy" list**, which was a list of customers HBL claimed to have conducted diligence on and deemed to be "very low risk" for anything improper.[116] Once customers were placed on the "good guy" list, they were able to conduct transactions without any screening.

138.   HBL's "good guy" list was designed to facilitate terror financing, and did so. NYDFS's investigation revealed that 154 customers that HBL deliberately placed on the "good guy" list were in fact persons and entities on OFAC's SDN list.[117]

139.   It is difficult to overstate how egregious this misconduct was. In order to place anybody on its "good guy" list, which would effectively exempt that

---

[115] *Id*. at 7.

[116] *Id*.

[117] *Id*. at 8.

customer from the normal screening that all customers must undergo, HBL had to affirmatively determine that the customer presented very low risk. But the SDN list is the *opposite* of "good guys." It consists of entities and individuals who the U.S. government has determined must be sanctioned because of their close associations with terrorism and/or crime. U.S. persons are generally prohibited from dealing with anybody on the SDN list, precisely because listed persons present a *high* risk of harming the United States.

140.   An examination of the SDN list for Pakistan shows that it is overwhelmingly based on terrorist designations. A search of the sanctions list, filtered by country, yields 144 Pakistani entries currently on the list. The vast majority of the 97 listed individuals (83 of them) are listed for terrorism reasons under the Specially Designated Global Terrorist program. In many cases, the entries on the list include remarks disclosing the terrorist organizations that these individuals are associated with. Those entities include al-Qaeda, the Haqqani Network, and LeT—which are also on the SDN list as entities. Indeed, of the 47 listed entities, 36 (about 77 percent) are listed for terrorist reasons.

141.   NYDFS found that HBL's improper construction of the "good guy" list led to significant evasion of terror sanctions. For example, HBL permitted a transaction that involved the leader of a Pakistani terrorist group, a transaction that

involved a known international arms dealer, and an individual on the Specially

Designated Global Terrorist list.[118]

142.   These were not isolated incidents. Instead, NYDFS found that HBL

did not screen 4,000 transactions for AML and other risks because the account

holders were on HBL's "good guy" list, and that "apparent improper inclusion on

the so-called 'good guy' list" had allowed "at least $250 million" to flow through

the New York Branch "without any screening."[119] Those were only the

transactions that NYDFS found; doubtless, there were more.

143.   Given the large number of terrorist customers who banked with HBL,

*see infra* ¶¶ 161-192) the fact that HBL's customer-base was concentrated in

Pakistan where most members of the al-Qaeda Terror Syndicate are based, and the

fact that most Pakistani SDNs are designated for terrorist purposes, it is

overwhelmingly likely that HBL placed members or agents of the Syndicate on the

"good guy" list, allowing those agents' transactions to proceed with no meaningful

scrutiny.

144.   In addition to allowing SDNs to do business using the "good guy" list,

it is also highly likely that HBL misused the "good guy" list to authorize

transactions by others who were not SDNs, but were agents of the Syndicate. That

---

[118] *Id.*

[119] *Id.*

conduct, too, is culpable because, as explained above, HBL had to affirmatively place any customer on the "good guy" list, which means it had to knowingly and intentionally decide not to screen that customer's transactions.

145.   Based on the foregoing, HBL used the "good guy" list to facilitate at least several million dollars of financial transactions for the benefit of members and agents of al-Qaeda, the Haqqani Network, and LeT. None of these transactions were "routine" in any sense. Rather, they were the product of special rules and practices HBL followed for its terrorist clients. In the words of NYDFS, HBL "open[ed] the door to the financing of terrorist activities that pose a grave threat to" Americans and put "the safety of our nation at risk."[120]

146.   This was confirmed in part by a February 2007 speech by India's National Security Advisor, who publicly stated that HBL supported terrorist groups like LeT and served as a conduit "through which such funds find their way to terrorist organisations," and had facilitated millions of dollars in terrorist finance.[121]

---

[120] NYDFS, *DFS Fines Habib Bank and its New York Branch $225 Million for Failure to Comply with Laws and Regulations Designed to Combat Money Laundering, Terrorist Financing, and Other Illicit Financial Transactions* (Sept. 7, 2017).

[121] IANS, *Text of National Security Adviser's Speech in Munich*, RxPG News (Feb. 15, 2007), http://www.rxpgnews.com/india/Text-of-national-security-advisers-speech-in-Munich_printer.shtml.

147.    *Second*, HBL also shielded suspicious terrorist-related transactions from review by engaging in **"wire-stripping,"** which is when the name of a transaction's beneficiary is withheld in order to obscure it. Identified instances of wire-stripping included a payment involving a Chinese weapons manufacturer subject to U.S. non-proliferation sanctions, which aided in the concealment of a sale of explosives. Another example included a SWIFT payment message that omitted the name of the recipient—who was on the SDN list, and was receiving 11,226,796 Pakistani rupees (approximately $107,000).[122]

148.    HBL intentionally engaged in "wire-stripping" to obscure the terrorist affiliations of open and notorious accountholders affiliated with al-Qaeda, the Haqqani Network, and Lashkar-e-Taiba.

149.    This wire-stripping was part of a broader pattern of rendering transactions opaque. NYDFS found more than 13,000 international wire transactions through the SWIFT system that omitted essential information, such as the identities of the ultimate originator and beneficiary of each transaction. Additionally, on numerous occasions, multiple SWIFT payment messages were improperly aggregated into a single message, thereby preventing screening for suspicious or prohibited activity.[123]

---

[122] *See* Notice, *supra* note 107, at 7-8.

[123] *See id.*

150.    Given the large number of terrorist customers who banked with HBL, *see infra* ¶¶ 161-192), the fact that HBL's customer-base was concentrated in Pakistan, where most members of the al-Qaeda Terror Syndicate are based, the fact that terrorist customers are highly likely to request or require wire stripping and other measures to conceal their transactions, the fact that HBL stripped transaction data on behalf of known criminals and SDNs, and the fact that more than 13,000 transactions had incomplete SWIFT messages, it is overwhelmingly likely that HBL engaged in wire-stripping or otherwise concealed source or beneficiary information for members or agents of the Syndicate, including al-Qaeda, the Haqqani Network, and LeT, allowing these agents to obtain and move money without detection.

151.    *Third*, HBL shielded suspicious terrorism-related transactions from review by adopting a **policy of affirmatively choosing not to report** suspicious terrorism-related transactions.

152.    NYDFS identified nearly 200 additional instances of suspicious activity that were never identified or reported. Some of these cases involved customers or beneficiaries who had been reported in the media as terrorist financiers, black market traders, drug traffickers, smugglers, and fraudsters.[124] When these transactions resulted in alerts, HBL staff apparently identified them as

---

[124] *Id.* at 10.

"false positives" and knowingly permitted them to proceed, even when the

transactors were on AML blacklists or publicly available lists of most wanted

criminals.[125]

153.   Based on HBL's use of the "good guy" list to shield transactions by

designated terrorists from OFAC screening, actively stripping data from its

transactions to conceal the identities of counter-parties, and its willful refusal to

report suspicion transactions, NYDFS enumerated 53 separate charges against

HBL, and sought civil monetary penalties in an amount up to $629,625,000.

154.   HBL settled with NYDFS by agreeing to pay a penalty of $225

million, and to surrender its license in New York, wind up its business there, and

close its branch. In the consent order, the Department's findings from the Notice

were formalized.[126] In a statement issued contemporaneously with the settlement,

DFS explained that it would "not tolerate inadequate risk and compliance functions

that ***open the door to the financing of terrorist activities that pose a grave threat***

to the people of this State and the financial system as a whole."[127] NYDFS also

refused to "stand by and let Habib Bank sneak out of the United States without

---

[125] *Id.*

[126] *See* Consent Order Under New York Banking Law §§ 39, 44 and 605, *In re: Habib Bank Limited* (2017), https://www.dfs.ny.gov/system/files/documents/2020/03/ea170907_habib.pdf.

[127] NYDFS, *DFS Fines Habib Bank and its New York Branch $225 Million for Failure to Comply with Laws and Regulations Designed to Combat Money Laundering, Terrorist Financing, and Other Illicit Financial Transactions* (Sept. 7, 2017) (emphasis added).

holding it accountable for putting the integrity of the financial services industry

and the **safety of our nation at risk**."[128]

155.   These American investigations were not the only relevant findings of

misconduct. In July 2019, as a transparency measure, State Bank of Pakistan

("SBP"), HBL's home regulator, began publishing online summaries of major

enforcement actions. In August 2019, SBP fined HBL 320.08 million rupees

(approximately $2,000,000) for deficiencies relating to AML and combating the

financing of terrorism.[129] Two months later, HBL was fined 35.62 million rupees

(approximately $220,000) for deficiencies relating to the areas of foreign trade

operations and customer due diligence.[130] The month after that, HBL was fined

25.984 million rupees (approximately $160,000) for violations in the area of

customer due diligence and knowing your customer.[131] And in January 2020, HBL

was fined another 12.8 million rupees (approximately $80,000) for similar

violations.[132] In sum, in less than one year and *after* aggressive regulatory action

---

[128] *Id.* (emphasis added).

[129] *See* State Bank of Pakistan, Detail of Significant Enforcement Actions by SBP August-2019, http://www.sbp.org.pk/BS/2019/DSEA-Aug-19.pdf.

[130] *See* State Bank of Pakistan, Detail of Significant Enforcement Actions by SBP October-2019, http://www.sbp.org.pk/BS/2019/DSEA-Oct-19.pdf.

[131] *See* State Bank of Pakistan, Detail of Significant Enforcement Actions by SBP November-2019, http://www.sbp.org.pk/BS/2019/DSEA-Nov-19.pdf.

[132] *See* State Bank of Pakistan, Detail of Significant Enforcement Actions by SBP January-2020, http://www.sbp.org.pk/BS/2020/DSEA-Jan-20.pdf.

by NYDFS, SBP has fined HBL at least 395 million rupees (approximately $2.5 million) for HBL's misconduct, much of which was terrorism-related.

156.   In February 2020, the Central Bank of the United Arab Emirates announced that it had opened its own investigation into misconduct at HBL's branch there. As of the filing of this Complaint, that investigation remains ongoing.

157.   The documented noncompliance at HBL was not a product of mere negligence. Instead, HBL chose to allow dangerous terrorist financing despite multiple warnings from government regulators that clearly identified the risk to the bank. That is why HBL was eventually effectively barred from the United States and forced to pay hundreds of millions of dollars in penalties.

158.   As noted, HBL was processing terrorist financing transactions as of at least 2006 and continued to do so despite ongoing government scrutiny and asserted efforts to improve. The misconduct documented by U.S. regulators in 2015 and 2017 was but a small part of more than a decade of egregious criminal conduct. Indeed, it is highly likely that the volume of illicit terror financing transactions, including through HBL's New York Branch, in the time period preceding the attacks in this case was even greater than it was in 2015 because by then, the bank was purportedly taking steps to clean up its act. Its earlier transactions, when it faced less regulatory scrutiny, were likely to be even worse.

66

159.   Based on the NYDFS findings and publicly available information about the identity of HBL's terrorist customers, Plaintiffs allege that HBL processed at least several million U.S. dollars in transactions for agents or operatives of the al-Qaeda Terror Syndicate.

**HBL Knowingly Aided Notorious Terrorists Affiliated with al-Qaeda's Syndicate**

160.   HBL knowingly aided notorious terrorists affiliated with the al-Qaeda Terror Syndicate. As found by NYDFS, HBL put at least 154 individuals on the SDN list on its "good guy" list, and that "improper inclusion" resulted in "at least $250 million in transactions" flowing through the bank "without any screening," even though the United States was determined to block those transactions. As explained above, these "good guys" included agents or operatives of al-Qaeda, the Haqqani Network, and LeT, all of which are members of the al-Qaeda Terror Syndicate.

161.   A deeper examination reveals that HBL has knowingly opened accounts for and done business with many terrorists affiliated with al-Qaeda's joint venture. Some notable names include: Jalaluddin Haqqani (founder of the FTO Haqqani Network), who advertised his account at HBL as a destination for donations in the 1990s; Osama bin Laden (leader of al-Qaeda, who held an account at HBL that was frozen by SBP in 2003); and Hafiz Muhammad Saeed and Zafar Iqbal, the co-founders of designated FTO LeT, both of whom are on the SDN list.

162.   HBL also held accounts for, and knowingly circumvented U.S. and

U.N. sanctions to benefit, the al-Qaeda front known as the Al Rashid Trust, also

known as the Aid Organization of the Ulema, and Al Akhtar Trust. According to

the U.S. Treasury Department, Al Rashid Trust was among the first organizations

designated as a terrorist financier and facilitator. It has been raising funds for the

Taliban since 1999. Al Rashid Trust has also funded al-Qaeda, and its officers are

reported to be key leaders of al-Qaeda. Al Rashid Trust is also closely linked to

JeM, another FTO closely associated with al-Qaeda.

163.   Al Rashid Trust and other fronts and groups used a British internet

site called the Global Jihad Fund, which openly associated itself with Osama bin

Laden, to publish bank account information and solicit support to facilitate the

growth of various jihad movements around the world by supplying them with

funds to purchase their weapons. The United States designated Al Rashid Trust an

SDGT in 2001,[133] and the United Nations listed it as a financial facilitator of

terrorists in October 2001. At the time of its designation, the United Nations stated

that "Al Rashid Trust was listed . . . as being associated with Al-Qaida, Usama bin

Laden or the Taliban for participating in the financing, planning, facilitating,

preparing or perpetrating of acts or activities by, in conjunction with, under the

---

[133] *See* U.S. Dep't of the Treasury, Protecting Charitable Organizations – A,
https://www.treasury.gov/resource-center/terrorist-illicit-finance/Pages/protecting-
charities_execorder_13224-a.aspx.

name of, on behalf or in support of Al-Qaida."[134] Over time, Al Rashid Trust's aliases have been added to the SDN list as well.

164.    In July 2006, the United Nations published information indicating Al Rashid Trust held at least two accounts at HBL's Foreign Exchange Branch with account numbers 055017-41 (for U.S. dollars) and 065001-38 (for British pounds). The Global Jihad Fund website permitted donors to direct their contributions to Al Rashid Trust to its accounts at HBL, including its U.S. dollar account numbered 055017-41.

165.    In November 2009, the European Union amended its designations of certain terrorist groups pursuant to "Council Regulation (EC) No 881/2002 imposing certain specific restrictive measures directed against certain persons and entities associated with Usama bin Laden, the Al-Qaida network and the Taliban."[135] The amended designation of Al Rashid Trust stated that it had "[o]perations in Afghanistan" and had "two account numbers in Habib Bank Ltd., Foreign Exchange Branch, Pakistan: 05501741 and 06500138."[136]

---

[134] U.N. Security Council, Al Rashid Trust, https://www.un.org/securitycouncil/sanctions/ 1267/aq_sanctions_list/summaries/entity/al-rashid-trust (quotation marks omitted).

[135] Official Journal of the European Union, Commission Regulation (EC) No 1102/2009 of 16 November 2009 amending for the 116th time Council Regulation (EC) No 881/2002 imposing certain specific restrictive measures directed against certain persons and entities associated with Usama bin Laden, the Al-Qaida network and the Taliban, https://eur-lex.europa.eu/legal-content/EN/TXT/HTML/?uri=CELEX:32009R1102&from=EN.

[136] *Id.*

166.   HBL also held accounts for Al Rashid Trust's successor, Al Akhtar Trust, which openly solicited donations through its website identifying HBL account numbers to which donors could contribute for "obligatory jihad."

167.   HBL permitted Al Rashid Trust and/or its successor, Al Akhtar Trust, to use HBL accounts to raise money to support al-Qaeda. Even though the United Nations had ordered those accounts frozen, HBL un-froze the accounts to allow Al Rashid Trust, through an alias, to use them to raise funds for Jamaat-ud-Dawa, a front organization for LeT. On July 2, 2008, the U.S. Department of the Treasury amended its terrorist designation for Al Rashid Trust to include the alias it used to bank with HBL, saying "[w]e are very concerned about designated entities reconstituting themselves under new names in attempts to circumvent sanctions and continue funneling money to terrorist activities."[137] On December 9, 2008, India asked the U.N. to amend its designation as well. The U.N. did so on December 10, 2008. Over the next 24 hours, HBL, which knew since July 2008 that Al Rashid Trust was using an alias, allowed it to withdraw nearly all of its funds from the HBL accounts (Pakistani rupees worth over $40,000 USD), leaving a pittance behind for the bank to symbolically freeze. Thus, over an eight-year

---

[137] U.S. Dep't of the Treasury, *Treasury Identifies New Aliases of Al Rashid and Al-Akhtar Trusts Pakistan-Based Trusts Previously Designated for Supporting al Qaida* (July 2, 2008), https://www.treasury.gov/press-center/press-releases/Pages/hp1065.aspx.

period, HBL twice flouted U.S. and U.N. designations of one of the most notorious and longstanding al-Qaeda fronts.[138]

168.   HBL also opened an account for another "trust," Al Rehmat Trust, and maintained the account for years after the U.S.-designated Al Rehmat Trust an FTO and operational front for JeM. The account was managed by Ghulam Murtaza, a terrorist operative and close associate of the founder and leader of JeM, Masood Azhar. Any diligence conducted on Al Rehmat Trust revealed: (1) Murtaza's close ties to Azhar; (2) Azhar and Murtaza were co-heads of Al Rehmat Trust; (3) the Trust was an operational front for JeM; and (4) the Trust and Azhar were U.S.-designated terrorists.

**HBL Assists al-Qaeda-Affiliated Terrorist Organizations on Behalf of the ISI**

169.   HBL acts as the unofficial bank of the Pakistani ISI, providing funding and financial services to the ISI's terrorist proxies in the region—all of which are also key affiliates of al-Qaeda, and members of the al-Qaeda Terror Syndicate.

170.   The ISI is an intelligence agency of Pakistan. Its membership consists primarily of military officers drawn from the service branches of the Pakistani military, and it also recruits civilians. As a matter of practice, the ISI has operated

---

[138] The Indian Express, *JuD bank accounts 'cleaned out', Pak delay blamed* (Dec. 20, 2008).

independently of Pakistan's civilian government, and pursues its own separate
vision of Pakistan's national interests.

171.   This matters because the official policy of the Pakistani government,
which the government abides by, is to condemn terrorism in all its forms, including
attacks against U.S. and Coalition forces. Indeed, the Pakistani government sees
itself as an ally to the United States in the fight against terrorism, and recognizes
that terrorism violates basic legal norms.

172.   The ISI (or perhaps certain elements within the ISI) by contrast, has a
rogue posture towards terrorists that is at odds with Pakistani law and policy, and
violates both international law and U.S. law. Multiple governments—including the
United States—have accused the ISI of supporting terrorist organizations,
including al-Qaeda, the Taliban (including the Haqqani Network), and LeT, among
others. This support takes the form of resources, intelligence, and protection.

173.   The ISI has also played a role in a significant number of terrorist
attacks, including (without limitation) the 2001 attack on the Indian Parliament
(carried out by LeT and JeM), the 2006 Varanasi, India bombings (carried out by
LeT), a July 2008 suicide bombing of the Indian embassy in Kabul (carried out by
the Haqqani Network), the November 2008 Mumbai attacks (carried out by LeT),
the 2009 attack on CIA base Camp Chapman in Khost, Afghanistan (carried out by
al-Qaeda, the Pakistani Taliban, and the Haqqani Network), and many attacks in

Kashmir. In these cases and others, investigators have identified evidence linking the ISI to the attacks, typically by providing logistical support and resources to the attackers. In at least two of these attacks (the Mumbai attacks and the Camp Chapman attack), a significant number of Americans were killed by the terrorists.

174.   The ISI supports terrorists operating in Afghanistan for multiple reasons. *First*, it perceives that the Taliban is the only political group in Afghanistan that is likely to be an ally to Pakistan, and so it seeks to empower the Taliban and advance its agenda. This support goes back at least as far as the 1990s, when a number of high-level Pakistani army officers and ISI agents joined the Taliban. The support continued after the September 11 attacks, when the ISI airlifted multiple key members of the Taliban into Pakistan before U.S. troops entered Afghanistan. It persisted in the ensuing decades, when the ISI provided resources and safe haven to the Taliban, including the Haqqani Network, to act as its proxies in Afghanistan. Over time, the collaboration between the ISI and terror groups—especially the Haqqani Network—has only grown deeper, as the Haqqani Network has undermined the Afghan government on the ISI's behalf, and the ISI has provided protection and resources to the Haqqani Network.[139] Such

---

[139] Marvin G. Weinbaum & Mehar Babbar, *The Tenacious, Toxic Haqqani Network*, MEI Policy Focus 2016-23, at 6-7 (Sept. 2016).

collaboration between the ISI and the Taliban (including the Haqqani Network) continues today.

175.   *Second*, the ISI believes that terrorist groups can act as useful proxies to counter Indian and American influence in the region. The ISI perceives Pakistan's interests in the region to be zero-sum versus India, and understands that terrorist groups can undermine India's ability to grow its influence or limit Pakistan's. It also perceives the United States as an ally of India's.

176.   The ISI has long turned to HBL to help in its illegal efforts. For example, in the early 1990s, ISI operatives distributed approximately 140 million Pakistani rupees to the political opponents of former Pakistani Prime Minister Benazir Bhutto, in a scandal now known as "Mehrangate." Younis Habib, a central figure in the scandal who was both the head of Mehran Bank and the chairman of HBL stated in his formal apology that "the embezzlements were named the 'Mehrangate Scandal', although the money was actually drawn from Habib Bank Limited."[140]

177.   In the early 2000s, HBL assisted the ISI by flooding currency markets in Nepal with counterfeit Indian notes. HBL used its branches in Nepal (where Indian currency is legal tender, but currency controls were weak) to distribute fake

---

[140] Express Tribune, *1990 Elections Scandal: Habib Says Then Army Chief Used Him* (Mar. 8, 2012), https://tribune.com.pk/story/347218/asghar-khan-petition-former-mehran-bank-chief-admits-distributing-rs400m/.

notes into the economy in an effort to undermine India's position. Multiple Pakistani embassy staff, believed to be connected to the ISI, were arrested carrying the fake notes.

178. In 2004, the ISI used these same HBL bank branches to provide financial support to Nepalese Maoist terrorists, who were actively carrying out attacks in India. According to Indian intelligence reports at the time, "Habib Bank is identified as a funding agency of the ISI."[141]

179. In 2006, HBL attempted to open branches in India itself. That effort was stymied by India's intelligence agencies, which "immediately red flagged the application, as HBL is a well known front for laundering terror money and has a history of facilitating money movements for terror groups."[142]

180. In the Indian National Security Advisor's 2007 speech, discussed *supra* ¶ 146, he observed that "certain official agencies across the border"—a thinly veiled reference to the ISI—provide funds to terrorist organizations including LeT in amounts in the millions. One of the "[c]onduits through which such funds find their way to terrorist organisations includes established banking channels such as the Habib Bank in Pakistan."

---

[141] Pervez Iqbal Siddiqui, *Lethal Combo, Maoist-Naxal Nexus*, Times of India (Nov, 19, 2004).

[142] Abhinandan Mishra, *UPA Minister Tried to Promote Pak Bank Despite Security Concerns*, Sunday Guardian (July 30, 2017).

181.  As noted above, the ISI's sponsorship of terrorism against Americans, including the provision of resources in preparation for attacks, continued well after 2007 (with, for example, its role in the 2008 Mumbai attack, and the 2009 Camp Chapman Attack). Indeed, the ISI's anti-American intentions in Afghanistan were so open and notorious that, by 2011, Chairman of the Joint Chiefs of Staff Admiral Michael Mullen stated that "[t]he Haqqani Network, … acts as a veritable arm of Pakistan's Inter-Services Intelligence agency."[143] Although Admiral Mullen's choice of words was somewhat hyperbolic, his statement illustrated clearly that the ISI (or at least elements within it) were committed to supporting anti-American terrorism in violation of Pakistani law and policy.

182.  Based on the ISI's ongoing provision of resources to terrorists, Plaintiffs allege that the ISI continued to use HBL after 2007 and to the present day as a conduit to send funds to terrorist organizations, and that HBL continued to cooperate with the ISI by delivering funds to terrorists.

183.  In Afghanistan, the ISI supports the Taliban, Haqqani Network, and LeT, among others. By permitting the ISI to use HBL as a conduit and mechanism for funding these groups, HBL permitted significant amounts of money—likely millions of dollars—to flow to these members of the al-Qaeda Terror Syndicate.

---

[143] Dawn (Pakistan), *Haqqani Network is a "Veritable Arm" of ISI: Mullen* (Sept. 22, 2011).

**HBL Provided Banking Services to Notorious Drug Trafficker and Terrorist Dawood Ibrahim, Who Funded and Assisted Members of the al-Qaeda Terror Syndicate**

184.   HBL helped Dawood Ibrahim—who is on the SDN list as an SDGT because of his ties to al-Qaeda—as well as his al-Qaeda aligned drug empire, known as D-Company, to launder drug money profits. This money laundering is inextricably tied with al-Qaeda and Taliban terrorist finance, and known to be so, because the Taliban have a monopoly on the opium trade in Afghanistan, and recycle their drug profits into the activities of the al-Qaeda Terror Syndicate. Ibrahim also provided funds and money laundering services to LeT.

185.   Ibrahim is originally from Mumbai, India, which is where he created the D-Company crime syndicate in the 1990s. He is wanted in India on charges of murder, extortion, targeted killing, drug trafficking, and terrorism.

186.   Ibrahim's earliest terrorist activity is believed to be his participation in the 1993 bombings of the Bombay Exchange, a series of coordinated attacks that involved a dozen bombs and killed hundreds. According to the Congressional Research Service, this attack was carried out with support from the ISI.[144]

187.   Around this time, Ibrahim moved his operations from Mumbai to Pakistan, where he deepened his ties with both the ISI and LeT. According to U.S.

---

[144] *See* John Rollins et al., *International Terrorism and Transnational Crime: Security Threats, U.S. Policy, and Considerations for Congress*, C.R.S. R41004, at 15 (Jan. 5, 2010).

government reports, D-Company began to finance LeT's activities, recruit for LeT, and share smuggling routes with LeT and al-Qaeda.[145]

188.   In 2003, the U.S. Treasury Department designated Ibrahim as an SDGT under Executive Order 13224, freezing his assets in the United States and prohibiting U.S. persons from transacting with him. At the time of the designation, the Treasury Department stated that it was "calling on the international community to stop the flow of dirty money that kills. For the Ibrahim syndicate, the business of terrorism forms part of their larger criminal enterprise, which must be dismantled." The government further explained that Ibrahim "has found common cause with Al Qaeda, sharing his smuggling routes with the terror syndicate and funding attacks by Islamic extremists aimed at destabilizing the Indian government," including LeT.[146] Ibrahim and D-Company were further designated as Significant Foreign Narcotics Traffickers under the Foreign Narcotics Kingpin Designation Act.

189.   Since his designation in 2003, Ibrahim has continued to engage in terrorism and terrorist financing in the region. Specifically, Ibrahim and D-Company provide funds to terrorist organizations (including al-Qaeda and LeT), and share their smuggling routes with terrorist organizations (including the Taliban

---

[145] *Id*. at 15-16.

[146] U.S. Dep't of the Treasury, *U.S. Designates Dawood Ibrahim as Terrorist Supporter* (Oct. 16, 2003).

and LeT) seeking to move people, weapons, commodities, and drugs undetected. Ibrahim is also reported to be involved in the direct planning of terrorist attacks with LeT leaders and ISI officers.

190.   Ibrahim and D-Company have close ties to HBL. A former HBL Senior Vice President, Javed Miandad—whose son married Ibrahim's daughter—is known to have provided banking channels to Ibrahim beginning in the 1990s. D-Company has also invested heavily through various shell companies in HBL's subsidiary Habib Metropolitan Financial Services, an equity brokerage firm in Pakistan. Ibrahim and D-Company continue to use HBL in their terror financing activities to this day.

191.   It is highly likely that transactions involving Ibrahim and/or D-Company were one of the reference points in NYDFS's 2017 Notice, which noted that HBL's New York Branch allowed nearly 200 instances of suspicious activity, some of which were correlated with "negative media associated with the parties and/or their beneficial owners, including allegations of terrorist financing, black market trading, drug trafficking, smuggling, and fraud." Ibrahim and D-Company have been publicly accused of all of these.

192.   Ibrahim and D-Company are among the most notorious criminals in all of India. By providing banking services to Ibrahim and D-Company, in

violation of U.S. sanctions laws, HBL knowingly and substantially contributed to the al-Qaeda Terror Syndicate's attack capabilities.

* * *

193.   The financial transactions HBL processed for each of its terrorist customers, and the financial services it provided them, were not "routine." As a threshold matter, HBL staff and executives ignored numerous and obvious red flags with respect to their terrorist customers and thus failed to take preventive and corrective actions mandated by HBL's internal policies and Pakistani law. HBL also created the "good guy" list in order to *excuse* certain terrorist customers from its standard diligence procedures, contrary to its own policies and SBP rules. These deviations from policy and legal requirements cannot be characterized as "routine" banking behavior.

194.   Moreover, the purpose of these transactions was to provide illegal support to terrorists engaged in extreme violence—an act that violates U.S. criminal law and cannot ever properly be regarded as routine.

### B. HBL Acted With the Requisite Scienter for Primary and Secondary Liability

195.   HBL knew or was deliberately indifferent to each of the following facts: (1) that it was providing financial services and funds to terrorists, including FTOs, in the al-Qaeda Terror Syndicate; (2) that these terrorists and terrorist organizations were actively engaged in acts of international terrorism directed

against Americans in the region; (3) that HBL's provision of financial services and funds to these terrorists and terrorist organizations served an important role in financing their operations and facilitated violence against Americans in the region; and (4) that providing financial services to these terrorist and terrorist groups was illegal precisely because it would facilitate terrorist violence.

196.   **HBL knew or was deliberately indifferent to the fact that it was providing financial services and facilitating the flow of funds to terrorists and FTOs in the al-Qaeda Terror Syndicate.** HBL's own AML and Counter Terrorist-Finance ("CTF") policies included comprehensive Know Your Customer ("KYC") and customer due diligence ("CDD") procedures. These policies were consistent with requirements promulgated by HBL's home regulator, SBP. Together, SBP regulations and HBL's policies established a system that required HBL to conduct extensive diligence on customers like those discussed in this Complaint, who were by definition "high risk."

197.   As set forth in detail below, such diligence surely revealed that the terrorist operatives and groups at issue in this Complaint were terrorists, and so HBL either provided financial services to people and entities that it knew were terrorists—or else its detailed and expansive policies and procedures for customer due diligence were all a sham, demonstrating HBL's deliberate indifference to the nature and consequences of its actions. Either way, HBL acted with scienter,

opening its doors and accounts to the world's worst terrorist and criminals, with no effort to prevent a flood of terrorist finance.

198.  This point is especially clear in the context of the "good guy" list. HBL represented to NYDFS that it had conducted appropriate diligence in placing customers on the "good guy" list. In the course of that diligence, HBL would have learned about its terrorist customers—but it nevertheless included at least one leader of a Pakistani terror organization on the list, along with 153 other SDNs. The creation of the list thus establishes HBL's knowledge or deliberate indifference to the nature of its customers, and also reflects HBL's agreement to join the al-Qaeda Terror Syndicate's conspiracy to raise and transfer funds that would foreseeably be used to kill Americans in Afghanistan.

199.  To provide more detail about HBL's policies and procedures: In 2009, SBP issued one of many "Circulars" to all banks in Pakistan. Annexure I to Circular Letter No. 7 detailed KYC and CDD requirements. SBP explained: "With the view to preserve integrity and safety of the financial system, it is expedient to prevent the possible use of the banking sector for money laundering and terrorist financing."[147]

---

[147] State Bank of Pakistan, ANNEXURE-I, Attachment to BPRD Circular Letter No.07 of 2009, at 1 (2009), http://www.sbp.org.pk/bprd/2009/Annexure-I-CL7.pdf.

200.   The baseline requirement was that "Banks / DFIs shall formulate and put in place, a comprehensive CDD / KYC policy duly approved by their Board of Directors and in case of branches of foreign banks, approved by their head office, and cascade the same down the line to each and every business location / concerned officers for strict compliance."[148] Customer due diligence was to be conducted when, among other things, "(a) establishing business relationship; (b) conducting occasional transactions above rupees one million whether carried out in a single operation or in multiple operations that appear to be linked; (c) carrying out occasional wire transfers (domestic / cross border) regardless of any threshold; (d) there is suspicion of money laundering / terrorist financing."[149]

201.   Annexure I was not simply concerned with surface level diligence, but also required banks to "identify the beneficial ownership of accounts / transactions by taking all reasonable measures" and "determine whether the customer is acting on behalf of another person, and should then take reasonable steps to obtain sufficient identification data to verify the identity of that other person."[150] For any customer who was a "legal person," banks "are required to take reasonable measures to (i) understand the ownership and control structure of the customer (ii)

---

[148] *Id.*

[149] *Id.*

[150] *Id.* at 2.

determine that the natural persons who ultimately own or control the customer. This includes those persons who exercise ultimate effective control over a legal person or arrangement."[151]

202.   SBP also "advised that CDD / KYC is not a one time exercise to be conducted at the time of entering into a formal relationship with customer / account holder. This is an on-going process for prudent banking practices."[152]

203.   All of the above was considered standard diligence. SBP made clear that bank AML/CTF policies should provide for "Enhanced Customer Due Diligence depending upon the customers' background, country of origin, public or high profile position, nature of business, etc."[153] SBP's Circular stated: "Banks / DFIs shall conduct enhanced due diligence when: (a) dealing with high-risk customers, business relationship or transaction including the following; . . . legal persons or arrangements including non-governmental organizations (NGOs) / not-for-profit organizations (NPOs) and trusts / charities . . . high net worth customers with no clearly identifiable source of income; and . . . customers holding public or high profile positions."[154]

---

[151] *Id.*

[152] *Id.* at 3.

[153] *Id.* at 1.

[154] *Id.* at 4.

204.   Under SBP's requirements, if a bank at any time was "not able to satisfactorily complete required CDD / KYC measures including identity, beneficial ownership or information on purpose and intended nature of business relationship," then the banking relationship was to be terminated and the suspicious behavior reported to authorities.[155]

205.   SBP reiterated these requirements in two documents circulated to all banks in Pakistan in 2012. The first document recommended that "enhanced due diligence" be performed on suspicious customers, which could "include . . . Obtaining additional information on the customer (occupation, volume of assets, address, information available through public databases, *internet*, etc)."[156]

206.   The second document again required that banks engage in ongoing monitoring of "all business relations with customers,"[157] and stated: "Banks/ DFIs shall not provide any banking services to proscribed entities and persons or to those who are associated with such entities and persons, whether under the

---

[155] *Id*. at 5.

[156] State Bank of Pakistan, *AML/CFT Guidelines on Risk Based Approach for Banks & DFIs*, at 5 (2012), http://www.sbp.org.pk/bprd/2012/C2-BRA-Guidelines.pdf. (Emphasis added).

[157] State Bank of Pakistan, *Anti-Money Laundering and Combating the Financing of Terrorism (AML/CFT) Regulations for Banks & DFIs*, at 7 (Sept. 13, 2012), http://www.sbp.org.pk/bprd/2012/C2-AML-CFT-Regulations.pdf.

85

proscribed name or with a different name. The banks/DFIs should monitor their

relationships on a continuous basis and ensure that no such relationship exists."[158]

207.   SBP also issued specific conditions for banking relationships with

NGOs and "charities," including a requirement to "conduct enhanced due diligence

(including obtaining senior management approval) . . . to ensure that these

accounts are used for legitimate purposes and the transactions are commensurate

with the stated objectives and purposes."[159] Furthermore, "individuals who are

authorized to operate these accounts and members of their governing body should

also be subject to comprehensive CDD. Banks/DFIs should ensure that these

persons are not affiliated with any proscribed entity, whether under the same name

or a different name."[160]

208.   Finally, SBP contemplated that HBL and other banks would monitor

newspapers and other publications for references to the bank's accounts: "In case

of advertisements through newspapers or any other medium, especially when bank

account number is mentioned for donations, Banks/DFIs will ensure that the title of

the account is the same as that of the entity soliciting donations."[161] Given that

"enhanced due diligence" could include internet searches on bank customers, it is

---

[158] *Id*. at 8.

[159] *Id*. at 9.

[160] *Id*. at 10.

[161] *Id*.

likely that HBL reviewed references to its own accounts in publications and on the internet as well. Those searches would reveal that HBL's customers were notorious terrorists. More broadly, SBP's regulations put HBL on notice that terror financing would cause terrorist violence in the region.

209.   On paper, in internal policy manuals, HBL represented that it had AML and CTF procedures consistent with Pakistani law. These included rules requiring the bank to know its customers—which required it to "establish true identity and bona fides or prospective customers or users of the Bank's facilities"—and to "risk assess" each customer. Among other things, these policies and procedures show that HBL knew what it was *supposed to do* to prevent the financing of terrorism and terrorist attacks, *and why* it was supposed to do them.

210.   In or around 2004, HBL published a KYC manual that included, among other things, a list of "Types of Clients Requiring Prior Approval of Business Group Head." Those clients included "Institutions / Individual whose association with Habib Bank could be considered controversial."

211.   HBL's 2004 policy manual contemplated that HBL staff would be "responsible for interviewing the prospective client" to "obtain sufficient information on the reputation of the client, legitimacy of the business, and nature and source of activity expected in the account."

212.   The manual also detailed the "Broad Objectives of KYC Policies," which included "Prevent money laundering and use of Banking Channels for criminal activities." The 2004 policy manual alerted staff that "Cash lends anonymity to many forms of criminal activity and is the normal medium of exchange in the world of drug trafficking / terrorism and other criminal activities." HBL acknowledged that, to manage their illicit cash, terrorist and other "criminals need" banking services.

213.   HBL's AML/CTF manual effective November 2006 strengthened the bank's policies, at least on paper. That manual stated "As a policy, HBL would not do business with" "Prohibited client types," which included "Individuals or entities subject to UN or local Country sanctions" and any "Client or business segment black listed by the Bank or the Regulators." To meet these standards, HBL must have monitored United Nations and "local Country sanctions," along with Pakistani government terrorist lists. Indeed, the bank's AML/CTF policy manual states: "AMLD or respective country MLRO would be responsible for keeping the negative lists updated at all times." Further, HBL must have maintained its own internal "black list," based on its own independent diligence on prospective customers.

214.   As SBP required, HBL policies stated it would "monitor all transactions and activity on an on-going basis to ensure," among other things, that

88

customer balances and activity were "consistent with the customer's known business or profession," and "[a]ll relevant information has been taken into account to assess whether there are and reasonable grounds to suspect money laundering."

215.   Sometime between 2014 and 2017, HBL issued a AML/CTF policy manual that stated: "HBL shall not provide any banking services to proscribed / sanctioned entities and persons or to those who are known for their association with such entities and persons, whether under the proscribed name or with a different name." This policy mirrored the requirements detailed by SBP in 2012.[162]

216.   HBL also detailed its customer due diligence policies in questionnaires its executives submitted to the Wolfsberg Group during the period relevant to Plaintiffs' claims. From 2010 to the present, HBL has regularly checked "Yes" for each of these questions: (1) "Does the FI[163] have a requirement to collect information regarding its customers' business activities?"; (2) "Does the FI screen customers and transactions against lists of persons, entities or countries issued by government/competent authorities?; and (3) "In addition to inspections by the government supervisors/regulators, does the FI client have an internal audit function or other independent third party that assesses AML policies and practices on a regular basis?"

---

[162] State Bank of Pakistan, *AML/CFT Regulations*, *supra* note 157, at 8.

[163] In the Wolfsberg questionnaires, "FI" is short for "Financial Institution."

217.   Taken together, the KYC and CDD policies required by SBP, included in HBL's internal policy manuals, and represented to international banking groups, establish that HBL committed itself to comprehensive measures that would trigger numerous and serious red flags for each of the terrorists and terrorist groups discussed in this Complaint. These red flags arose both when HBL opened each account and when it conducted ongoing monitoring of the terrorist customers and accounts.

218.   Despite these red flags, HBL continued to provide financial services and thus facilitate the flow of funds to numerous high-profile terrorists and terrorist groups for years after they were designated as FTOs or SDGTs by the U.S. government, or sanctioned by the United Nations for association with al-Qaeda and the Taliban. Those designated customers include ones named in this Complaint: Jalaluddin Haqqani, founder of the FTO Haqqani Network; Osama bin Laden; Hafiz Muhammad Saeed and Zafar Iqbal, the co-founders of designated FTO LeT; the al-Qaeda fronts known as the Al Rashid Trust and Al Akhtar Trust; Al Rehmat Trust, the "operational front" for JeM; Dawood Ibrahim; and the ISI's preferred terrorist groups, JeM and LeT. HBL also continued to provide financial services for terrorists in Pakistan that the NYDFS publicly described but did not name in 2017, including the leader of a terrorist group. HBL has long represented that it continuously monitored U.S. and U.N. terrorist designations, and SBP separately

informed banks in Pakistan of all U.N. designations. Thus, HBL knew that some of its customers were high-profile and dangerous terrorists, worthy of designation by the United States and/or U.N. Yet it continued to provide them financial services.

219.   Other characteristics of each of these customers and their financial activity raised red flags. Both Al Rashid Trust and Al Rehmat Trust collected substantial sums in cash and deposited those funds to HBL accounts. Both also received international wire transfers from donors. As purported charities and NGO's, they were subjected to "Enhanced Due Diligence," and both the organizations and their members faced the same scrutiny. If their accounts were opened in the name of an individual, that person and his or her association with the "trusts" were quickly established. Regardless, both the entities and the individuals associated with them would trigger the "suspicion of money laundering / terrorism" provision of SBP's KYC and CDD requirements.

220.   HBL's banking relationship with al-Qaeda front Al Rashid Trust and its alter egos over many years reflects the bank's general awareness of its role with respect to terrorist finance and its agreement to facilitate its terrorist clients' violent objectives for another reason. After the United Nations froze Al Rashid Trust's bank accounts with HBL in 2001, HBL allowed Al Rashid Trust, using an alias, to use its original or new accounts to raise funds for a front for LeT (which had already been designated an FTO). When the U.S. and U.N. added Al Rashid

91

Trust's alias to their designations, HBL allowed the al-Qaeda and LeT front to withdraw its money before freezing only a symbolic amount in the accounts. *See supra* ¶ 167. The games HBL played with these designations reflect its general awareness of its important role in funding al-Qaeda, LeT, and other members of the al-Qaeda Terror Syndicate.

221.   Each of the individual terrorist leaders also tripped alarms at HBL. They certainly held "high profile positions" and were well-known terrorist founders, funders, leaders, and associates. Dawood Ibrahim is one of the best-known criminals, terrorists, and drug traffickers in South Asia. Even the most basic internet search on any of these individuals (much less the interview HBL committed to) reveals the criminal nature of the "reputation" HBL promised to check. And any risk assessment would present them as extremely high risk. At a minimum, each was an "[i]ndividual whose association with Habib Bank could be considered controversial." They thus triggered additional scrutiny, including prior approval of the bank's Business Group Head.

222.   HBL also knew that certain customers raised concerns as a result of specific government warnings. For example, NYDFS specifically warned HBL about Al Rajhi Bank, and the U.S. Senate had issued a report specifically documenting the bank's ties to al-Qaeda, but HBL knowingly continued to do

billions of dollars of business with Al Rajhi Bank in a manner that defied even minimal AML and CTF requirements.

223.   The same is true of the terrorist groups ISI used HBL to fund, and of the ISI itself. The terrorist groups ISI sponsored were U.S. and/or U.N. sanctioned before any of the terrorist attacks at issue in this Complaint, and there is no reason to believe HBL has cut off its financial services to the ISI. By any objective measure, the ISI is an extremely high-risk customer, and any diligence conducted on it would reveal its connections to designated terrorist groups.

224.   In addition to these known HBL customers, NYDFS described but did not name two terrorist customers of HBL in Pakistan, and indicated that HBL claimed to have screened and risk-assessed these customers, along with 152 other U.S. designated individuals. As NYDFS explained, these were "customers who purportedly had been specifically scrutinized by the bank and identified as very low risk."[164] NYDFS also identified at least once instance in which the bank's system alerted its staff to a transaction by a most-wanted criminal, but the staff improperly dismissed the alert as a "false positive" and deliberately cleared the transaction.

225.   Thus, when HBL conducted its due diligence on each customer on the "good guy" list and affirmatively determined that transactions for these customers

---

[164] *See* Notice at 7.

would not require further OFAC screening by its New York branch, it checked

them against U.S. and international designations/sanctions lists and knew or was

deliberately indifferent to the result: "154 terms included in Habib Bank's 'good

guy' list corresponded to identical entries that were included on the Specially

Designated Nationals and Blocked Persons List (the 'SDN List')," including the

leader of a Pakistani terrorist group, an international arms dealer, and "an

individual on the Specially Designated Global Terrorist list."[165]

226.   If HBL's representations to NYDFS were true, the bank must have

screened these 154 customers against U.S., U.N., and Pakistani sanctions lists,

conducted its own Enhanced Due Diligence of them, and then completely ignored

the resulting red flags. HBL followed the same process for each of the terrorists

and terrorist groups this Complaint identifies and focuses on. Thus, HBL provided

financial services and facilitated the flow of funds to members of the al-Qaeda

Terror Syndicate, knowingly or with deliberate indifference to their true nature.

227.   The circumstances of HBL's provision of financial services to the

Syndicate reinforce the inference of knowledge or deliberate indifference. NYDFS

found that HBL engaged in "wire-stripping" to remove inculpatory information

from transaction records. At other times, it processed SWIFT transactions without

appropriately detailed information regarding the transactors. And it continued its

---

[165] *Id.* at 8.

relationships with terrorist customers, and took active steps to shield their accounts and transactions from scrutiny in the United Stated and Pakistan, despite sustained efforts from multiple governments to convince HBL to stop financing terrorism.

228.   It is also revealing that HBL's customer list reads as a "Who's who" of major terrorists in the region. This is a case in which a bank repeatedly and flagrantly dealt with highly prominent terrorist leaders and their organizations. The most plausible conclusion from the sheer volume of terror financing that went through HBL is that the bank acted knowingly in soliciting and carrying out these transactions.

229.   **HBL knew or was deliberately indifferent to the fact that its terrorist customers were engaged in acts of international terrorism directed against Americans.** The terrorist designations and sanctions HBL monitored explained why each terrorist or group was named. Further, as discussed below, HBL understood that the U.S. government designated terrorist groups because they pose a grave threat to Americans. And HBL is a large, sophisticated bank, with branches throughout Pakistan (including the home bases of the Haqqani Network and JeM) and a branch (from 2004 until 2019) in Afghanistan. The diligence HBL conducted on its terrorist customers would reveal their associations with al-Qaeda and the Taliban, and their roles in violent attacks in Afghanistan—all of which

were publicized in credible, mainstream U.S. and international media sources, and were apparent to a bank of HBL's sophistication.

230.   **HBL knew or was deliberately indifferent to the fact that its own conduct caused violence against Americans.** In 2007, Mariane Pearl sued HBL for its role in the 2002 kidnapping and beheading of her husband, American journalist Daniel Pearl. *See Pearl v. Ahmed Omar Saeed Sheikh*, No. 07-cv-6639-PAC (S.D.N.Y.). Pearl's complaint alleged, *inter alia*, violations of the ATA as well as aiding and abetting, identifying HBL's transactions with Al Rashid Trust and Al Akhtar Trust, as well as the FTO Harakut-ul-Mujahideen, as predicates for liability. The complaint further alleged that these FTO recipients were acting with the support and direction of the ISI, and that both Al Rashid Trust and the terrorists the ISI sponsored were involved in operations in Afghanistan. HBL's spokesman denied the allegations, but the matter was not fully litigated. Instead, the lawsuit was voluntarily dismissed shortly after HBL's attorneys entered an appearance, suggesting a settlement.

231.   Whatever happened in the case, the allegations and evidence in HBL's possession placed it on notice that any business dealings with the ISI or Al Rashid Trust were prohibited and may have caused terrorist attacks that created liability under the Anti-Terrorism Act. After reviewing the *Pearl* complaint, HBL certainly understood that financing terrorists violated U.S. law, such that any further support

for the same or other terrorists after 2007—which was well-documented by NYDFS, the Federal Reserve, and SBP—could only have been perpetrated with the requisite scienter. HBL specifically understood this with respect to Al Rashid Trust, which, as discussed previously (*see* ¶¶ 162-167), the bank knowingly circumvented U.S. and U.N. sanctions to support, *after* the *Pearl* suit was filed.

232.   The *Pearl* lawsuit was by no means the only warning that assisting in terrorist finance would cause violence against Americans. HBL is a sophisticated financial institution that has long operated in the United States and is presumed by law to understand the purpose of the criminal law prohibitions on material support to terrorists as well as the requirements of the Bank Secrecy Act and all applicable AML and CTF regulations.

233.   As the U.S. Supreme Court has explained, "Congress has prohibited the provision of 'material support or resources' to certain foreign organizations that engage in terrorist activity. 18 U.S.C. § 2339B(a)(1). That prohibition is based on a finding that the specified organizations 'are so tainted by their criminal conduct that any contribution to such an organization facilitates that conduct.' Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), §301(a)(7), 110 Stat. 1247, note following 18 U.S.C. § 2339B (Findings and Purpose)."[166]

---

[166] *Holder v. Humanitarian Law Project*, 561 U.S. 1, 7 (2010).

234.   As a sophisticated financial institution, HBL understood the role that banks play in the international financial system as well as how HBL itself would play a vital role in facilitating the flow of funds from donors and operatives around the world to terrorist organizations in Pakistan if it permitted terrorist organizations and/or their operatives to gain access to financial system through the bank.

235.   Thus, HBL understood that "any contribution" it made to members of the al-Qaeda Terror Syndicate—including permitting the Syndicate and/or its operatives to gain access to the global financial system through the bank—would facilitate their violent campaigns.

236.   The United Nations likewise imposes terrorist financing sanctions. As relevant here, these sanctions began in 1999, when, pursuant to Resolution 1267, the U.N. Security Council imposed sanctions on the Taliban, largely due to the fact that it was harboring Osama bin Laden and other terrorists in Afghanistan.[167] These sanctions included an assets freeze against designated individuals and entities. In 2011, the Security Council adopted Resolution 1989, which split the previous committee in two—one called the Al-Qaida Sanctions Committee, and the other still focused on the Taliban. In 2015, the Committee was expanded again to include

---

[167] U.N. Security Council, Security Council Committee Pursuant to Resolutions 1267 (1999) 1989 (2011) and 2253 (2015) Concerning Islamic State in Iraq and the Levant (Da'esh), Al-Qaida and Associated Individuals, Groups, Undertakings, and Entities, https://www.un.org/securitycouncil/sanctions/1267#background_info.

Da'esh (ISIS). The committee's sanctions require all states to "freeze without delay the funds and other financial assets or economic resources of designated individuals and entities."[168] The sanctions apply to persons or entities that will be listed because they "[p]articipat[e] in the financing, planning, facilitating, preparing, or perpetrating of acts or activities by, in conjunction with, under the name of, on behalf of, or in support of" al-Qaeda.[169]

237.   As the United Nations explains, "[t]he purpose of the assets freeze is to deny listed individuals, groups, undertakings and entities the means to support terrorism."[170] The terms of the freeze are broad, and are "preventative in nature."[171] For implementation, states circulate the list of sanctioned individuals to commercial banks, who are in turn supposed to screen the list against their client databases.[172] The State Bank of Pakistan follows this practice. The United Nations further cautioned about the possibility that designated individuals and entities would control funds indirectly, that money was fungible such that even apparently

---

[168] *Id.*

[169] *Id.*

[170] United Nations Al-Qaida Sanctions Committee, Assets Freeze: Explanation of Terms ¶ 3 (2015), https://www.un.org/securitycouncil/sites/www.un.org.securitycouncil/files/ eot_assets_freeze_-_english.pdf.

[171] *Id.* ¶ 26.

[172] *Id.* ¶ 27.

benign transactions should be blocked, and that non-profit organizations would also be subject to abuse.[173]

238.  Thus, the United Nations called "upon Member States to move vigorously and decisively to cut the flows of funds and other financial assets and economic resources to individuals and entities on the Al-Qaida Sanctions List."[174]

239.  Based on these sustained measures, in place since 1999, HBL necessarily understood that any support for sanctioned organizations—or similar organizations—would support terrorist violence.

240.  During the period relevant to Plaintiffs' claims, the government of Pakistan also made it clear that funding terrorists leads to terrorist violence. Pakistan relied on its own Anti Terrorism Act, 1997 to starve terrorist groups of the funds critical to their ability to plan and stage attacks. This is clear from the Act's preamble: "An Act to provide for the prevention of terrorism, sectarian violence and for speedy trial of heinous offences."[175]

241.  HBL's internal policy manuals for the prevention of money laundering and terrorist finance have acknowledged since at least 2006 that HBL is required to comply with the Anti Terrorism Act, 1997.

---

[173] *Id.* ¶¶ 5, 19-21, 29.

[174] *Id.* ¶ 29.

[175] *See* Anti Terrorism Act, 1997, *available at* https://www.satp.org/Docs/Document/7.pdf.

242.   In a 2013 version of this manual, HBL paraphrased the Act: "A Person commits an offence if he/she enters into or becomes concerned in any arrangement which facilitates the retention or control, by or on behalf of another person of terrorist property.

(a) By concealment,

(b) By removal from the jurisdiction.

(c) By transfer of nominees, or

(d) In any other way."

Thus, HBL knew both the Anti Terrorism Act, 1997's requirements and its purpose: to prevent terrorist violence.

* * *

243.   With respect to primary liability under the ATA, HBL's policies for countering money laundering and the financing of terrorism, its understanding of the purposes of those policies and the violent consequences of violating them, and its actual conduct with respect the terrorists and terrorist groups it not only serviced but shielded from asset seizures and other legal actions, establish that HBL facilitated the flow of essential funds to members of the al-Qaeda Terror Syndicate knowing or with deliberate indifference to the fact that it was (i) providing material support to FTOs with knowledge of or deliberate indifference to their connection to terrorism; and (ii) providing material support to terrorist groups knowing or

101

deliberately indifferent to the consequence that its support would facilitate the terrorists' violent campaigns, including against Americans.

244.   Because support for terrorism was the necessary consequence of HBL's actions, and because HBL knew this, it also acted with the apparent intent to intimidate or coerce a civilian population, influence policy by intimidation or coercion, or affect the conduct of a government by mass destruction, assassination, or kidnapping. Indeed, these outcomes were the avowed purpose of HBL's terrorist customers.

245.   HBL also acted with the scienter necessary for secondary liability. HBL's policies, understanding of the purpose of those policies, and conduct contrary to them establish that it was at least generally aware that it was playing a role in the al-Qaeda Terror Syndicate's overall tortious scheme to commit terrorist violence by facilitating terrorist financing to members of the Syndicate.

## C. HBL's Assistance to the al-Qaeda Terror Syndicate Was Substantial, and Caused Terrorist Attacks

246.   HBL played a crucial role in allowing members of the al-Qaeda Terror Syndicate—including al-Qaeda, the Taliban (including the Haqqani Network), LeT, and JeM (the terrorist organizations principally responsible for the attacks in this case)—to perpetrate terrorist attacks because the amounts of U.S. dollars and other currencies that it funneled to these groups were high (millions of

102

dollars), and the money was important to the Syndicate's ability to carry out violent attacks on Americans.

247.   By knowingly maintaining accounts and processing transactions for members of the al-Qaeda Terror Syndicate and their agents, HBL participated in the financial infrastructure essential to terrorism against Americans in Afghanistan.

248.   HBL also took deliberate steps that made it easy for members of the Syndicate to raise and move money without detection. Most clearly, HBL's use of the "good guy" list assured terrorists and their funders that donations made through HBL would not be blocked or frozen in transit, but would instead be protected from scrutiny and reach their intended beneficiaries. HBL's concealment of wire transfer information had the same effect. This assurance, along with HBL's prominence, size, and easy access to U.S. dollar clearing in the United States, made it an attractive vehicle for terror financing.

249.   By knowingly allowing terrorist groups and fundraisers to openly solicit donations to their HBL accounts, HBL also lent its public profile as Pakistan's largest bank to terrorist fundraising efforts. In fact, HBL was well-known for decades in the region as a safe space for terrorists and their financial angels. Thus, fundraisers and donors to the members of the al-Qaeda Terror Syndicate could rest assured that the funds they transferred through HBL would

achieve the desired goal of supporting terrorist attacks on Americans in

Afghanistan and elsewhere.

250.   HBL's customers used their accounts at the bank to hold and transfer

huge sums, totaling at least several million dollars, to members of the al-Qaeda

Terror Syndicate from 2006 through at least 2017. These funds were significant

enough to have been a substantial factor in both strengthening the Syndicate's

terrorist enterprise and causing the attacks that injured Plaintiffs.

251.   As explained in the detailed descriptions of the members of the

Syndicate, HBL's conduct aided the Syndicate in carrying out deadly terrorist

attacks. Contributions to al-Qaeda and the Haqqani Network helped pay for, *inter*

*alia*, weapons, explosives, recruiting, salaries, and other necessary expenses to

commit terror attacks. Contributions to LeT helped pay for recruiting for terrorists,

and especially suicide bombers. And contributions to JeM helped pay for recruiting

for suicide bombers as well as martyr payments for those who took part in

Syndicate attacks.

252.   These sustained transfers provided the Syndicate sufficient resources

to injure and kill Americans, including Plaintiffs and Plaintiffs' family members.

Indeed, the amount of money required to perpetrate terror attacks in Afghanistan

and Pakistan is relatively small (a few thousand dollars or less for a suicide

bombing).[176] That is true generally, and especially true in this case because the al-Qaeda Terror Syndicate already had a sophisticated terrorist infrastructure that allowed it to deploy these funds for maximum violent effect.

253.   The substantiality of HBL's assistance, and its causal effect, is confirmed by the legislative findings underlying the laws it violated. U.S. law flatly prohibits knowingly providing any material support to an FTO, and broadly prohibits transactions with SDGTs. This is precisely because the U.S. government—both Congress and the Executive Branch—have concluded that any material contribution to an FTO promotes terrorist attacks. NYDFS raised similar concerns with HBL starting in 2006.

254.   Government communications further confirm that terrorist financing leads to terrorist violence against Americans. As an unclassified cable (as published by *WikiLeaks*) from the U.S. Ambassador to India to the U.S. Secretary of State explained in February 2010 (right before the attacks in this case began):

> *Cutting off the financing of terrorist groups is a key component of our national strategy to combat terrorism. A large number of terrorist organizations operate in South Asia including*, but not limited to *al-Qa'ida (AQ), Lashkar e-Tayyiba (LT)*, Tehrik*i-Taliban (TTP), Harakat ul-Jihad-i-Islami/Bangladesh (HUJI-B), Harakat ul-Jihad-Islami (HUJI), Harakat ul-Mujahedin (HUM), *Jaish-e-Mohammed (JEM)*, and Lashkar I Jhangvi (LJ). *In order to operate and grow, these groups depend on and receive funding from outside sources*

---

[176] *See, e.g.*, Ann Wilkens, *Suicide Bombers and Society: A Study on Suicide Bombers in Afghanistan and Pakistan*, at 15-16 & n.14 (2011), *available at* https://www.foi.se/rest-api/report/FOI-R--3058--SE (describing the low price of suicide bombs).

including wealthy donors and grass root organizations in Pakistan, Saudi Arabia, United Arab Emirates (UAE) and other Gulf and Islamic states. *Building the capacity* of governments in South Asian countries *to stem the flow of funds to terrorist groups is essential to disrupting their activities*. The creation of robust financial investigative capabilities in South Asia is *critical to reaching our counterterrorism goals*. (Emphases added.)[177]

255.   By encouraging and facilitating money transfers to members of the al-Qaeda Terror Syndicate and shielding their assets and transactions from regulators and law enforcement, HBL performed an essential role in providing material support to al-Qaeda, the Taliban (including the Haqqani Network), LeT, JeM, and the rest of the al-Qaeda Terror Syndicate.

256.   HBL thus aided and abetted and conspired with the al-Qaeda Terror Syndicate in committing the attacks that injured Plaintiffs.

257.   That support was a substantial factor in the sequence of responsible causation for the attacks at issue in this case because it provided the Syndicate with resources it could use to pay for and carry out attacks on Americans. Specifically, transfers knowingly facilitated by HBL helped the members of the Syndicate pay for weapons, explosives, recruiting, salaries, martyr payments, and other necessary expenses to commit terror attacks.

---

[177] https://wikileaks.org/plusd/cables/10NEWDELHI356_a.html

### D. HBL's Assistance to the al-Qaeda Terror Syndicate Had a Substantial Nexus to the United States

258.    HBL's substantial assistance to the al-Qaeda Terror Syndicate had a substantial nexus to the United States for three reasons.

259.    First, HBL's conduct targeted the United States because the bank knew that its material support would aid and facilitate terrorists targeting Americans.

260.    Second, HBL's conduct occurred in the United States because much of HBL's illicit and knowing assistance to the al-Qaeda Terror Syndicate was directed through HBL's New York Branch.

261.    Third, HBL conspired with the al-Qaeda Terror Syndicate, who directed their violent acts at the United States.

**HBL's Conduct Targeted the United States**

262.    HBL knowingly provided material support to al-Qaeda, the Haqqani Network, and LeT, knowing that these terrorist organizations were expressly targeting the United States and Americans.

263.    The al-Qaeda Terror Syndicate directed attacks at *Americans* with the specific intent of killing *Americans* in particular—so that it could inflict pain in the

107

United States and influence U.S. policy.[178] It did not incidentally injure Americans in the course of other terrorist operations.

264.   The al-Qaeda Terror Syndicate's ultimate, publicly stated goal was to effect a withdrawal of coalition forces from Afghanistan, and to murder Americans as commanded in Osama bin Laden's 1998 *fatwa*.

265.   Each terrorist attack that killed and injured Plaintiffs was part of that campaign of anti-American terrorism.

266.   HBL provided banking services to al-Qaeda, Haqqani Network, and LeT operatives and fundraisers knowing that the Syndicate would use the resulting funds to target U.S. citizens in terrorist attacks.

267.   HBL knowingly provided financial services for al-Qaeda's terrorist enterprise, even going so far as to deem certain terrorists who were members or supporters of the Syndicate "good guys" as shown by the "good guy" list.

268.   HBL's motivation for assisting al-Qaeda, the Haqqani Network, and LeT was to harm Americans in Afghanistan and help drive America out of the country. HBL had two distinct but related reasons for desiring that outcome.

---

[178] *See* U.S. Dep't of Justice, *Manhattan U.S. Attorney Announces Extradition of OFAC-Sanctioned Afghan Man for Narco-Terrorism Offenses* (Feb. 6, 2019) ("Haqqani Network and the Taliban have been and are engaged in highly public acts of terrorism against U.S. interests, including U.S. and coalition forces in Afghanistan.").

269.   *First*, HBL's management subjectively supported the mission of anti-American terrorists in Afghanistan. This allegation is supported by multiple known facts, including that HBL's employees:

(i)     Created, maintained, and utilized the "good guy" list, which was expressly designed and used to undermine the enforcement of American terrorism-related financial rules by preemptively excusing certain terrorists, each of whom HBL deemed to be a "good guy," and worth protecting from American counter-terrorism scrutiny;

(ii)    Pursued an arrangement with the ISI under which HBL provided funds and services to anti-American terrorists; and

(iii)   Personally tended to HBL's relationships with key terrorists who supported the operations of the Syndicate including LeT's co-founders, Hafiz Muhammad Saeed and Zafar Iqbal, as well as D-Company founder (and al-Qaeda and LeT supporter), Dawood Ibrahim.

The most plausible inference from these facts is that HBL's management subjectively intended to assist its terrorist customers in their effort to harm Americans, because none of these actions could have occurred on accident—and certainly all of these actions in combination could not have been accidental.

270.   *Second*, HBL decided that harming Americans was the necessary price of maintaining a good relationship with the ISI, or at least those elements within the ISI that frequently used HBL to achieve their objectives. Through the ISI's longstanding support of the Taliban, the Haqqani Network, and LeT, the ISI made plain to any thinking observer—let alone a sophisticated Pakistani bank—

that the ISI viewed terrorist attacks against Americans in Afghanistan as supporting the ISI's strategy in Afghanistan.

271.   The price of HBL's continued close relationship with the ISI was HBL's demonstrated willingness to assist the ISI in its efforts to funnel money to terrorist proxies in Afghanistan and Pakistan. HBL intentionally aided and abetted the ISI's support of the terrorist campaign against Americans in Afghanistan as a way to curry favor with—and receive business from—the ISI.

## HBL's Conduct Relied Upon HBL's New York Branch or Other New York Correspondent Banks

272.   The NYDFS and Federal Reserve reviews, consent orders, and settlement focused on financial transactions that flowed through the only HBL entity they regulated: HBL's New York branch. Those transactions involved both large volume and dollar values, and they reflected continuous (since at least 2006) misuse of HBL's New York branch to process transactions on behalf of terrorist operatives and funders.

273.   As discussed below, HBL also processed financial transactions for, and provided financial services to, the members of the al-Qaeda Terror Syndicate discussed herein by virtue of those groups' receipt of donations from outside Pakistan, which involved currency exchanges and wire transfers that HBL cleared through its New York branch.

274.   Each of HBL's transactions on behalf of terrorist operatives and funders was intentionally routed through HBL's New York branch rather than, for example, a correspondent account with another New York bank.

275.   This was necessary to the criminal scheme for several reasons. First, HBL's own New York branch could be, and was, directed by its headquarters to process transactions without screening them because HBL had already vouchsafed that "due diligence" had been performed on those customers.

276.   No legitimate U.S. financial institution would have agreed to violate U.S. laws and clear these transfers without OFAC screening.[179]

277.   Second, terrorist groups depend on access to and deployment of U.S. dollars to fund their operations and facilitate their terror campaigns. Specifically, the al-Qaeda Terror Syndicate responsible for Plaintiffs' injuries solicits and relies upon donations from around the world. These donations primarily default to or require exchange into U.S. dollars, which is why HBL routed them through the United States and had to develop an internal mechanism to prevent scrutiny from U.S. regulators.

---

[179] For these reasons, it is unlikely that transactions HBL processed for U.S.-designated members of the al-Qaeda Terror Syndicate were routed through other U.S. correspondent banks. Indeed, as a result of HBL's closure of its New York branch, it has begun a process of "de-dollarisation," which is directly related to this issue. *See* The International News, *Habib Bank to Wind Down Afghanistan's Operations* (Mar. 29, 2019), https://www.thenews.com.pk/print/450070-habib-bank-to-wind-down-afghanistan-s-operations.

278.    Indeed, global donations are the lifeblood of the al-Qaeda Terror Syndicate. As the U.S. Ambassador to India explained in 2010, "these groups depend on and receive funding from outside sources" around the world.[180] This was specifically true with respect to the transactions NYDFS focused on and found threatened the lives of Americans.

279.    Pakistan's former Finance Minister stated that the primary problem NYDFS focused on was "payments originating in Saudi Arabia" that "went to Pakistan" and were then "exploited by terror groups, money-launderers and smugglers."[181] These were the transactions that NYDFS found to "open the door to the financing of terrorist activities that pose a grave threat to" New Yorkers and put "the safety of our nation at risk." Thus, there is a direct line between HBL's transfer of funds from outside Pakistan to Pakistan-based terrorist groups and the injuries Plaintiffs suffered.

280.    Such international transfers necessarily involved U.S. dollars. Commercial banks that accept funds in one currency (for example, Saudi riyals) and deposit them in another, typically choose a central currency to exchange into and out of.

---

[180] Cable, *supra* note 177.

[181] K.K. Shahid, *FATF Team Arrives in Pakistan*, The Friday Times (Aug. 17, 2018).

281.   As Stanford Economics Professor Ronald McKinnon explained,
"choosing one currency like the dollar to be the intermediary currency is the most
natural way of economizing on foreign exchange transacting.[182] That is because it
is far easier and less expensive to use a single central currency than it is to set up
bilateral currency exchange markets for every possible currency pair (the example
Professor McKinnon gives is that if a bank wished to trade 150 currencies all
against each other, it could set up 149 markets if it used a central currency, as
opposed to 11,175 markets if it created a separate market for each currency pair).
The U.S. dollar is by far the most common central currency. Accordingly, if a
donor in Saudi Arabia wanted to donate in riyals to a terrorist organization in
Pakistan that needed U.S. dollars or Pakistani rupees, that transaction is likely to be
cleared through a correspondent bank in the United States that would convert the
riyals to dollars (and the dollars to rupees if needed) before transferring the funds
to Pakistan.

282.   For this reason, HBL's New York Branch was involved in many
transactions for its terrorist customers that did not originate in the United States or
were not originally denominated in dollars.

---

[182] Ronald McKinnon, *The World Dollar Standard and Globalization: New Rules for the Game?*, Stanford Ctr. for Int'l Dev., at 8-9 (Sept. 2003), *available at* https://kingcenter.stanford.edu/sites/default/files/publications/181wp.pdf.

283.   HBL's terrorist clients did not only require U.S. dollars to convert non-Pakistani currencies to rupees. They also withdrew U.S. dollars from HBL accounts in Pakistan. For example, the ISI gave significant amounts of U.S. dollars to the Haqqani Network, which it obtained from the bank Indian intelligence described as ISI's "funding agency," HBL. HBL needed its New York branch to make these dollars available.

284.   In addition, the financial transactions HBL's New York branch processed for members of the al-Qaeda Terror Syndicate, and any other financial services it provided to them, were inextricably tied to, and relied on, a payments processing platform that was tied to the banking laws and infrastructure of New York State.

285.   In August 2008, HBL announced it had joined the Clearing House Interbank Payment System ("CHIPS").[183] In a press release, Faiq Sadiq, Country Manager for Habib Bank Limited in the U.S. stated "CHIPS is a world-class wire transfer system that provides Habib Bank Limited with the capability to clear and settle payments quickly and at a reduced cost . . . Connecting to the CHIPS network is not only safe and secure, but also offers Habib Bank Limited the

---

[183] FinExtra, *Pakistan's Habib Bank connects to Chips* (Aug. 21, 2008), https://www.finextra.com/pressarticle/22942/pakistans-habib-bank-connects-to-chips.

capability to serve the global needs of its business customers."[184] A representative

of The Clearing House, which owned CHIPS, added: "In an increasingly global

economy, financial institutions and their customers need wire transfer capabilities

that can help them conduct business anywhere in the world . . . CHIPS is

committed to helping institutions and their customers achieve their strategic

business objectives by providing a premier wire transfer solution used by the

world's largest banks and corporations. Using CHIPS for its payments needs will

also give Habib Bank Limited the opportunity to maximize their liquidity."[185]

286.   HBL decided for financial and competitive reasons to join CHIPS,

and its participation in that payment system during the time period relevant to

Plaintiffs' claims[186] was integral to HBL's ability to process international wire

transfers and to conduct currency exchange operations.

287.   CHIPS is owned by a New York corporation, The Clearing House

Payments Company L.L.C. CHIPS' Rules and Administrative Procedures provide

that "[t]he rights and obligations of a Participant as Sending or Receiving

Participant to a CHIPS payment message shall be governed by these Rules and by

the laws of the State of New York, including Article 4-A of the New York

---

[184] *Id.*

[185] *Id.*

[186] HBL was a member of CHIPS from at least early 2009 to July 2017.

Uniform Commercial Code" and "[t]he rights and obligations of all other parties to a funds transfer of which a CHIPS payment message is a part, shall be governed, to the greatest extent permitted by law, by these Rules and the law of the State of New York, including Article 4-A of the New York Uniform Commercial Code."[187]

288.   Accordingly, HBL, through the use of its New York Branch, has purposefully availed itself of (1) New York's dependable and transparent banking system (which allows donors to its terrorist customers to transfer funds without fear of loss); (2) the U.S. dollar as a stable and fungible currency (which permits the exchange of currencies essential to terrorist fundraising); and (3) the predictable jurisdictional and commercial law of New York (which governed HBL's banking services using New York-owned CHIPS).

**HBL Conspired with Al-Qaeda, the Haqqani Network, and LeT to Harm Americans**

289.   Finally, HBL joined a conspiracy to commit terrorist attacks against Americans. HBL's terrorist customers were engaged in an ongoing conspiracy, through the Syndicate, to commit terrorist attacks against Americans. This conspiracy was purposely directed at the United States because the Syndicate

---

[187] The Clearing House, *CHIPS Rules and Administrative Procedures Effective April 1, 2020*, https://www.theclearinghouse.org/-/media/new/tch/documents/payment-systems/chips_rules_and_administrative_procedures_2020_effective_04-01-2020.pdf.

sought to kill Americans specifically, and to undermine U.S. foreign policy interests by targeting U.S. soldiers and civilians abroad.

290.   To achieve the objective of that conspiracy, the conspirators sought to raise money to fund the planning and commission of terrorist attacks, and to shield their funds from government scrutiny and seizure.

291.   HBL's terrorist customers were themselves members of the conspiracy because they were either members of the Syndicate or were agents of members of the Syndicate. By agreeing to provide the conspirators with funds and financial services, including illicit access to the U.S. financial system, while knowing that these terrorist organizations would use the resulting funds to pay for terrorist attacks, HBL joined the Syndicate conspiracy.

292.   The terrorist attacks at issue in this case were foreseeable acts in furtherance of the conspiracy. Indeed, the attacks, and others like them, were the conspiracy's primary objective.

## III.   Al-Qaeda Committed, Planned And Authorized The Terrorist Attacks That Injured Plaintiffs

293.   While HBL and its customers were supporting the al-Qaeda Terror Syndicate, the Syndicate was carrying out violent attacks on Americans. The attacks at issue in this case injured 72 unique victims and occurred from June 7, 2010 through January 14, 2019. The attacks included suicide bombings, IED attacks, mortar attacks, and/or rocket attacks against Americans in Afghanistan.

These attacks were committed, planned, and authorized by al-Qaeda, and carried out by al-Qaeda, the Taliban (including the Haqqani Network), and/or LeT. As noted above, JeM also played a role in these attacks, sometimes helping to recruit suicide bombers, and also paying martyr payments afterward.

### A. Al-Qaeda Led the Syndicate

294.   Following the Soviet withdrawal from Afghanistan, Osama bin Laden began to transform al-Qaeda into a global terrorist group capable of launching attacks around the world. After moving to Sudan in the early 1990s, al-Qaeda's leadership returned to Afghanistan in approximately 1996, where it was sheltered by the Taliban for the next five years. Osama bin Laden declared war on the United States in a published *fatwa* (an authoritative religious decree) in 1996.[188] One scholar who surveyed first-hand accounts of the initial meeting between bin Laden and the Taliban during this period reported that it "emphasize[d] the Taliban's humble attitude toward the Saudi guest and their immediate readiness to serve him."[189]

295.   In return for the Taliban's safe harbor, al-Qaeda provided substantial resources to the Taliban. By March 1997, bin Laden had met with Mullah Mohammed Omar personally and offered to lend his fighters to the Taliban. As bin

---

[188] *See* sources cited *supra* note 5.

[189] Stenersen, *Al-Qaida in Afghanistan*, *supra* note 5, at 58.

118

Laden's deputy, Abu Hafs al-Masri, wrote at the time, the Taliban "movement is a capable Islamic entity and it is possible that it can be a turning point for the betterment of the Islamic world. The movement needs a vision and it needs support. It needs someone who will give it a military strategy. And it needs to build a military force which is suitable for the situation in Afghanistan."[190] To that end, al-Qaeda shared technical knowledge with the Taliban and paid the Taliban between $10 million to $20 million a year for shelter. In doing so, Al-Qaeda supplied the strategy and support the Taliban needed to morph into a deadly terrorist group capable of inflicting mass casualties on Americans.

296.   At the same time that Osama bin Laden was cementing his ties with the Taliban, he was escalating his attacks on the United States. In 1998, while under the Taliban's protection, Osama bin Laden declared a global jihad against the United States, calling on all Muslims to kill Americans at any opportunity. On August 7, 1998, al-Qaeda suicide bombers in explosive-laden trucks attacked U.S. embassies in Kenya and Tanzania, killing more than 200 people. The United States responded two weeks later with missile strikes on al-Qaeda bases in Afghanistan and demanded that Mullah Omar turn over Osama bin Laden. He refused.

---

[190] *Id.* at 67-68.

297.   On October 8, 1999, the U.S. State Department designated al-Qaeda as an FTO, and a week later the United Nations called for sanctions against the Taliban unless it expelled bin Laden from Afghanistan. Again, the Taliban refused.

298.   In the spring 2001, Osama bin Laden, on behalf of al-Qaeda, pledged an oath of allegiance to Mullah Omar and the Taliban. A few months later, on September 11, 2001, al-Qaeda attacked the World Trade Center in New York and the Pentagon, killing thousands. A third attack, possibly aimed at the White House, was thwarted by passengers aboard United Flight 93. The United States demanded once again that the Taliban turn over bin Laden, and once again the Taliban refused. The Coalition invaded Afghanistan in October, and bin Laden and Taliban leaders eventually fled to Pakistan.

299.   Al-Qaeda's and the Taliban's close relationship continued long after September 11. During this period, the Taliban's "ties to al-Qaeda were crucial to the Taliban's growth as an insurgency after its routing from Afghanistan."[191] In May 2007, for example, Taliban official Mullah Dadullah said, "[W]e and al-Qaeda are as one."[192] In early 2009, a military-intelligence official was quoted as saying, "The line between the Taliban and al Qaeda is increasingly blurred,

---

[191] McNally & Weinbaum, *Resilient al-Qaeda*, *supra* note 53, at 3.

[192] Thomas Ruttig, *The Other Side*, Afghanistan Analysts Network, at 23 (July 2009).

especially from a command and control perspective."[193] By the end of that year, Chairman of the Joint Chiefs of Staff Admiral Michael Mullen said the same thing openly. "We are deeply concerned about the growing level of collusion between the Taliban and al Qaeda," he told *The Wall Street Journal*.[194] And as Lieutenant General Ronald L. Burgess, Jr. testified to the Senate Select Committee on Intelligence, "Al-Qa'eda's propaganda, attack planning and support of the Taliban and Haqqani networks continues."[195]

300.   The Taliban and al-Qaeda have remained intimately intertwined in the years since. For example, in 2015, Osama bin Laden's successor, Ayman Zawahiri, pledged an oath of allegiance to the recently-installed Taliban leader Mullah Akhtar Mohammad Mansour, who publicly announced his acceptance of the pledge the following day.[196] When Mansour was killed in May 2016, Zawahiri pledged allegiance to his successor, Mawlawi Haibatullah Akhundzada.

301.   The overlap between the organizations meant that al-Qaeda routinely played an important role in Taliban and Haqqani terrorist attacks. As terrorism

---

[193] Bill Roggio, *Al Qaeda Builds A 'Shadow Army'*, Wash. Times (Feb. 13, 2009).

[194] Anand Gopal, *Afghan Police Killings Highlight Holes in Security*, Wall St. J. (Dec. 15, 2009).

[195] *Current and Projected National Security Threats to the United States?*: Hr'g Of The Senate Select Committee On Intelligence, S. Hr'g 111-557, at 13 (Feb. 2, 2010) (statement of Lt. Gen. Ronald Burgess, Jr., Dir., Def. Intelligence Agency), 2010 WLNR 27828348.

[196] Thomas Joscelyn & Bill Roggio, *New Taliban Emir Accepts al Qaeda's Oath Of Allegiance*, Long War J. (Aug. 14, 2015).

121

scholars Bill Roggio and Thomas Joscelyn observed, "[i]t is not clear where, say, al Qaeda ends and the Taliban and other terrorist groups begin. This is by design. Bin Laden envisioned al Qaeda as the vanguard of a broader jihadist coalition. Al Qaeda was always a joint venture."[197] Mr. Joscelyn testified that the word "syndicate"—referring to the Taliban's and al-Qaeda's joint terrorist venture in Afghanistan—offers an "excellent description of how al Qaeda operates."[198]

302.   Al-Qaeda's leadership of that terrorist syndicate reflected the degree to which al-Qaeda and the Taliban became fully and operationally intertwined. As India's Permanent Representative to the United States explained in describing the al-Qaeda-Taliban "syndicate of terrorism," both groups were by 2011 "ideologically and operationally fused."[199] By the fall of 2009, the noted journalist Peter Bergen concluded, "the Taliban and Al Qaeda function more or less as a single entity. The signs of this are everywhere."[200]

303.   The Taliban and al-Qaeda's interdependence and joint venture continued throughout the period in which Plaintiffs were killed and injured. As two

---

[197] Roggio & Joscelyn, *The al Qaeda-Taliban Connection*, *supra* note 4.

[198] *Al-Qaeda in Afghanistan and Pakistan: An Enduring Threat*, Hr'g Before the H. Comm. on Foreign Affairs, Subcommittee on Terrorism, Nonproliferation, and Trade, S. Hr'g 113-156 , at 28 (May 20, 2014) (statement of Thomas Joscelyn, Sr. Research Fellow, Found. for Def. of Democracies), 2014 WLNR 13518260.

[199] *India Against Hasty Troop Withdrawal From Afghanistan*, Daily Fin. Post (Oct. 1, 2011), 2011 WLNR 20105460 (quoting Hardeep Singh Puri, India's Permanent Representative to the United Nations).

[200] Peter Bergen, *The Front: The Taliban-Al Qaeda Merger*, New Republic (Oct. 19, 2009).

defense writers noted in 2016, the U.S. military's relative success against al-Qaeda neither eliminated al-Qaeda nor broke apart the syndicate in which it participated: Afghanistan's southern and eastern provinces remained a "hub of Afghan insurgents and [the] al-Qaeda-led terrorist syndicate."[201]

304.   In 2010, one terrorism scholar warned against drawing a bright line between al-Qaeda and the Afghan terrorist groups that it sponsored. In explaining the importance of "recogniz[ing] the link between al Qa'ida and Afghan insurgent groups," he observed that a "policy focused on targeting al-Qa'ida—and not the Taliban, Haqqani Network, or other groups—would ignore one of the most egregious lessons from September 11."[202]

305.   The U.S. government agreed with that assessment. During the relevant timeframe, the U.S. government repeatedly stated that al-Qaeda and the Taliban acted together in a terrorist "syndicate," and warned against efforts to distinguish between them. Examples include:

- <u>Secretary of State Hillary Clinton, July 2009</u>: "[W]e had an intensive strategic review upon taking office[.] And we not only brought the entire United States government together, but we reached out to friends and allies . . . [T]he result of that strategic review was to conclude that **al-Qaeda** is supported by and uses its extremist allies like elements within **the Taliban** . . . **to be proxies for a lot of its attacks** . . . So the

---

[201] Ayaz Ahmed & Dr. Faisal Javed, *Pakistan And SCO: Opportunities for Pakistan*, Asian Defence J. (Aug. 31, 2016), 2016 WLNR 25890108.

[202] Seth G. Jones, *In the Graveyard of Empires: America's War in Afghanistan*, at 332 (W.W. Norton & Co. 2010).

*Taliban* . . . [is] part of a kind of ***terrorist syndicate with al-Qaeda at the center***[.]"[203]

- Secretary of State Hillary Clinton, December 2009: "[W]e have increasingly come to see these organizations ***not as separate independent operators*** that occasionally cooperate with one another, ***but as part of a syndicate of terrorism***. . . . [T]he level of operational cooperation, training, equipping, financing, has grown exponentially. And ***at the head of the table, like an old Mafia kind of diagram, sits al Qaeda***."[204]

- Secretary of Defense Robert Gates, January 2010: "Defense Secretary Robert M. Gates said yesterday that ***Al Qaeda was using proxy terrorist groups to orchestrate attacks in*** . . . ***Afghanistan*** as part of a broader strategy to destabilize the region. In a news conference held after two days of meetings with Indian officials, ***Gates said Al Qaeda had formed a 'syndicate' of terrorist groups with Taliban factions in Afghanistan and Pakistan*** . . . 'What we see is that the success of any one of these groups leads to new capabilities and a new reputation for all,' Gates said. ***'A victory for one is a victory for all.'*** US intelligence officials have said that jihadi groups in the region are cooperating more closely than ever . . . . ***Gates said all of the factions were working under the umbrella of Al Qaeda***."[205]

- Secretary of Defense Robert Gates, May 2010: "The other concern we have . . . is the ***creation of the syndicate of terrorist organizations*** that are working with each other***, al Qaeda,*** the Taliban in Pakistan***, the Taliban in Afghanistan, the Haqqani Network***. There are five or six of these groups that are now really working together and ***a success for one is a success for all*** . . . And so this problem has become more complex as

---

[203] *Sec. of State Hillary Clinton*, NBC News: Meet the Press (July 26, 2009) (emphases added).

[204] *Afghanistan: Assessing The Road Ahead*, Hr'g before the U.S. Senate Committee on Foreign Relations, S. Hr'g 111-479, at 24 (Dec. 3, 2009) (statement of Hillary Rodham Clinton, Sec'y of State, U.S. State Dep't).

[205] *Gates Casts Qaeda As Terror Syndicate*, Wash. Post (Jan. 21, 2010), 2010 WLNR 1263055 (emphases added).

these groups have **gotten closer and cooperated operationally** in a way that we really haven't seen, I think, significantly before 2007, 2006."[206]

- Under Secretary of Defense for Policy Michele Flournoy, April 2011: "**We view al Qaeda, Haqqani, the Taliban, these are all part of a syndicate** of groups that help each other. **The Pakistanis tend to make finer distinctions between them** -- you know, not being . . . tolerant to some, like al Qaeda, but otherwise tolerating others. **We are trying to** work with them to **shift that perspective** and shift that calculus."[207]

**B. Al-Qaeda Authorized and Planned Taliban Terrorist Attacks**

306.   Since at least the mid-2000s, al-Qaeda planned and authorized the Taliban's, including the Haqqani Network's, attacks on U.S. forces in Afghanistan in several ways.

307.   **Authorization.** Al-Qaeda provided critical religious authorization for Taliban (including the Haqqani Network) attacks on U.S. forces. As noted above, in 1998 Osama bin Laden himself directed all Muslims to kill Americans at every opportunity. In the ensuing years, senior al-Qaeda leaders issued a series of *fatwas* directed toward the Taliban, conferring religious permission for them to attack Coalition forces in Afghanistan. Examples include:

- Osama bin Laden, October 2001: "[A]s [Mullah] Omar has said, the British invaded and were defeated in Afghanistan before bin Laden was to be found here, and the Russians came, before we did, and now **the Americans have come, and we implore God to defeat them like He**

---

[206] *John King Presents: Full Interview with Secretary of Defense Robert Gates*, CNN (May 8, 2010), 2010 WLNR 27823364 (emphases added).

[207] *Pakistan Must Meet Certain Expectations on Counter-Terrorism*, Hindustan Times (Apr. 22, 2011) (emphases added).

*defeated their previous allies*. . . . I say that *jihad is without doubt mandatory* for all Muslims . . ."[208]

- Ayman al-Zawahiri, May 2006: "I address my statement to my Muslim brothers in Kabul … *I appeal to Muslims in Kabul in particular and throughout Afghanistan in general, for the sake of God, to sincerely stand against the infidels' forces*, which are invading Muslims' lands. . . . I appeal to my Muslim brothers in Kabul in particular, and throughout Afghanistan in general, to defend Islam. . . . I urge them to . . . *resist this infidel*, oppressive, and unjust occupation of Muslims' lands. . . . My Muslim brothers in Kabul in particular and throughout Afghanistan in general: Stand by the mujahideen until the invading forces are expelled . . ."[209]

- Ayman al-Zawahiri, September 2007: "My Muslim nation: Abd-al-Rashid Ghazi, Mullah Dadollah, Abdallah Azzam, Abu-Umar al-Sayf, Hammudah al-Uqlah, Abdallah al-Rashud, and those like them of the mujahid and steadfast ulema are the ones who *deserve to be followed by you*. . . . *The Crusaders themselves have admitted their defeat in Afghanistan at the hands of the lions of the Taliban* under the banner of the lion of Islam, our amir, the leader of the faithful, Mullah Muhammad Omar Mujahid, may God watch over him."[210]

- Ayman al-Zawahiri, August 2009: "What is taking place in Afghanistan is a *lesson that the entire Muslim Nation must learn*. The Afghans should be proud of the fact that they will go down in Islamic history as the people whose Islamic emirate, led by the Commander of the Faithful, Mullah Muhammad Omar (may God protect him) has challenged America, the strongest power on the face of the earth. This emirate has sacrificed all it has for the sake of its doctrine, its principals, and for the protection and the safety of its Muslim migrant brothers, as well as the

---

[208] *Osama bin Laden: Terror for Terror*, Al-Jazeera (Oct. 21, 2001) (emphases added).

[209] *Ayman al-Zawahiri: Zawahiri Addresses Afghans*, Al-Jazeera (May 30, 2006) (emphases added).

[210] *Ayman al-Zawahiri: Power of Truth*, As-Sahab (Sept. 20, 2007) (emphasis added).

126

oppressed mujahidin
. . ."[211]

- Ayman al-Zawahiri, May 2012: "O' Muslim, glorious, defiant Afghan people, and O' Muslim Ummah everywhere: ***join the Mujahideen, support and back them up, and fight under the banner of the Islamic Emirate under the leadership of the Amir of Believers Mulla Muhammad Omar Mujahid*** . . . who caused the Crusaders consecutive defeats and who are on the verge of expelling them [Crusaders] from the pure Afghanistan . . . Fight the enemies of Allah . . . Their defeat began appearing on the horizon, so intensify your attacks on them until Allah gives you dominance over them."[212]

308.   After Osama bin Laden was killed, the Taliban confirmed his religious and moral authority over their Afghan jihad, stating: "Osama Bin Laden You were the ***sheikh of the Umma***, a zealous man, and ***the scholar and imam of the nation at the level of Jihad*** and the fighting of the enemies and their minions. You were ***our*** sheikh, ***our*** imam and ***role model***, the hero and miracle of our times, unique among your peers, pious and highly sensible."[213]

309.   Al-Qaeda also authorized the Taliban's terrorist attacks through its participation in the al-Qaeda Terror Syndicate. That multi-group syndicate involved periodic mafia-style meetings in which al-Qaeda, the Taliban (including the Haqqani Network), and other members of the Syndicate (such as LeT) would

---

[211] *Ayman al-Zawahiri: The Facts of Jihad and the Lies of Hypocrisy*, As-Sahab (Aug. 4, 2009) (emphasis added).

[212] *Ayman al-Zawahiri: Statement on the Burning of Qur'ans in Kabul*, As-Sahab (May 9, 2012) (emphasis added).

[213] Al-Somood, *Bin Laden is alive O dead ones and the cowards should not dare close their eyes* (July 1, 2011) (emphasis added).

confer about geographies and targets to attack.[214] The Syndicate jointly authorized particular types of terrorist attacks in particular geographies to be carried out by the syndicate's individual members. Among other things, the Syndicate specifically approved: (i) the creation and operation of the Kabul Attack Network to attack Americans in Kabul and the surrounding provinces; (ii) the campaign of suicide attacks against Americans throughout Afghanistan; (iii) the Taliban's campaign of using anti-American IED and suicide attacks specifically in N2KL and P2K; and (iv) the Taliban's "surge" in Kandahar and Helmand from 2010 through 2012.

310.   The close operational coordination not only manifested itself in the Kabul Attack Network, but also provided a broader terrorist superstructure that organized the insurgency throughout Afghanistan. In observing that this superstructure formed an Afghan-Pakistani "syndicate," a former CIA analyst and White House observer documented several notable syndicate-sponsored terrorist attacks in Afghanistan that "demonstrated the intricate connections between al Qaeda and its allies in Pakistan and Afghanistan."[215]

311.   Consistent with all these activities, al-Qaeda operatives often assumed a position of moral, religious, and tactical authority over Taliban members.

---

[214] *See* Roggio & Joscelyn, *The al Qaeda-Taliban Connection*, *supra* note 4.

[215] Riedel, *Deadly Embrace*, *supra* note 3, at 100.

128

Al-Qaeda members, for example, often "act[ed] as instructors and religious teachers for Taliban personnel and their family members."[216]

312.  Al-Qaeda's messages of authorization extended to suicide bombings. In February 2003, bin Laden issued a recording calling specifically for suicide attacks in Afghanistan and Iraq. A few months later, he reiterated in a *fatwa* directed at Afghans that "jihad against [the Coalition] is your duty" and that, "If you start suicide attacks, you will see the fear of Americans all over the world."[217] The Taliban had previously viewed suicide attacks as taboo, but al-Qaeda convinced it that such attacks were religiously permissible. Al-Qaeda trumpeted that success online, announcing, "While suicide attacks were not accepted in the Afghani culture in the past, they have now become a regular phenomenon!"[218] With al-Qaeda's authorization, the number of suicide attacks in Afghanistan increased from one in 2002, two in 2003, and six in 2004 to 21 in 2005, and more than 100 in 2006.

313.  Al-Qaeda's role in that suicide-bombing trend was pivotal. As Islamic history scholar Brian Glyn Williams explained, "Al Qaeda operatives carried out

---

[216] Thomas Joscelyn, *Al Qaeda Growing Stronger Under Taliban's Umbrella, UN Finds*, Long War J. (June 23, 2019).

[217] *Osama bin Laden: Calls for Martyrdom Operations Against US and British Interests* (Apr. 10, 2003) (emphasis added).

[218] Brian Glyn Williams, *Suicide Bombings in Afghanistan*, Jane's Islamic Affairs Analyst, at 5 (Sept. 2007), *available at* https://www.brianglynwilliams.com/IAA%20suicide.pdf.

two to three [suicide] bombings per year on the Afghan government and NATO troops from 2002 to 2004 that were meant to demonstrate the effectiveness of this alien tactic to the local Taliban. These demonstrative acts and videos of successful [al-Qaeda] suicide bombings in Iraq seem to have convinced the Taliban to condone the previously taboo tactic of suicide bombing."[219]

314.   Al-Qaeda also authorized the Taliban's use of IED attacks against Americans in Afghanistan. Osama bin Laden publicly called for the Taliban to escalate its IED campaign against Americans in Afghanistan on several occasions in 2006 alone, in speeches in which he instructed his followers that Allah supported their use of IEDs because of the psychological terror, "destruction of the soldier's morale" and "rise in cases of suicide among" Americans. Osama bin Laden's messages of authorization—directed toward a specific type of Muslim (Taliban), a class of target (Americans in Afghanistan), and weapon (IEDs)—were important in enabling the Taliban's IED campaign against Coalition forces.

315.   Al-Qaeda also authorized the Taliban's use of RPG attacks against Americans in Afghanistan. In 2006, for example, Osama bin Laden publicly called for anti-American terrorists to escalate their use of RPGs in Afghanistan.

---

[219] Brian Glyn Williams, *Afghanistan Declassified: A Guide to America's Longest War* at 202 (2012).

316.    Al-Qaeda also authorized the Taliban's campaign of kidnapping Americans and others who supported the Afghan government. For example, Mustafa Abu al-Yazid (aka Saeed al-Masri), was one of al-Qaeda's founders, served as al-Qaeda's leader in Afghanistan, and helped persuade the Taliban to "adopt[] a number of 'al-Qaida inspired' tactics, first and foremost suicide bombings, but also others associated with al-Qaida, such as kidnappings, decapitation of hostages, roadside bombs, and an active media campaign."[220] Similarly, another senior al-Qaeda leader, Abu Hafs al-Najdi (aka Abdul Ghani), "commonly instructed subordinate leaders to conduct kidnapping operations against foreigners."[221]

317.    **Planning.** Al-Qaeda also planned the Taliban's, including the Haqqani Network's, terrorist attacks against Americans in Afghanistan. Working through its syndicate partners and from its safe havens on both sides of the Afghanistan-Pakistan border, al-Qaeda "plan[ned] international as well as regional terrorist attacks, particularly in Afghanistan."[222] Two terrorism scholars explained al-Qaeda's syndicate-related shuras as follows:

[220] Anne Stenersen, *Blood Brothers Or A Marriage Of Convenience? The Ideological Relationship Between Al-Qaida And The Taliban*, Paper presented at ISA's 50th Annual Convention, "Exploring the Past, Anticipating the Future" in New York City, Febr. 15-18, 2009, *available at* https://convention2.allacademic.com/one/isa/isa09/.

[221] ISAF Joint Command, *ISAF Confirms Number 2 Insurgent Killed In Coalition Airstrike*, Def. Visual Info. Distribution Serv. (Apr. 13, 2011).

[222] McNally & Weinbaum, *Resilient al-Qaeda*, *supra* note 53, at 3.

The staying power of al-Qaeda became rooted in its ability to draw from and coordinate with allied groups embedded in multiple networks on both sides of the border. . . . It established a number of shuras to **coordinate strategy, operations, and tactics** against the West and regional allied governments. In particular, al-Qaeda fighters have been involved in **planning and carrying out suicide attacks, developing improved explosive devices, and helping conduct operations** against high-value targets.[223]

318.    Al-Qaeda training provided another key mechanism through which that planning occurred. Before the September 11 attacks, al-Qaeda operated training camps in eastern Afghanistan at the Taliban's request. By 2005 at the latest, al-Qaeda began bringing instructors from Iraq to train the Taliban how to fight Americans.

319.    By the mid-2000's, al-Qaeda's partnership with the Haqqani Network had facilitated the emergence of a network of al-Qaeda training camps in North Waziristan. According to a declassified 2008 Defense Intelligence Agency intelligence report:

> [Sirajuddin] **Haqqani is also affiliated with the several foreign fighter (ff) training facilities that are controlled by or associated with al Qaeda** (AQ) in North Waziristan.
>
> . . . A list and brief description of each facility follows.
>
> A. Mohammad Taher ((Yuldashov)), leader of the Islamic Movement of Uzbekistan (IMU), and his 60 bodyguards are staying at an AQ training center in Miram Shah Dand.

---

[223] *Id*. at 3-4.

B. There is an al-Qaeda training center located at the Miskeen and Khaisur in Miram Shah. Approximately 45 U/I Arabs and Uzbeks receive training there.

C. An AQ training facility called "Shaki Masood" is located in Miram Shah and over 200 AQ members (NFI) reside there; Usama bin Laden has been seen in this center (NFI).

D. Another AQ training facility is located at Spin-Qamar in Masood District of Northern Waziristan. Over 80 Arabs receive training there (NFI).[224]

320.   One al-Qaeda operative, whom U.S. officials characterized as "an important al-Qaida planner and explosives expert," Ghazwan al-Yemeni, trained Taliban members in Miran Shah, in Pakistan.[225] He eventually helped plan the December 30, 2009 attack on Camp Chapman that killed seven Americans.

321.   The training continued throughout the relevant timeframe of this case. In 2015, for example, U.S. and Afghan forces raided two al-Qaeda training camps in Kandahar Province—both reportedly "hosted by the Taliban."[226] One camp was the largest al-Qaeda facility discovered since the September 11 attacks, occupying nearly 30 square miles.

---

[224] Defense Intelligence Agency, *Intelligence Information Report: Location and Activities of the Training Centers Affiliated with the Haqqani Network, Taliban, and al-Qaeda in Northern Waziristan and Future Plans and Activities of Sarajuddin ((Haqqani))* (Apr. 16, 2008) (emphasis added; original emphasis omitted).

[225] Evan F. Kohlmann, *Al-Qa'ida's Yemeni Expatriate Faction In Pakistan*, CTC Sentinel, Vol. 4, Issue 1, at 11-12 (Jan. 2011).

[226] Thomas Joscelyn & Bill Roggio, *Trump's Bad Deal With The Taliban*, Politico (Mar. 18, 2019), https://www.politico.com/magazine/story/2019/03/18/donald-trump-afghanistan-zalmay-khalilzad-225815.

322.   Al-Qaeda specifically planned the Kabul Attack Network's campaign of terror, including its spectacular suicide bombings and insider attacks. As two terrorism scholars explained, the "operational and tactical cooperation" provided by al-Qaeda "increased the ability of the Haqqani Network to carry out sophisticated attacks in Kabul," including insider attacks in Kabul "through operations planned together with Sirajuddin Haqqani."[227]

323.   Al-Qaeda also planned Taliban attacks by devising the operational scheme through which the Taliban carried out its attacks, and by providing the Taliban with financing that helped it do so. For example, in July 2010, the U.S. Treasury Department designated Nasiruddin Haqqani, the brother of Sirajuddin, a Specially Designated Global Terrorist pursuant to Executive Order 13224.[228] The designation noted that Nasiruddin had received terrorist funding via payments from al-Qaeda.[229] More broadly, al-Qaeda has long provided substantial financial assistance to the Taliban, with the aim of increasing the frequency of its terrorist attacks against Americans in Afghanistan. Al-Qaeda not only provided direct aid, but also helped the Taliban raise additional funds from Arabs around the world—

---

[227] McNally & Weinbaum, *Resilient al-Qaeda*, *supra* note 53, at 9.

[228] U.S. Dep't of Treasury, *Treasury Targets Taliban and Haqqani Network Leadership: Treasury Designates Three Financiers Operating in Afghanistan and Pakistan* (July 22, 2010).

[229] *Id.*

all of which was important to the Taliban's anti-American campaign of terrorism in Afghanistan.

324.    Information derived from al-Qaeda and Taliban detainees held at Guantanamo Bay, Cuba ("Gitmo") corroborates the planning activities of the al-Qaeda-Taliban syndicate. For example, according to purported Gitmo intelligence files quoted by terrorism experts Bill Roggio and Thomas Joscelyn, one detainee, Abdul Razak, was "a high-level military commander in a newly-conceived 'unification' of Al Qaeda, [Hezb-e-Islami Gulbuddin ("HIG")] and Taliban forces within Afghanistan," which the leaders of the respective terrorist groups "envisioned [as a] new coalition of HIG, Al Qaeda, and Taliban during a meeting in Pakistan in early spring 2003."[230] Another purported Gitmo detainee file as quoted by Messrs. Roggio and Joscelyn concerning Haroon al Afghani, a dual-hatted al-Qaeda/HIG terrorist, stated as follows:

> [Afghani] is assessed to have attended a joint operations meeting among extremist elements in mid-2006. A letter describing an 11 August 2006 meeting between commanders of the Taliban, al Qaeda, [Lashkar e Taiba], . . . and the Islamic Party (probably a reference to the HIG), disclosed that the groups decided to increase terrorist operations in the Kapisa, Kunar, Laghman, and Nangarhar provinces, including suicide bombings, mines, and assassinations.[231]

---

[230] Roggio & Joscelyn, *The al Qaeda-Taliban Connection*, *supra* note 4.

[231] *Id.* (brackets in original)

Taken together, these reports "demonstrate a high degree of collusion between al Qaeda and other terrorist groups" as part of a "jihadist hydra" that shared the "common goal" of seeking to "drive the U.S.-led coalition out of Afghanistan."[232]

325.   The Taliban also relied on "Al-Sahab, al Qa'ida's media enterprise, to distribute video propaganda and recruit supporters."[233] As terrorism scholar Seth Jones explained, al-Qaeda's media-support for the Taliban was as important operationally as its financial support: "Afghan groups were able to tap into the broad international jihadi network" because "al Qa'ida was instrumental in improving" the Taliban's "communications capabilities."[234] In addition, "jihadi websites, with links to al Qa'ida, … helped raise funds for the Taliban. Some solicited military items for the Taliban, including gas masks and night vision goggles."[235]

326.   Al-Qaeda also taught the Taliban effective terrorist tradecraft. Through its relationship with al-Qaeda, the Taliban "developed or acquired new commercial communications gear and field equipment," as well as "good tactical, camouflage, and marksmanship training."[236] They also "share[d] communication

---

[232] *Id.*

[233] Jones, *Graveyard of Empires*, *supra* note 202, at 232.

[234] *Id.* at 291.

[235] *Id.* at 292.

[236] *Id.* at 293.

and transportation routes, coordinate[d] attacks, and even utilize[d] the same explosive and suicide-bomber networks."[237]

327.   All of these activities were part of al-Qaeda's planning of the Taliban's terrorist attacks in Afghanistan. By providing an array of advice, direction, and material support to the Taliban, al-Qaeda was able to use the Taliban for its own jihadist ends. In so doing, al-Qaeda followed its more general practice of planning terrorist attacks whose details it would delegate to local Islamic proxies. As terrorism scholar Thomas Ruttig observed: "Both in Afghanistan and Pakistan, al-Qaeda exploits local conditions by co-opting militant groups with local battle experience."[238] Here, its "cooptation" of the Taliban was especially effective.

328.   Al-Qaeda's planning activities extended to suicide bombings in particular. The suicide attacker is a core component of al-Qaeda's ideology and operational philosophy. Al-Qaeda exported its suicide-bombing expertise to the Taliban through their joint syndicate, and in so doing played a pivotal leadership and operational role in every Taliban suicide bombing in Afghanistan. For that reason, every suicide bombing alleged in this case was jointly planned and committed by al-Qaeda and the Taliban.

---

[237] McNally & Weinbaum, *Resilient al-Qaeda*, *supra* note 53, at 9.

[238] Ruttig, *The Other Side*, *supra* note 192, at 22.

329.   Al-Qaeda planned suicide bombings in Afghanistan by mounting a coordinated communications campaign to persuade Taliban (including Haqqani) terrorists to embrace suicide attacks against Americans. This campaign included messaging touting suicide attacks and honoring "martyrs" through al-Qaeda print and video outlines; promoting religious "scholarly" outreach; and emphasizing in-person indoctrination of Taliban and Haqqani leadership.

330.   Al-Qaeda used this message—and the moral authority conveyed by bin Laden's 2003 *fatwa* authorizing martyrdom operations—to change the Taliban's organizational posture toward suicide bombing. Those efforts convinced the Taliban to begin participating in, and claiming credit for, al-Qaeda-planned suicide attacks in Afghanistan. Without al-Qaeda's involvement, neither Taliban leadership nor its rank-and-file commanders would have embraced suicide bombing as a permissible tactic against Coalition forces in Afghanistan. As Dr. Jones summarized the evidence, "Al Qa'ida's involvement was particularly important in this regard because Afghan insurgent groups were surprisingly inept at suicide attacks."[239]

331.   To implement its planned suicide-bombing campaign, al-Qaeda also created and ran training camps that converted disaffected recruits into suicide bombers at an industrial scale. In collaboration with other syndicate members,

---

[239] Jones, *Graveyard of Empires*, *supra* note 202, at 293.

Al-Qaeda created and designed a process for identifying candidates for martyrdom operations; indoctrinating them with the necessary religious and socio-political concepts; and training them how, for example, to conceal a suicide vest, navigate a checkpoint, and detonate for maximum impact. Some of this training occurred in al-Qaeda-affiliated camps in Pakistan.

332.   Under al-Qaeda's standard training procedure for suicide bombers, each suicide bomber swore fealty to al-Qaeda. Al-Qaeda emphasized declarations of fealty to ensure the suicide bomber's commitment to al-Qaeda's and the Taliban's jihad by creating a psychological "point of no return" for the bomber. Suicide bombers who completed al-Qaeda's training course were officially viewed by al-Qaeda as al-Qaeda operatives and given all the stature in jihadist circles that such a title provided.

333.   To carry-out their joint suicide bombing campaign, al-Qaeda and the Taliban relied upon a series of dual-hatted al-Qaeda/Taliban terrorists to support the key nodes of the training and recruitment effort, including the madrassas from which most recruits were drawn and the training camps in which they were refined into suicide weapons. Such dual-hatted al-Qaeda/Taliban terrorists include, but are not limited to, the following:

- **Sirajuddin Haqqani**, a member of al-Qaeda's ruling council and commander of the Haqqani Network. Sirajuddin Haqqani operated at least four joint al-Qaeda/Taliban training camps in North Waziristan, from which al-Qaeda and the Taliban supported the suicide bombing

campaign in Afghanistan with a regular stream of al-Qaeda operatives who would kill themselves in Taliban martyrdom attacks. Sirajuddin Haqqani helped plan many of the suicide attacks in this case, including, but not limited to, the October 29, 2011 suicide bombing conducted by al-Qaeda and the Haqqani Network under the auspices of the Kabul Attack Network, which killed David E. Cabrera, James M. Darrough, and Christopher R. Newman.

- **Qari Ziaur Rahman**, a dual-hatted al-Qaeda/Taliban terrorist who was a top regional commander of both organizations in Kunar and Nuristan Provinces. Rahman worked closely with al-Qaeda's chief of operations for Kunar Province, Abu Ikhlas al-Masri, with whom he shared operations, training, and logistics resources. Rahman helped plan suicide attacks that took place in N2KL, including, but not limited to, the June 21, 2010 suicide attack in Kunar Province that killed Andrew R. Looney.

- **Sheikh Aminullah (aka Fazeel-a-Tul Shaykh Abu Mohammed Ameen al Peshwari)**, a dual-hatted al-Qaeda/Taliban terrorist who ran the Ganj Madrassa, which trained and recruited suicide bombers for al-Qaeda and the Taliban. Sheikh Aminullah helped plan suicide attacks that took place in N2KL.

334. Al-Qaeda also created the suicide network infrastructure necessary to deploy al-Qaeda suicide bombers in support of the Taliban's jihad against Americans in Afghanistan. This attack infrastructure included (i) high-level meetings between representatives of al-Qaeda, the Taliban, and other members of the syndicate; (ii) joint al-Qaeda/Taliban safehouses and ratlines to support the deployment of suicide bombers inside Afghanistan; and (iii) a constellation of al-Qaeda-affiliated propaganda outlets that glorified the attackers, which was essential both for purposes of maximizing the chance the particular attacker would

140

carry out his attack, as well as incentivizing the next generation of suicide bombers thereafter.

335.   As a reflection of the joint nature of al-Qaeda-Taliban martyrdom operations, al-Qaeda suicide bombers were often referred to as "Mullah Omar's Missiles." By following a strategy in which the weapon (*i.e.*, the suicide bomber) was created by al-Qaeda and then deployed by the Taliban, both organizations played to their respective operational competencies to maximize the impact of their shared jihad against Americans in Afghanistan.

336.   Al-Qaeda's planning of the Taliban's terrorist campaign against Americans in Afghanistan also emphasized tactics designed to shoot down American helicopters, including Black Hawks and Chinooks. Al-Qaeda's role was essential, as the Taliban and Haqqani Network terrorists had no tactical experience successfully targeting American helicopters prior to their training from al-Qaeda. Al-Qaeda's anti-helicopter training was renowned in jihadist circles, having successfully trained terrorists in Iraq and Somalia with a substantial history of downing American helicopters, including the "Black Hawk Down" incident during the Battle of Mogadishu in 1993, and a litany of successful attacks in Iraq from 2003 through 2007.

337.   Shooting down a helicopter with an RPG requires precise training and is one of the most challenging attack types for an unskilled terrorist to execute.

Consequently, al-Qaeda's specialized skills, experience, and training had an

outsized impact on the Taliban and Haqqani Network. Al-Qaeda forward-deployed

trainers into Afghanistan for the specific purpose of instructing Taliban fighters

concerning attacks targeting helicopters. The Taliban deployed this training to

attack multiple American and Coalition helicopters, including in an August 6, 2011

attack, committed jointly by the Haqqani Network and al-Qaeda, that destroyed a

Chinook helicopter and killed Christopher Campbell, John Douangdara, Bryan J.

Nichols, Jesse D. Pittman, Heath M. Robinson, Michael J. Strange, Aaron C.

Vaughn, and Kraig M.K. Vickers, whose family members are Plaintiffs in this

case. *See infra* ¶¶ 388, 395, 484, 511, 564, 601, 611, 620.

338.   Al-Qaeda further planned the Taliban's campaign of fertilizer-based

IEDs in Afghanistan. As the acclaimed journalist Peter Bergen documented in

2009:

> [I]n recent years, Taliban leaders have drawn especially close to Al
> Qaeda. … Today, at the leadership level, the Taliban and Al Qaeda
> function ***more or less as a single entity***. The signs of this are
> everywhere. For instance, IED attacks in Afghanistan have increased
> dramatically since 2004. What happened? As a Taliban member told
> Sami Yousafzai and Ron Moreau of *Newsweek*, "***The Arabs taught us
> how to make an IED by mixing nitrate fertilizer and diesel fuel and
> how to pack plastic explosives and to connect them to detonators
> and remote-control devices like mobile phones***. We learned how to
> do this blindfolded so we could safely plant IEDs in the dark."[240]

---

[240] Bergen, *The Front*, *supra* note 200 (emphases added).

Roughly 80% or more of all the IEDs used in successful attacks against Americans in Afghanistan since 2007 have been fertilizer-based IEDs. On information and belief, nearly all of the IED victims in this case were killed by fertilizer-based IEDs planted by the Taliban and derived from al-Qaeda schematics and training.

339.   More broadly, al-Qaeda members regularly trained Taliban commanders in sophisticated bomb-making techniques that were material to the Taliban's ability to assemble and deploy explosives against Coalition forces. According to the terrorism scholar Seth Jones:

> Insurgent groups also used al Qa'ida support to construct increasingly sophisticated improvised explosive devices (IEDs), including remote controlled detonators. For example, al Qa'ida ran a handful of manufacturing sites in the Bush Mountains, the Khamran Mountains, and the Shakai Valley in Pakistan's Federally Administered Tribal Areas. They ranged from small facilities hidden within compounds that build IEDs to much larger "IED factories" that doubled as training centers and labs whose recruits experimented with IED technology. Some of this explosives expertise came from Iraqi groups that provided information on making and using various kinds of remotely controlled devices and timers.[241]

As part of that assistance, al-Qaeda also invited Taliban commanders to Iraq, where it learned how to make armor-penetrating "shaped" charges,[242] a type of IED later known as an EFP, which is designed to penetrate the armor on U.S. vehicles.

---

[241] Jones, *Graveyard of Empires*, *supra* note 202, at 292.

[242] Sami Yousafzai & Ron Moreau, *Unholy Allies: The Taliban Haven't Quit, And Some Are Getting Help And Inspiration From Iraq*, Newsweek (Sept. 25, 2005).

340.    Al-Qaeda's support of Taliban IED and EFP attacks also included the use of forward deployed al-Qaeda terrorist trainers throughout Afghanistan. For example, by 2010, "[i]n southern Afghanistan, there [were] pockets of al Qa'ida . . . in Helmand and several neighboring provinces, such as Kandahar and Zabol," which helped the Taliban "conduct suicide attacks and other improvised explosive device[]" attacks.[243] Al-Qaeda also forward deployed IED terrorist trainers in P2K and N2KL.

341.    Al-Qaeda's planning efforts were significant and amplified the lethality of the Taliban insurgency. Indeed, al-Qaeda's ability to export its terrorism expertise to local groups like the Taliban is what "renders al-Qaeda effective in the first place."[244] In the case of the Taliban, al-Qaeda executed the "transfer of technical knowhow, devices, and training for IED use, truck and suicide bombings as well as the channel[]ing of what some observer[s] call 'strategic-level funding.'"[245] Those activities were material to the Taliban's ability to execute the type of attacks that killed and injured Plaintiffs. As Mr. Ruttig concluded, al-Qaeda's activities "raise[d] the level of sophistication of Taleban and associated networks' operations."[246]

---

[243] Jones, *Graveyard of Empires*, *supra* note 202, at 330.

[244] Ruttig, *The Other Side*, *supra* note 192, at 22.

[245] *Id.*

[246] *Id.*

342.   As Mr. Bergen put it in November 2009, "Small numbers of Al Qaeda instructors embedded with much larger Taliban units have functioned something like U.S. Special Forces do—as trainers and force multipliers."[247] Al-Qaeda's sophistication and support was important to the Taliban's terrorist enterprise. And al-Qaeda's involvement went beyond technical support; it also worked actively with Taliban leadership to set strategy and orchestrate attacks. For that reason, "Al Qaeda leader Ayman al-Zawahiri, Hamza bin Laden and the Taliban leadership 'have repeatedly emphasized the importance of the alliance between' the two groups."[248]

## C. Al-Qaeda Directly Participated in Taliban Terrorist Attacks

343.   Al-Qaeda members also committed attacks alongside the Taliban, including some of the attacks that killed or injured Plaintiffs or their family members. In the early 2000s, al-Qaeda's third-ranking member, Abu Layth-al Libi, participated in attacks on Americans in Afghanistan alongside Taliban members under the command of Sirajuddin Haqqani. On July 13, 2008, Taliban and al-Qaeda members jointly attacked a U.S.-Afghan outpost in Wanat in Nuristan Province, killing nine U.S. soldiers. In May 2010, Taliban and al-Qaeda members

---

[247] Bergen, *The Front*, *supra* note 200.

[248] Joscelyn, *Al Qaeda Growing Stronger*, *supra* note 216.

participated in an attack on the U.S. airbase in Bagram, killing an American contractor.

344.   In fact, many terrorist operatives were "dual-hatted," meaning that they were both Taliban and al-Qaeda members. Those dual-hatted terrorists directly committed many of the attacks that killed and injured Plaintiffs. Examples are set forth below.

345.   **Nangarhar, Nuristan, Kunar and Laghman (N2KL) Provinces.** Al-Qaeda deployed senior operatives to coordinate attacks in the strategically critical (and contiguous) Nangarhar, Nuristan, Kunar and Laghman Provinces (known as N2KL), which were well-known al-Qaeda strongholds. In N2KL, al-Qaeda, the Taliban, and LeT maintained joint cells responsible for anti-American terrorism. The dual-hatted al-Qaeda/Taliban terrorists who ran the cells include:

- **Farouq al-Qahtani**, al-Qaeda's "emir for eastern Afghanistan" who "supported the Taliban-led insurgency against the Afghan government, US forces and their allies."[249] Al-Qahtani maintained this position until he was killed in a U.S. airstrike on or about October 2016. After Qahtani's death, al-Qaeda's General Command issued a statement praising Qahtani's leadership of a joint cell with the Taliban, through which Qahtani "participated with their mujahidin brothers from the

---

[249] Thomas Joscelyn, *Pentagon Confirms Death of Senior al Qaeda Leader In Afghanistan* (Nov. 4, 2016).

Islamic Emirate . . . in cleansing [Kunar and Nuristan Province] from the crusaders' abomination."[250]

- **Sakhr al-Taifi**, al-Qaeda's second highest leader in Afghanistan, who, while embedded with the Taliban, "coordinate[d] and direct[ed] insurgent attacks against Afghan security forces and coalition troops throughout eastern Afghanistan," and "also supplie[d] weapons and equipment to insurgents."[251] On information and belief, al-Taifi helped commit all of the attacks carried out by joint al-Qaeda/Taliban cells in N2KL until he was killed in a Coalition airstrike on or about May 27, 2012.

- **Mufti Assad**, an al-Qaeda network leader for Kunar Province, who "was an insurgent leader who controlled al-Qaida terrorists operating in Kunar," "led dozens of all-Qaida affiliated fighters throughout eastern Afghanistan and coordinated their attacks across the region," and "was also an explosives expert who provided training to insurgents on how to construct and use improvised explosive devices."[252] On information and belief, Assad replaced al-Taifi after the latter was killed, and Assad assumed the same role until he himself was killed in a coalition airstrike on or about August 2012.

- **Abdallah Umar al-Qurayshi**, a senior al-Qaeda operative who commanded the joint al-Qaeda/Taliban cells operating in Kunar and Nuristan Provinces. On information and belief, al-Qurayshi helped commit all of the attacks carried out by joint al-Qaeda/Taliban cells operating in Kunar and Nuristan Provinces prior to his death on or about September 25, 2010 during a coalition airstrike that also killed a senior Taliban commander named Matin who operated as part of the al-Quarayshi's joint al-Qaeda/Taliban cell.

---

[250] Al-Qaeda General Command, *The Martyrdom of the Commander Faruq al-QabtanT and His Comrades in Konar Province* (Nov. 23, 2016), *available at* https://scholarship.tricolib.brynmawr.edu/bitstream/handle/10066/18978/AQC20161123.pdf?sequence=1&isAllowed=y.

[251] ISAF Joint Command, *Morning Operational Update*, Def. Visual Info. Distribution Serv. (May 28, 2012).

[252] ISAF Joint Command, *Morning Operational Update*, Def. Visual Info. Distribution Serv. (Aug. 5, 2012).

- **Abu Atta al-Kuwaiti**, a senior al-Qaeda explosives expert who coordinated the Nuristan and Kunar Province al-Qaeda/Taliban joint cells' IED and suicide bomb attacks. On information and belief, al-Kuwaiti helped commit every IED attack carried out by joint al-Qaeda/Taliban cells operating in Kunar and Nuristan Provinces prior to his death on or about September 25, 2010 during the same coalition airstrike that also killed al-Qurayshi and the Taliban commander Matin.

- **Abu Ikhlas al-Masri**, a who served as an al-Qaeda commander responsible for helping coordinate al-Qaeda / Taliban attacks in Kunar Province from 2008 until his capture on or about December 2010. On information and belief, al-Masri helped commit all of the attacks carried out by al-Qaeda/Taliban joint cells in Kunar Province until his death.

- **Sa'ad bin Abi Waqas**, a senior al-Qaeda leader who "coordinated attacks against coalition forces" and "conducted training" for terrorists throughout Kunar Province, "as well as weapons procurement."[253] Waqas replaced Masri as al-Qaeda's operations chief in Kunar Province until Waqas was killed in the same April 13, 2011 coalition airstrike that killed al-Najdi. On information and belief, Waqas helped commit all of the attacks carried out by al-Qaeda/Taliban joint cells in Kunar Province after al-Masri's death.

- **Abu Hafs al-Najdi (aka Abdul Ghani)**, a senior al-Qaeda operative who directed al-Qaeda operations in Kunar Province, and was specifically responsible for "planning attacks against Afghan and coalition forces" and "directing suicide-bomb attacks targeting U.S. government officials" that were facilitated by his "network" of Taliban terrorists.[254] On information and belief, al-Najdi planned and authorized the Taliban's attacks against Americans in Kunar Province, including its suicide attacks, prior to his death in a Coalition airstrike on April 13, 2011.

- **Fatah Gul**, an al-Qaeda facilitator who "ran terrorist training camps where insurgents learned how to conduct improvised explosive devices

---

[253] ISAF Joint Command, *Morning Operational Update*, Def. Visual Info. Distribution Serv. (Apr. 16, 2011).

[254] U.S. Dep't of Def., *Strike Kills No. 2 Insurgent in Afghanistan* (Apr. 26, 2011).

attacks" in the N2KL region of Afghanistan.[255] Fatah Gul maintained this position until he was killed in a Coalition airstrike on or about August 2012.

346.   As explained above, LeT operatives also embedded themselves with these cells and participated in these attacks. *See supra* ¶ 98.

347.   **Paktia, Paktika, and Khost (P2K) Provinces.** Like N2KL, P2K was a strategically critical area that historically served as a Haqqani Network stronghold and also operated as a "traditional al-Qaeda safe haven[]."[256] In this area, al-Qaeda and the Taliban, through the Haqqani Network, maintained joint cells responsible for anti-American terrorism. The dual-hatted terrorists who ran the cells include:

- **Bekkay Harrach (aka al-Hafidh Abu Talha al-Almani)**, a senior member of al-Qaeda's external operations branch, who specifically planned, authorized, and helped commit Haqqani Network attacks while living under the direct protection of Siraj Haqqani, himself a member of al-Qaeda's ruling council. On information and belief, Harrach helped commit every major Haqqani Network attack in Afghanistan prior to his death on or about May 19, 2010. As one Haqqani source told *Der Spiegel* in January 2009, "[i]f we want to do something, we always ask [Harrach] for his opinion."

- **Sirajuddin Haqqani**, a member of al-Qaeda's ruling council and commander of the Haqqani Network, who has previously stated that al-Qaeda "enlighten[s] the road for [the Taliban] and they resist against the cross worshippers [i.e., the Americans] by cooperating with us and us with them in one trench" pursuant to cooperation between al-Qaeda and

---

[255] ISAF Joint Command, *Morning Operational Update* (Aug. 5, 2012).

[256] McNally & Weinbaum, *Resilient al-Qaeda*, *supra* note 53, at 11-12.

the Taliban "at the highest limits."[257] On information and belief,
Sirajuddin Haqqani planned, authorized, and helped to commit the
Haqqani Network's attack campaign in P2K after Harrach's death on or
about May 19, 2010.

- **Khalil al-Rahman Haqqani**, is a brother of Jalaluddin Haqqani and
served as a dual-hatted al-Qaeda/Taliban terrorist, serving as a
"fundraiser, financier, and operational commander" for the Haqqani
Network,[258] as well as an agent who "acted on behalf of al-Qa'ida"[259] and
had "been linked to al-Qa'ida terrorist operations."[260] On information and
belief, Khalil al-Rahman Haqqani helped to plan, authorize, and commit
the Haqqani Network's attacks after Harrach's death on or about May 19,
2010.

348.   As explained above, LeT operatives also embedded themselves with

these cells and participated in these attacks. *See supra* ¶ 98.

349.   **Kabul Attack Network-Related Provinces.** Al-Qaeda deployed

senior operatives to coordinate attacks in the strategically critical cluster of

provinces around the capital city. This area was the focus of the Kabul Attack

Network, where al-Qaeda and the Taliban, including the Haqqani Network,

maintained joint al-Qaeda/Taliban cells responsible for planning and committing

---

[257] Roggio, *Taliban Cooperation*, *supra* note 32.

[258] Bill Roggio, *US Designates al Qaeda, Haqqani Network Leaders As Terrorists*, Long War
J. (Feb. 9, 2011).

[259] U.S. Dep't of Treasury, *Treasury Targets The Financial And Support Networks of Al
Qa'ida And The Taliban, Haqqani Network Leadership* (Feb. 9, 2011).

[260] U.S. Dep't of State, *Rewards for Justice - Reward Offers for Information on Haqqani
Network Leaders* (Aug. 20, 2014).

attacks. *See supra* Part I.E. The dual-hatted al-Qaeda/Taliban terrorists who ran the

cells include:

- **Sirajuddin Haqqani**, a member of al-Qaeda's ruling council and commander of the Haqqani Network. On information and belief, Sirajuddin Haqqani has served as the overall strategic planner supervising the activities of the Kabul Attack Network beginning no later than April 2010, and he has continued in that role to this day.

- **Ahmed Jan Wazir**, a dual-hatted al-Qaeda/Taliban terrorist who, in 2008, was named commander of jihadist forces in Ghazni Province by both al-Qaeda and the Taliban. On information and belief, Wazir commanded the activities of the Kabul Attack Network in Ghazni Province, and planned every attack committed by the Kabul Attack Network there until he was killed by a Coalition air strike on or about November 21, 2013.

350.   As explained above, LeT operatives also embedded themselves with

these cells and participated in these attacks. *See supra* ¶ 100.

## IV.   The Plaintiffs

### <u>The Michael A. Hughes Family</u>

351.   Michael A. Hughes served in Afghanistan as a civilian government

contractor working for DynCorp, International. On February 10, 2014, Mr. Hughes

was injured in an IED attack in Kabul Province, Afghanistan. Mr. Hughes died on

February 10, 2014 as a result of injuries sustained during the attack.

352.   The attack was committed by the Taliban (including the Haqqani

Network, a designated FTO at the time of the attack) and al-Qaeda (a designated

FTO at the time of the attack) acting together in the Kabul Attack Network.

353.    Mr. Hughes's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, he was a civilian not taking part in hostilities, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

354.    Mr. Hughes was a national of the United States at the time of the attack and his death.

355.    As a result of the attack, Mr. Hughes was injured in his person and/or property. The Plaintiff members of the Hughes Family are the survivors and/or heirs of Mr. Hughes and are entitled to recover for the damages Mr. Hughes sustained.

356.    Plaintiff Kathleen L. Alexander is the sister of Mr. Hughes. She is a national of the United States.

357.    Plaintiff Daniel O. Hughes is the brother of Mr. Hughes. He is a national of the United States.

358.    Plaintiff Patricia S. Hughes is the sister of Mr. Hughes. She is a national of the United States.

359.    Plaintiff Kristine A. Zitny is the sister of Mr. Hughes. She is a national of the United States.

360.   As a result of the February 10, 2014 attack and Mr. Hughes's injuries and death, each member of the Hughes Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Mr. Hughes's society, companionship, and counsel.

### The Charles Adkins Family

361.   Sergeant First Class Charles Adkins served in Afghanistan as a member of the U.S. Army. On April 16, 2011, SFC Adkins was injured in a suicide bombing insider attack committed by the Taliban and al-Qaeda (a designated FTO at the time of the attack) acting together in a joint al-Qaeda-Taliban cell in Laghman Province, Afghanistan. SFC Adkins died on April 16, 2011 as a result of injuries sustained during the attack.

362.   SFC Adkins was a national of the United States at the time of the attack and his death.

363.   Plaintiff Charles E. Adkins is the father of SFC Adkins. He is a national of the United States.

364.   Plaintiff Sheila G. Good is the mother of SFC Adkins. She is a national of the United States.

365.   Plaintiff Velvet L. Adkins is the step-mother of SFC Adkins. She is a national of the United States. Velvet Adkins lived in the same household as SFC

Adkins for a substantial period of time and considered SFC Adkins the functional equivalent of a biological son.

366. As a result of the April 16, 2011 attack and SFC Adkins's injuries and death, each member of the Adkins Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SFC Adkins's society, companionship, and counsel.

**The Jeffrey Ausborn Family**

367. Major Jeffrey Ausborn served in Afghanistan as a member of the U.S. Air Force. On April 27, 2011, Maj Ausborn was injured in an insider attack committed by the Taliban (including the Haqqani Network) and al-Qaeda (a designated FTO at the time of the attack) acting together in the Kabul Attack Network in Kabul Province, Afghanistan. Maj Ausborn died on April 27, 2011 as a result of injuries sustained during the attack.

368. Maj Ausborn was a national of the United States at the time of the attack and his death.

369. Plaintiff Suzanna L. Ausborn is the widow of Maj Ausborn. She is a national of the United States.

370. Plaintiff Mitchell M.W. Maloy is the step-son of Maj Ausborn. He is a national of the United States. Mitchell M.W. Maloy lived in the same household as

Maj Ausborn for a substantial period of time and considered Maj Ausborn the functional equivalent of a biological father.

371.   Plaintiff Summer L. Maloy is the step-daughter of Maj Ausborn. She is a national of the United States. Summer L. Maloy lived in the same household as Maj Ausborn for a substantial period of time and considered Maj Ausborn the functional equivalent of a biological father.

372.   As a result of the April 27, 2011 attack and Maj Ausborn's injuries and death, each member of the Ausborn Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Maj Ausborn's society, companionship, and counsel.

**Maggie M. Bilyeu**

373.   Plaintiff Specialist Maggie M. Bilyeu served in Afghanistan as a member of the U.S. Army. On November 12, 2016, SPC Bilyeu was injured in a suicide bombing attack in Parwan Province, Afghanistan. The attack severely wounded SPC Bilyeu, who suffered injuries from shrapnel requiring 22 surgeries to her leg, breast and abdomen, an amputated left leg, and hearing loss requiring a hearing aid. As a result of the November 12, 2016 attack and her injuries, SPC Bilyeu has experienced severe physical and emotional pain and suffering.

374.   The attack was committed by al-Qaeda (a designated FTO at the time of the attack) and the Taliban with al-Qaeda providing and training the suicide bomber.

375.   The attack that injured SPC Bilyeu would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist who committed the attack was unlawfully wearing the uniform of a base employee in order to gain access to the base and the attack indiscriminately placed civilians at risk, killing American contractors, because it occurred on a large base with civilians working there.

376.   SPC Bilyeu was a national of the United States at the time of the attack, and remains one to this day.

**The Christopher L. Brown Family**

377.   Staff Sergeant Christopher L. Brown served in Afghanistan as a member of the U.S. Army. On April 3, 2012, SSG Brown was injured in an IED attack in Kunar Province, Afghanistan. SSG Brown died on April 3, 2012 as a result of injuries sustained during the attack.

378.   The attack was committed by the Taliban and al-Qaeda (a designated FTO at the time of the attack) acting together in a joint al-Qaeda-Taliban cell.

379.   SSG Brown's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s)

156

who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

380.   SSG Brown was a national of the United States at the time of the attack and his death.

381.   As a result of the attack, SSG Brown was injured in his person and/or property. The Plaintiff members of the Brown Family are the survivors and/or heirs of SSG Brown and are entitled to recover for the damages SSG Brown sustained.

382.   Plaintiff Ariell S. Taylor is the widow of SSG Brown. She is a national of the United States. She brings claims to both her personal capacity and her representative capacity on behalf of SSG Brown's estate.

383.   As a result of the April 3, 2012 attack and SSG Brown's death, each member of his family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Brown's society, companionship, and counsel.

384.   SSG Brown's estate is entitled to recover economic and non-economic damages from Defendants, due to his murder.

### The Tara Brown Family

385.   Master Sergeant Tara Brown served in Afghanistan as a member of the U.S. Air Force. On April 27, 2011, MSgt Brown was injured in an insider

attack in Kabul Province, Afghanistan. MSgt Brown died on April 27, 2011 as a result of injuries sustained during the attack.

386.   The attack was committed by the Taliban (including the Haqqani Network) and al-Qaeda (a designated FTO at the time of the attack) acting together in the Kabul Attack Network.

387.   MSgt Brown's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist who committed the attack was unlawfully wearing the uniform of his enemy and indiscriminately placed civilians at risk, because it occurred at the Kabul International Airport.

388.   MSgt Brown was a national of the United States at the time of the attack and her death.

389.   As a result of the attack, MSgt Brown was injured in her person and/or property. The Plaintiff members of the Brown Family are the survivors and/or heirs of MSgt Brown and are entitled to recover for the damages MSgt Brown sustained.

390.   Plaintiff Ernest L. Brown II is the widower of MSgt Brown. He is a national of the United States.

391.   Plaintiff Jim Arthur Jacobs is the father of MSgt Brown. He is a national of the United States.

392.   Plaintiff Gladys M. Vereen is the mother of MSgt Brown. She is a national of the United States.

393.   Plaintiff Christopher Baptist is the brother of MSgt Brown. He is a national of the United States.

394.   Plaintiff Dominic Jacobs is the brother of MSgt Brown. He is a national of the United States.

395.   Plaintiff Jim Augustino Jacobs is the brother of MSgt Brown. He is a national of the United States.

396.   Plaintiff Laguanda S. Jacobs is the sister of MSgt Brown. She is a national of the United States.

397.   As a result of the April 27, 2011 attack and MSgt Brown's injuries, each member of the Brown Family has experienced severe mental anguish, emotional pain and suffering, and the loss of MSgt Brown's society, companionship, and counsel.

**The Christopher Campbell Family**

398.   Chief Petty Officer Christopher Campbell served in Afghanistan as a member of the U.S. Navy. On August 6, 2011, CPO Campbell was injured in an attack on a helicopter in Wardak Province, Afghanistan. CPO Campbell died on August 6, 2011 as a result of injuries sustained during the attack.

399.   The attack was committed by the Haqqani Network (a part of the Taliban) and al-Qaeda (a designated FTO at the time of the attack).

400.   CPO Campbell's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

401.   CPO Campbell was a national of the United States at the time of the attack and his death.

402.   As a result of the attack, CPO Campbell was injured in his person and/or property. The Plaintiff members of the Campbell Family are the survivors and/or heirs of CPO Campbell and are entitled to recover for the damages CPO Campbell sustained.

403.   Plaintiff Cynthia C. Campbell is the sister of CPO Campbell. She is a national of the United States.

404.   As a result of the August 6, 2011 attack and CPO Campbell's injuries, each member of the Campbell Family has experienced severe mental anguish, emotional pain and suffering, and the loss of CPO Campbell's society, companionship, and counsel.

**The John Douangdara Family**

405.   Petty Officer 1st Class John Douangdara served in Afghanistan as a member of the U.S. Navy. On August 6, 2011, PO1 Douangdara was injured in an attack on a helicopter in Wardak Province, Afghanistan. PO1 Douangdara died on August 6, 2011 as a result of injuries sustained during the attack.

406.   The attack was committed by the Haqqani Network (a part of the Taliban) and al-Qaeda (a designated FTO at the time of the attack).

407.   PO1 Douangdara's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

408.   PO1 Douangdara was a national of the United States at the time of the attack and his death.

409.   As a result of the attack, PO1 Douangdara was injured in his person and/or property. The Plaintiff members of the Douangdara Family are the survivors and/or heirs of PO1 Douangdara and are entitled to recover for the damages PO1 Douangdara sustained.

410.   Plaintiff Phouthasith Douangdara is the father of PO1 Douangdara. He is a national of the United States.

411.   As a result of the August 6, 2011 attack and PO1 Douangdara's injuries, each member of the Douangdara Family has experienced severe mental anguish, emotional pain and suffering, and the loss of PO1 Douangdara's society, companionship, and counsel.

**Carey G. DuVal**

412.   Plaintiff Captain Carey G. DuVal served in Afghanistan as a member of the U.S. Army. On August 24, 2014, CPT DuVal was injured in a suicide bombing IED attack in Nangarhar Province, Afghanistan. The attack severely wounded CPT DuVal, who suffered an amputation of his right hand, a broken right ulna, elbow, and humerus, a broken right femur, and loss of 20 percent of his right quadricep. As a result of the August 24, 2014 attack and his injuries, CPT DuVal has experienced severe physical and emotional pain and suffering.

413.   The attack was committed by the Taliban and al-Qaeda (a designated FTO at the time of the attack) acting together in a joint al-Qaeda-Taliban cell.

414.   The attack that injured CPT DuVal would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants and the detonation of a vehicle indiscriminately placed civilians at risk.

162

415.   CPT DuVal was a national of the United States at the time of the attack, and remains one to this day.

**The Thomas Fogarty Family**

416.   Staff Sergeant Thomas Fogarty served in Afghanistan as a member of the U.S. Army. On May 6, 2012, SSG Fogarty was injured in an IED attack committed by the Haqqani Network (a part of the Taliban) and al-Qaeda (a designated FTO at the time of the attack) acting together in a joint al-Qaeda-Taliban cell in Paktia Province, Afghanistan. SSG Fogarty died on May 6, 2012 as a result of injuries sustained during the attack.

417.   SSG Fogarty was a national of the United States at the time of the attack and his death.

418.   Plaintiff C.F., by and through his next friend Stephanie Fisher, is the minor son of SSG Fogarty. He is a national of the United States.

419.   Plaintiff K.F., by and through his next friend Stephanie Fisher, is the minor son of SSG Fogarty. He is a national of the United States.

420.   Plaintiff Stephanie J. Fisher is the mother of SSG Fogarty. She is a national of the United States.

421.   Plaintiff Thomas A. Fogarty is the father of SSG Fogarty. He is a national of the United States.

422.   As a result of the May 6, 2012 attack and SSG Fogarty's injuries and death, each member of the Fogarty Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Fogarty's society, companionship, and counsel.

**The Jonathan Gollnitz Family**

423.   Sergeant Jonathan Gollnitz served in Afghanistan as a member of the U.S. Army. On September 26, 2012, SGT Gollnitz was injured in a suicide bombing attack committed by the Taliban (including the Haqqani Network, a designated FTO at the time of the attack) and al-Qaeda (a designated FTO at the time of the attack) acting together in the Kabul Attack Network in Logar Province, Afghanistan. SGT Gollnitz died on September 26, 2012 as a result of injuries sustained during the attack.

424.   SGT Gollnitz was a national of the United States at the time of the attack and his death.

425.   Plaintiff L.C.D., by and through his next friend, Bridgett DeHoff, is the minor son of SGT Gollnitz. He is a national of the United States.

426.   Plaintiff Kirk A. Gollnitz is the brother of SGT Gollnitz. He is a national of the United States.

427.   Plaintiff Tyler Gollnitz is the brother of SGT Gollnitz. He is a national of the United States.

428.   As a result of the September 26, 2012 attack and SGT Gollnitz's injuries and death, each member of the Gollnitz Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Gollnitz's society, companionship, and counsel.

**The Brittany Gordon Family**

429.   Specialist Brittany Gordon served in Afghanistan as a member of the U.S. Army. On October 13, 2012, SPC Gordon was injured in an IED attack committed by the Haqqani Network, a designated FTO at the time of the attack and part of the Taliban, in Zabul Province, Afghanistan. SPC Gordon died on October 13, 2012 as a result of injuries sustained during the attack.

430.   SPC Gordon was a national of the United States at the time of the attack and her death.

431.   Plaintiff Cedric F. Gordon is the father of SPC Gordon. He is a national of the United States.

432.   Plaintiff Conchetta M. Diaz is the sister of SPC Gordon. She is a national of the United States.

433.   Plaintiff Cedric D. Gordon Sr. is the brother of SPC Gordon. He is a national of the United States.

434.   Plaintiff Adrian K.A. Sherrod is the brother of SPC Gordon. He is a national of the United States.

435.   As a result of the October 13, 2012 attack and SPC Gordon's injuries and death, each member of the Gordon Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Gordon's society, companionship, and counsel.

**The Tyler R. Iubelt Family**

436.   Private First Class Tyler R. Iubelt served in Afghanistan as a member of the U.S. Army. On November 12, 2016, PFC Iubelt was injured in a suicide bombing attack in Parwan Province, Afghanistan. PFC Iubelt died on November 12, 2016 as a result of injuries sustained during the attack.

437.   The attack was committed by al-Qaeda (a designated FTO at the time of the attack) and the Taliban with al-Qaeda providing and training the suicide bomber.

438.   PFC Iubelt's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist who committed the attack was unlawfully wearing the uniform of a base employee in order to gain access to the base and the attack indiscriminately placed civilians at risk, killing American contractors, because it occurred on a large base with civilians working there

439.   PFC Iubelt was a national of the United States at the time of the attack and his death.

166

440.   As a result of the attack, PFC Iubelt was injured in his person and/or property. The Plaintiff members of the Iubelt Family are the survivors and/or heirs of PFC Iubelt and are entitled to recover for the damages PFC Iubelt sustained.

441.   Plaintiff Shelby Iubelt is the widow of PFC Iubelt. She is a national of the United States.

442.   Plaintiff V.I., by and through her next friend Shelby Iubelt, is the minor daughter of PFC Iubelt. She is a national of the United States.

443.   Plaintiff Michael Iubelt is the father of PFC Iubelt. He is a national of the United States.

444.   Plaintiff Charlotte Loquasto is the mother of PFC Iubelt. She is a national of the United States.

445.   Plaintiff J.A.L., by and through his next friend Charlotte Loquasto, is the minor brother of PFC Iubelt. He is a national of the United States.

446.   As a result of the November 12, 2016 attack and PFC Iubelt's injuries, each member of the Iubelt Family has experienced severe mental anguish, emotional pain and suffering, and the loss of PFC Iubelt's society, companionship, and counsel.

### The Ryan P. Jayne Family

447.   Specialist Ryan P. Jayne served in Afghanistan as a member of the U.S. Army Reserve. On November 3, 2012, SPC Jayne was injured in an IED

attack in Paktia Province, Afghanistan. SPC Jayne died on November 3, 2012 as a result of injuries sustained during the attack.

448. The attack was committed by the Haqqani Network (a designated FTO at the time of the attack and part of the Taliban) and al-Qaeda (a designated FTO at the time of the attack) acting together in a joint al-Qaeda-Taliban cell.

449. SPC Jayne's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

450. SPC Jayne was a national of the United States at the time of the attack and his death.

451. As a result of the attack, SPC Jayne was injured in his person and/or property. The Plaintiff members of the Jayne Family are the survivors and/or heirs of SPC Jayne and are entitled to recover for the damages SPC Jayne sustained.

452. Plaintiff A.J.J., by and through her next friend Paul E. Jayne, is the minor sister of SPC Jayne. She is a national of the United States.

453. As a result of the November 3, 2012 attack and SPC Jayne's injuries and death, each member of the Jayne Family has experienced severe mental

anguish, emotional pain and suffering, and the loss of SPC Jayne's society, companionship, and counsel.

### The Alexis Kamerman Family

454.   Alexis Kamerman served in Afghanistan as a civilian educator with American University of Afghanistan. On January 17, 2014, Ms. Kamerman was injured in a complex attack involving a suicide bomber and gunmen committed by the Taliban (including the Haqqani Network, a designated FTO at the time of the attack) and al-Qaeda (a designated FTO at the time of the attack) acting together in the Kabul Attack Network in Kabul Province, Afghanistan. Ms. Kamerman died on January 17, 2014 as a result of injuries sustained during the attack.

455.   Ms. Kamerman was a national of the United States at the time of the attack and her death.

456.   Plaintiff Alison R. Pohn is the mother of Ms. Kamerman. She is a national of the United States.

457.   Plaintiff John C. McCarthy is the step-father of Ms. Kamerman. He is a national of the United States. John C. McCarthy lived in the same household as Ms. Kamerman for a substantial period of time and considered Ms. Kamerman the functional equivalent of a biological daughter.

458.   As a result of the January 17, 2014 attack and Ms. Kamerman's injuries and death, each member of the Kamerman Family has experienced severe

mental anguish, emotional pain and suffering, and the loss of Ms. Kamerman's society, companionship, and counsel.

### The David W. H. Lau Family

459.    Plaintiff Sergeant First Class David W. H. Lau served in Afghanistan as a member of the U.S. Army National Guard. On April 4, 2012, SFC Lau was injured in a suicide bombing attack committed by the Taliban and al-Qaeda (a designated FTO at the time of the attack) with al-Qaeda providing and training the suicide bomber in Faryab Province, Afghanistan. The attack severely wounded SFC Lau, who suffered severe injuries to both his legs requiring three years in a limb salvage program, extensive injuries to his dominant hand including the loss of a finger resulting in diminished function, severe injuries to shoulders and bicep, limb atrophy, dental injuries, loss of hearing, burns, and embedded toxic ball bearings. As a result of the April 4, 2012 attack and his injuries, SFC Lau has experienced severe physical and emotional pain and suffering.

460.    SFC Lau was a national of the United States at the time of the attack, and remains one to this day.

461.    Plaintiff Hamide Lau is the wife of SFC Lau. She is a national of the United States.

462.    Plaintiff K.L., by and through his next friend David W. H. Lau, is the minor son of SFC Lau. He is a national of the United States.

463.   Plaintiff M.L., by and through her next friend David W. H. Lau, is the minor daughter of SFC Lau. She is a national of the United States.

464.   Plaintiff Alexander Lau is the son of SFC Lau. He is a national of the United States.

465.   Plaintiff Vivian Perry is the mother of SFC Lau. She is a national of the United States.

466.   Plaintiff Holly L. Abraham is the sister of SFC Lau. She is a national of the United States.

467.   Plaintiff Leroy W. Lau Jr. is the brother of SFC Lau. He is a national of the United States.

468.   Plaintiff Michelle L. Rauschenberger is the sister of SFC Lau. She is a national of the United States.

469.   Plaintiff Jammie J. Smith is the sister of SFC Lau. She is a national of the United States.

470.   As a result of the April 4, 2012 attack and SFC Lau's injuries, each member of the Lau Family has experienced severe mental anguish, emotional pain and suffering.

### The Chester J. McBride III Family

471.   Staff Sergeant Chester J. McBride III served in Afghanistan as a member of the U.S. Air Force. On December 21, 2015, SSgt McBride was injured

in a suicide bombing attack committed by the Taliban in Parwan Province, Afghanistan. SSgt McBride died on December 21, 2015 as a result of injuries sustained during the attack.

472.   SSgt McBride was a national of the United States at the time of the attack and his death.

473.   Plaintiff Annie L. McBride is the mother of SSgt McBride. She is a national of the United States.

474.   Plaintiff Chester R. McBride Sr. is the father of SSgt McBride. He is a national of the United States.

475.   As a result of the December 21, 2015 attack and SSgt McBride's injuries and death, each member of the McBride Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSgt McBride's society, companionship, and counsel.

### The Mecolus C. McDaniel Family

476.   Staff Sergeant Mecolus C. McDaniel served in Afghanistan as a member of the U.S. Army. On March 19, 2011, SSG McDaniel was injured in an IED attack committed by the Haqqani Network, a part of the Taliban, in Khost Province, Afghanistan. SSG McDaniel died on March 19, 2011 as a result of injuries sustained during the attack.

172

477.   SSG McDaniel was a national of the United States at the time of the attack and his death.

478.   Plaintiff Charlette Gilbert is the step-daughter of SSG McDaniel. She is a national of the United States. Charlette Gilbert lived in the same household as SSG McDaniel for a substantial period of time and considered SSG McDaniel the functional equivalent of a biological father.

479.   As a result of the March 19, 2011 attack and SSG McDaniel's injuries and death, each member of the McDaniel Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG McDaniel's society, companionship, and counsel.

**The Liam Nevins Family**

480.   Sergeant First Class Liam Nevins served in Afghanistan as a member of the U.S. Army. On September 21, 2013, SFC Nevins was injured in an insider attack committed by the Haqqani Network (a designated FTO at the time of the attack and part of the Taliban) and al-Qaeda (a designated FTO at the time of the attack) acting together in a joint al-Qaeda-Taliban cell in Paktia Province, Afghanistan. SFC Nevins died on September 21, 2013 as a result of injuries sustained during the attack.

481.   SFC Nevins was a national of the United States at the time of the attack and his death.

173

482.   Plaintiff William R. Nevins is the father of SFC Nevins. He is a national of the United States.

483.   As a result of the September 21, 2013 attack and SFC Nevins's injuries and death, each member of the Nevins Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SFC Nevins's society, companionship, and counsel.

**The Bryan J. Nichols Family**

484.   Chief Warrant Officer 2 Bryan J. Nichols served in Afghanistan as a member of the U.S. Army Reserve. On August 6, 2011, CW2 Nichols was injured in an attack on a helicopter committed by the Haqqani Network, a part of the Taliban, in Wardak Province, Afghanistan. CW2 Nichols died on August 6, 2011 as a result of injuries sustained during the attack.

485.   CW2 Nichols was a national of the United States at the time of the attack and his death.

486.   Plaintiff Mary R. Hammerbacher-Nichols is the widow of CW2 Nichols. She is a national of the United States.

487.   Plaintiff Monte D. Nichols is the brother of CW2 Nichols. He is a national of the United States.

488.   Plaintiff Nicole A. Robles is the sister of CW2 Nichols. She is a national of the United States.

489.   As a result of the August 6, 2011 attack and CW2 Nichols's injuries and death, each member of the Nichols Family has experienced severe mental anguish, emotional pain and suffering, and the loss of CW2 Nichols's society, companionship, and counsel.

**The Rob L. Nichols Family**

490.   Specialist Rob L. Nichols served in Afghanistan as a member of the U.S. Army. On July 23, 2013, SPC Nichols was injured in an IED attack in Wardak Province, Afghanistan. SPC Nichols died on July 23, 2013 as a result of injuries sustained during the attack.

491.   The attack was committed by the Haqqani Network, a designated FTO at the time of the attack and part of the Taliban.

492.   SPC Nichols's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants and the passive detonation system indiscriminately placed civilians at risk.

493.   SPC Nichols was a national of the United States at the time of the attack and his death.

494.   As a result of the attack, SPC Nichols was injured in his person and/or property. The Plaintiff members of the Nichols Family are the survivors and/or

175

heirs of SPC Nichols and are entitled to recover for the damages SPC Nichols sustained.

495.   Plaintiff Bruce K. Nichols is the father of SPC Nichols. He is a national of the United States.

496.   Plaintiff M.G.N., by and through her next friend Bruce Nichols, is the minor sister of SPC Nichols. She is a national of the United States.

497.   Plaintiff Jeanne M. Nichols is the step-mother of SPC Nichols. She is a national of the United States. Jeanne Nichols lived in the same household as SPC Nichols for a substantial period of time and considered SPC Nichols the functional equivalent of a biological son.

498.   As a result of the July 23, 2013 attack and SPC Nichols's injuries, each member of the Nichols Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Nichols's society, companionship, and counsel.

### The John W. Perry Family

499.   Staff Sergeant John W. Perry served in Afghanistan as a member of the U.S. Army. On November 12, 2016, SSG Perry was injured in a suicide bombing attack in Parwan Province, Afghanistan. SSG Perry died on November 12, 2016 as a result of injuries sustained during the attack.

500.   The attack was committed by al-Qaeda (a designated FTO at the time of the attack) and the Taliban with al-Qaeda providing and training the suicide bomber.

501.   SSG Perry's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants

502.   SSG Perry was a national of the United States at the time of the attack and his death.

503.   As a result of the attack, SSG Perry was injured in his person and/or property. The Plaintiff members of the Perry Family are the survivors and/or heirs of SSG Perry and are entitled to recover for the damages SSG Perry sustained.

504.   Plaintiff Julianne Good Perry is the widow of SSG Perry. She is a national of the United States.

505.   Plaintiff G.W.P., by and through his next friend Julianne Good Perry, is the minor son of SSG Perry. He is a national of the United States.

506.   Plaintiff L.R.P., by and through her next friend Julianne Good Perry, is the minor daughter of SSG Perry. She is a national of the United States.

507.   Plaintiff Kathleen Perry is the mother of SSG Perry. She is a national of the United States.

508.   Plaintiff Stewart L. Perry is the father of SSG Perry. He is a national of the United States.

509.   Plaintiff A.T.P., by and through her next friend Stewart L. Perry, is the minor sister of SSG Perry. She is a national of the United States.

510.   As a result of the November 12, 2016 attack and SSG Perry's injuries, each member of the Perry Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Perry's society, companionship, and counsel.

**The Jesse D. Pittman Family**

511.   Petty Officer 1st Class Jesse D. Pittman served in Afghanistan as a member of the U.S. Navy. On August 6, 2011, PO1 Pittman was injured in an attack on a helicopter in Wardak Province, Afghanistan. PO1 Pittman died on August 6, 2011 as a result of injuries sustained during the attack.

512.   The attack was committed by the Haqqani Network (a part of the Taliban) and al-Qaeda (a designated FTO at the time of the attack).

513.   PO1 Pittman's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

514.   PO1 Pittman was a national of the United States at the time of the attack and his death.

515.   As a result of the attack, PO1 Pittman was injured in his person and/or property. The Plaintiff members of the Pittman Family are the survivors and/or heirs of PO1 Pittman and are entitled to recover for the damages PO1 Pittman sustained.

516.   Plaintiff Ida B. Pittman is the mother of PO1 Pittman. She is a national of the United States.

517.   Plaintiff John T. Pittman Sr. is the father of PO1 Pittman. He is a national of the United States.

518.   As a result of the August 6, 2011 attack and PO1 Pittman's injuries, each member of the Pittman Family has experienced severe mental anguish, emotional pain and suffering, and the loss of PO1 Pittman's society, companionship, and counsel.

**The Peter Provost Family**

519.   Peter Provost served in Afghanistan as a civilian contractor working for Fluor Corporation. On November 12, 2016, Mr. Provost was injured in a suicide bombing attack in Parwan Province, Afghanistan. Mr. Provost died on November 12, 2016 as a result of injuries sustained during the attack.

520.   The attack was committed by al-Qaeda (a designated FTO at the time of the attack) and the Taliban with al-Qaeda providing and training the suicide bomber.

521.   Mr. Provost's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist who committed the attack was unlawfully wearing the uniform of a base employee in order to gain access to the base and the attack indiscriminately placed civilians at risk, killing American contractors, because it occurred on a large base with civilians working there

522.   Mr. Provost was a national of the United States at the time of the attack and his death.

523.   As a result of the attack, Mr. Provost was injured in his person and/or property. The Plaintiff members of the Provost Family are the survivors and/or heirs of Mr. Provost and are entitled to recover for the damages Mr. Provost sustained.

524.   Plaintiff Gail Provost is the widow of Mr. Provost. She is a national of the United States.

525.   Plaintiff Meghan J. Hollingsworth is the daughter of Mr. Provost. She is a national of the United States.

526.    Plaintiff Sarah T. Peterson is the daughter of Mr. Provost. She is a national of the United States.

527.    Plaintiff Brian Provost is the son of Mr. Provost. He is a national of the United States.

528.    Plaintiff Spencer D. Provost is the son of Mr. Provost. He is a national of the United States.

529.    Plaintiff Gertrude Provost is the mother of Mr. Provost. She is a national of the United States.

530.    Plaintiff Louis Provost is the father of Mr. Provost. He is a national of the United States.

531.    Plaintiff Judith L. Ashley is the sister of Mr. Provost. She is a national of the United States.

532.    Plaintiff Louise P. Conlon is the sister of Mr. Provost. She is a national of the United States.

533.    Plaintiff MaryJane G. Medeiros is the sister of Mr. Provost. She is a national of the United States.

534.    Plaintiff John A. Provost is the brother of Mr. Provost. He is a national of the United States.

535.    Plaintiff Paul Provost is the brother of Mr. Provost. He is a national of the United States.

536.   Plaintiff Scott P. Provost is the brother of Mr. Provost. He is a national of the United States.

537.   As a result of the November 12, 2016 attack and Mr. Provost's injuries, each member of the Provost Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Mr. Provost's society, companionship, and counsel.

**The Jarrold M. Reeves Jr. Family**

538.   COL(R) Jarrold M. Reeves Jr. served in Afghanistan as a civilian contractor working for Fluor Corporation. On November 12, 2016, COL(R) Reeves was injured in a suicide bombing attack in Parwan Province, Afghanistan. COL(R) Reeves died on November 12, 2016 as a result of injuries sustained during the attack.

539.   The attack was committed by al-Qaeda (a designated FTO at the time of the attack) and the Taliban with al-Qaeda providing and training the suicide bomber.

540.   COL(R) Reeves's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist who committed the attack was unlawfully wearing the uniform of a base employee in order to gain access to the base and the attack indiscriminately placed civilians

at risk, killing American contractors, because it occurred on a large base with civilians working there

541.   COL(R) Reeves was a national of the United States at the time of the attack and his death.

542.   As a result of the attack, COL(R) Reeves was injured in his person and/or property. The Plaintiff members of the Reeves Family are the survivors and/or heirs of COL(R) Reeves and are entitled to recover for the damages COL(R) Reeves sustained.

543.   Plaintiff Katrina Reeves is the widow of COL(R) Reeves. She is a national of the United States.

544.   Plaintiff Summer Reeves Dunn is the daughter of COL(R) Reeves. She is a national of the United States.

545.   Plaintiff Hannah Mason is the daughter of COL(R) Reeves. She is a national of the United States.

546.   Plaintiff Jennifer K. Reeves is the daughter of COL(R) Reeves. She is a national of the United States.

547.   Plaintiff Mallory T. Williams is the daughter of COL(R) Reeves. She is a national of the United States.

548.   Plaintiff Charlotte A. Reeves is the mother of COL(R) Reeves. She is a national of the United States.

549.   Plaintiff Victoria J. Reeves is the sister of COL(R) Reeves. She is a national of the United States.

550.   Plaintiff Joyce A. Tulloch is the sister of COL(R) Reeves. She is a national of the United States.

551.   As a result of the November 12, 2016 attack and COL(R) Reeves's injuries, each member of the Reeves Family has experienced severe mental anguish, emotional pain and suffering, and the loss of COL(R) Reeves's society, companionship, and counsel.

### The Joseph Riley Family

552.   Specialist Joseph Riley served in Afghanistan as a member of the U.S. Army. On November 24, 2014, SPC Riley was injured in a suicide bombing attack in Kabul Province, Afghanistan. SPC Riley died on November 24, 2014 as a result of injuries sustained during the attack.

553.   The attack was committed by the Taliban (including the Haqqani Network, a designated FTO at the time of the attack), and al-Qaeda (a designated FTO at the time of the attack), acting together in the Kabul Attack Network.

554.   SPC Riley's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified

themselves as enemy combatants and the detonation of a vehicle indiscriminately placed civilians at risk

555.   SPC Riley was a national of the United States at the time of the attack and his death.

556.   As a result of the attack, SPC Riley was injured in his person and/or property. The Plaintiff members of the Riley Family are the survivors and/or heirs of SPC Riley and are entitled to recover for the damages SPC Riley sustained.

557.   Plaintiff Michelle Riley is the mother of SPC Riley. She is a national of the United States.

558.   Plaintiff Rodney Riley is the father of SPC Riley. He is a national of the United States.

559.   As a result of the November 24, 2014 attack and SPC Riley's injuries, each member of the Riley Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Riley's society, companionship, and counsel.

**Nathan J. Rimpf**

560.   Plaintiff First Lieutenant Nathan J. Rimpf served in Afghanistan as a member of the U.S. Army. On July 8, 2012, 1LT Rimpf was injured in an IED attack in Ghazni Province, Afghanistan. The attack severely wounded 1LT Rimpf, who suffered the loss of his left leg below the knee, the loss of his right leg above

185

the knee, and partial paralysis of his right scapula. As a result of the July 8, 2012 attack and his injuries, 1LT Rimpf has experienced severe physical and emotional pain and suffering.

561.   The attack was committed by the Haqqani Network, part of the Taliban.

562.   The attack that injured 1LT Rimpf would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants and the passive detonation system indiscriminately placed civilians at risk.

563.   1LT Rimpf was a national of the United States at the time of the attack, and remains one to this day

### The Heath M. Robinson Family

564.   Senior Chief Petty Officer Heath M. Robinson served in Afghanistan as a member of the U.S. Navy. On August 6, 2011, SCPO Robinson was injured in an attack on a helicopter in Wardak Province, Afghanistan. SCPO Robinson died on August 6, 2011 as a result of injuries sustained during the attack.

565.   The attack was committed by the Haqqani Network (a part of the Taliban) and al-Qaeda (a designated FTO at the time of the attack).

566.   SCPO Robinson's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

567.   SCPO Robinson was a national of the United States at the time of the attack and his death.

568.   As a result of the attack, SCPO Robinson was injured in his person and/or property. The Plaintiff members of the Robinson Family are the survivors and/or heirs of SCPO Robinson and are entitled to recover for the damages SCPO Robinson sustained.

569.   Plaintiff Daniel M. Robinson is the father of SCPO Robinson. He is a national of the United States.

570.   As a result of the August 6, 2011 attack and SCPO Robinson's injuries, each member of the Robinson Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SCPO Robinson's society, companionship, and counsel.

**Christopher J. Rosebrock**

571.   Plaintiff Captain Christopher J. Rosebrock served in Afghanistan as a member of the U.S. Army National Guard. On April 4, 2012, CPT Rosebrock was injured in a suicide bombing attack committed by the Taliban and al-Qaeda (a

designated FTO at the time of the attack) with al-Qaeda providing and training the suicide bomber in Faryab Province, Afghanistan. The attack severely wounded CPT Rosebrock, who suffers from disfiguring shrapnel wounds, muscular atrophy and reduced mobility in his left arm, a concussion, a traumatic brain injury, and blown eardrums. As a result of the April 4, 2012 attack and his injuries, CPT Rosebrock has experienced severe physical and emotional pain and suffering.

572.   CPT Rosebrock was a national of the United States at the time of the attack and remains one to this day.

### The Nicholas J. Rozanski Family

573.   Captain Nicholas J. Rozanski served in Afghanistan as a member of the U.S. Army National Guard. On April 4, 2012, CPT Rozanski was injured in a suicide bombing attack committed by the Taliban in Faryab Province, Afghanistan. CPT Rozanski died on April 4, 2012 as a result of injuries sustained during the attack.

574.   CPT Rozanski was a national of the United States at the time of the attack and his death.

575.   Plaintiff Alex J. Rozanski is the brother of CPT Rozanski. He is a national of the United States.

576.   As a result of the April 4, 2012 attack and CPT Rozanski's injuries and death, each member of the Rozanski Family has experienced severe mental

anguish, emotional pain and suffering, and the loss of CPT Rozanski's society, companionship, and counsel.

**The Jonathan P. Schmidt Family**

577.   Staff Sergeant Jonathan P. Schmidt served in Afghanistan as a member of the U.S. Army. On September 1, 2012, SSG Schmidt was injured in a complex attack involving small arms fire and grenades committed by the Haqqani Network, a part of the Taliban, in Ghazni Province, Afghanistan. SSG Schmidt died on September 1, 2012 as a result of injuries sustained during the attack.

578.   SSG Schmidt was a national of the United States at the time of the attack and his death.

579.   Plaintiff Natalie Schmidt is the widow of SSG Schmidt. She is a national of the United States.

580.   Plaintiff A.L.S., by and through his next friend Natalie Schmidt, is the minor daughter of SSG Perry. He is a national of the United States.

581.   As a result of the September 1, 2012 attack and SSG Schmidt's injuries and death, each member of the Schmidt Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Schmidt's society, companionship, and counsel.

**The Mark Schoonhoven Family**

582.   Staff Sergeant Mark Schoonhoven served in Afghanistan as a member of the U.S. Army. On December 15, 2012, SSG Schoonhoven was injured in an IED attack in Kabul Province, Afghanistan. SSG Schoonhoven died on January 20, 2013 as a result of injuries sustained during the attack.

583.   The attack was committed by the Taliban (including the Haqqani Network, a designated FTO at the time of the attack), and al-Qaeda (a designated FTO at the time of the attack), acting together in the Kabul Attack Network.

584.   SSG Schoonhoven's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants and the passive detonation system indiscriminately placed civilians at risk.

585.   SSG Schoonhoven was a national of the United States at the time of the attack and his death.

586.   As a result of the attack, SSG Schoonhoven was injured in his person and/or property. The Plaintiff members of the Schoonhoven Family are the survivors and/or heirs of SSG Schoonhoven and are entitled to recover for the damages SSG Schoonhoven sustained.

190

587.   Plaintiff Tammie S. Schoonhoven is the widow of SSG Schoonhoven. She is a national of the United States.

588.   Plaintiff A.M.S., by and through her next friend Tammie S. Schoonhoven, is the minor daughter of SSG Schoonhoven. She is a national of the United States.

589.   Plaintiff A.R.S., by and through her next friend Tammie S. Schoonhoven, is the minor daughter of SSG Schoonhoven. She is a national of the United States.

590.   Plaintiff Deborah F. Schoonhoven is the mother of SSG Schoonhoven. She is a national of the United States.

591.   Plaintiff Christopher S. Schoonhoven is the brother of SSG Schoonhoven. He is a national of the United States.

592.   Plaintiff S.M.P., by and through her next friend Deborah F. Schoonhoven, is the minor step-daughter of SSG Schoonhoven. She is a national of the United States. S.M.P. lived in the same household as SSG Schoonhoven for a substantial period of time and considered SSG Schoonhoven the functional equivalent of a biological father.

593.   As a result of the December 15, 2012 attack and SSG Schoonhoven's injuries, each member of the Schoonhoven Family has experienced severe mental

anguish, emotional pain and suffering, and the loss of SSG Schoonhoven's society, companionship, and counsel.

### The Jacob M. Schwallie Family

594.    Sergeant Jacob M. Schwallie served in Afghanistan as a member of the U.S. Army. On May 7, 2012, SGT Schwallie was injured in an IED attack in Ghazni Province, Afghanistan. SGT Schwallie died on May 7, 2012 as a result of injuries sustained during the attack.

595.    The attack was committed by the Haqqani Network, a part of the Taliban.

596.    SGT Schwallie's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

597.    SGT Schwallie was a national of the United States at the time of the attack and his death.

598.    As a result of the attack, SGT Schwallie was injured in his person and/or property. The Plaintiff members of the Schwallie Family are the survivors and/or heirs of SGT Schwallie and are entitled to recover for the damages SGT Schwallie sustained.

599.   Plaintiff Sarah M. Schwallie is the mother of SGT Schwallie. She is a national of the United States.

600.   As a result of the May 7, 2012 attack and SGT Schwallie's injuries and death, each member of the Schwallie Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Schwallie's society, companionship, and counsel.

**The Michael J. Strange Family**

601.   Petty Officer 1st Class Michael J. Strange served in Afghanistan as a member of the U.S. Navy. On August 6, 2011, PO1 Strange was injured in an attack on a helicopter in Wardak Province, Afghanistan. PO1 Strange died on August 6, 2011 as a result of injuries sustained during the attack.

602.   The attack was committed by the Haqqani Network (a part of the Taliban) and al-Qaeda (a designated FTO at the time of the attack).

603.   PO1 Strange's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

604.   PO1 Strange was a national of the United States at the time of the attack and his death.

605.    As a result of the attack, PO1 Strange was injured in his person and/or property. The Plaintiff members of the Strange Family are the survivors and/or heirs of PO1 Strange and are entitled to recover for the damages PO1 Strange sustained.

606.    Plaintiff Charles W. Strange is the father of PO1 Strange. He is a national of the United States.

607.    Plaintiff C.E.S., by and through her next friend Charles W. Strange, is the minor sister of PO1 Strange. She is a national of the United States.

608.    Plaintiff Charles W. Strange III is the brother of PO1 Strange. He is a national of the United States.

609.    Plaintiff Katelyn M. Strange is the sister of PO1 Strange. She is a national of the United States.

610.    As a result of the August 6, 2011 attack and PO1 Strange's injuries, each member of the Strange Family has experienced severe mental anguish, emotional pain and suffering, and the loss of PO1 Strange's society, companionship, and counsel.

**The Aaron C. Vaughn Family**

611.    Chief Petty Officer Aaron C. Vaughn served in Afghanistan as a member of the U.S. Navy. On August 6, 2011, CPO Vaughn was injured in an

attack on a helicopter in Wardak Province, Afghanistan. CPO Vaughn died on August 6, 2011 as a result of injuries sustained during the attack.

612.   The attack was committed by the Haqqani Network (a part of the Taliban) and al-Qaeda (a designated FTO at the time of the attack).

613.   CPO Vaughn's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

614.   CPO Vaughn was a national of the United States at the time of the attack and his death.

615.   As a result of the attack, CPO Vaughn was injured in his person and/or property. The Plaintiff members of the Vaughn Family are the survivors and/or heirs of CPO Vaughn and are entitled to recover for the damages CPO Vaughn sustained.

616.   Plaintiff Catherine Kimberly Vaughn Kryzda is the widow of CPO Vaughn. She is a national of the United States.

617.   Plaintiff C.C.V., by and through her next friend Catherine Kimberly Vaughn Kryzda, is the minor daughter of CPO Vaughn. She is a national of the United States.

618.   Plaintiff R.C.V., by and through his next friend Catherine Kimberly Vaughn Kryzda, is the minor son of CPO Vaughn. He is a national of the United States.

619.   As a result of the August 06, 2011 attack and CPO Vaughn's injuries, each member of the Vaughn Family has experienced severe mental anguish, emotional pain and suffering, and the loss of CPO Vaughn's society, companionship, and counsel.

### The Kraig M.K. Vickers Family

620.   Senior Chief Petty Officer Kraig M.K. Vickers served in Afghanistan as a member of the U.S. Navy. On August 6, 2011, SCPO Vickers was injured in an attack on a helicopter in Wardak Province, Afghanistan. SCPO Vickers died on August 6, 2011 as a result of injuries sustained during the attack.

621.   The attack was committed by the Haqqani Network (a part of the Taliban) and al-Qaeda (a designated FTO at the time of the attack).

622.   SCPO Vickers's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

623.   SCPO Vickers was a national of the United States at the time of the attack and his death.

196

624.   As a result of the attack, SCPO Vickers was injured in his person and/or property. The Plaintiff members of the Vickers Family are the survivors and/or heirs of SCPO Vickers and are entitled to recover for the damages SCPO Vickers sustained.

625.   Plaintiff Hortense K.W. Vickers is the widow of SCPO Vickers. She is a national of the United States.

626.   Plaintiff K.E.F.V., by and through her next friend Hortense K.W. Vickers, is the minor daughter of SCPO Vickers. She is a national of the United States.

627.   Plaintiff K.M.G.V., by and through her next friend Hortense K.W. Vickers, is the minor daughter of SCPO Vickers. She is a national of the United States.

628.   Plaintiff K.N.V., by and through his next friend Hortense K.W. Vickers, is the minor son of SCPO Vickers. He is a national of the United States.

629.   Plaintiff Mary J. Vickers is the mother of SCPO Vickers. She is a national of the United States.

630.   Plaintiff Robert M.K. Vickers Sr. is the father of SCPO Vickers. He is a national of the United States.

631.   Plaintiff Mark M. Vickers is the brother of SCPO Vickers. He is a national of the United States.

197

632.  Plaintiff Robert M. K. Vickers Jr. is the brother of SCPO Vickers. He is a national of the United States.

633.  Plaintiff Vance M.K. Vickers is the brother of SCPO Vickers. He is a national of the United States.

634.  Plaintiff Michelle J.K. Yarborough is the sister of SCPO Vickers. She is a national of the United States.

635.  Plaintiff Makahea Xhelili is the sister-in-law of SCPO Vickers. She is a national of the United States. Makahea Xhelili lived in the same household and was raised as a daughter by SCPO Vickers and Hortense Vickers for a substantial period of time and considered SCPO Vickers, who was her legal guardian, the functional equivalent of a biological father.

636.  As a result of the August 6, 2011 attack and SCPO Vickers's injuries, each member of the Vickers Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SCPO Vickers's society, companionship, and counsel.

**The Jeffrey D. White Jr. Family**

637.  Specialist Jeffrey D. White Jr. served in Afghanistan as a member of the U.S. Army. On April 3, 2012, SPC White was injured in an IED attack committed by the Haqqani Network (a part of the Taliban) and al-Qaeda (a designated FTO at the time of the attack) acting together in a joint al-Qaeda-

Taliban cell in Khost Province, Afghanistan. SPC White died on April 3, 2012 as a result of injuries sustained during the attack.

638.   SPC White was a national of the United States at the time of the attack and his death.

639.   Plaintiff Jeffrey L. White Sr. is the father of SPC White. He is a national of the United States.

640.   Plaintiff Paula K. White is the mother of SPC White. She is a national of the United States.

641.   Plaintiff Kyle White is the brother of SPC White. He is a national of the United States.

642.   Plaintiff Michael White is the brother of SPC White. He is a national of the United States.

643.   As a result of the April 3, 2012 attack and SPC White's injuries and death, each member of the White Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC White's society, companionship, and counsel.

## CLAIMS FOR RELIEF

### First Claim for Relief

### Civil Liability Under 18 U.S.C. § 2333(d)
### *for Aiding and Abetting Foreign Terrorist Organizations*

644.   Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

645.   Plaintiffs were all injured by acts of international terrorism as defined by 18 U.S.C. § 2331(1).

646.   This claim for relief applies to all attacks that were committed, planned, and authorized by organizations that had been designated FTOs as of the date of the attacks.

647.   HBL aided and abetted the person(s) who committed the attacks by knowingly providing illicit financial services that facilitated large funds transfers to the members of the al-Qaeda Terror Syndicate in the lead-up to the terrorist attack at issue.

648.   As alleged above, HBL provided this assistance knowingly.

649.   HBL was generally aware that by unlawfully providing funds to the members of the al-Qaeda Terror Syndicate, it was playing a role in the Syndicate's terrorist and tortious activities.

650.   The assistance HBL provided was substantial because, *inter alia*, the amount of money provided to the al-Qaeda Terror Syndicate was significant, HBL

had a culpable state of mind, and the assistance continued over many years, evincing a deliberate long-term intention by HBL to participate in the ongoing illicit enterprise.

651.   The attacks at issue were a reasonably foreseeable result of the Syndicate's terrorist and tortious activities.

652.   In amending the ATA through JASTA, Congress has repeatedly stressed its objective to create civil liability for persons and entities that have provided material support, directly or indirectly, to foreign organizations or persons that engage in terrorist activities against the United States.

653.   HBL should accordingly be held liable for civil aiding and abetting under 18 U.S.C. § 2333(d).

## Second Claim for Relief

### Civil Liability Under 18 U.S.C. § 2333(d)
### *for Conspiring with Foreign Terrorist Organizations*

654.   Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

655.   HBL entered into a conspiracy with its customers (including Al Rashid Trust and Dawood Ibrahim, as well as the other SDGTs listed in this Complaint), as well as al-Qaeda, the Haqqani Network, LeT, and JeM, to join the al-Qaeda Terror Syndicate's terrorist campaign.

656.   As explained above, the Syndicate members conspired to carry out a terror campaign targeting Coalition forces in Afghanistan for the purpose of targeting United States citizens and institutions and affecting the policies of the U.S. government.

657.   HBL knew that the objective of the conspiracy between these sophisticated terrorist organizations was to facilitate terrorist attacks, including attacks against Coalition forces. This includes the attacks at issue in this case that were planned, authorized, or executed by designated FTOs.

658.   HBL agreed to join and further this conspiracy by helping its terrorist customers move large sums of money (primarily in USD) through the international financial system (and particularly the United States) undetected.

659.   The terrorist attacks at issue in this case were a foreseeable act in furtherance of this conspiracy that caused Plaintiffs' injuries.

660.   HBL should accordingly be held liable for conspiracy under 18 U.S.C. § 2333(d).

## Third Claim for Relief

### Civil Liability Under 18 U.S.C. § 2333(a) for
### *Providing Material Support to Terrorists in Violation of 18 U.S.C. § 2339A*

661.   Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

662.   HBL provided material support or resources to members of the al-Qaeda Terror Syndicate in violation of 18 U.S.C. § 2339A by transferring money to these terrorist organizations knowing that those funds would be used in preparation for or in carrying out one or more violations of enumerated predicate offenses, including 18 U.S.C. §§ 844(f) (destroying federal property), 930(c) (homicide in the course of attacking a federal facility), 956 (conspiracy to kill, kidnap, maim, or injure individuals, or to damage property, in a foreign country), 1114 (killing a federal officer, employee, or member of the armed forces), 1361 (destruction of federal property), and 2332 (killing or assaulting a United States national outside the United States).

663.   HBL's material support to notorious terrorists in the manner and with the knowledge alleged in this Complaint constitutes acts of international terrorism, because HBL's conduct involved acts that are dangerous to human life, that violated the criminal laws of the United States, and objectively appeared to be intended to influence the policy of a government by intimidation or coercion or affect the conduct of a government by mass destruction, assassination, or kidnapping, and transcends national boundaries.

664.   HBL's actions caused Plaintiffs' injuries by providing the members of the al-Qaeda Terror Syndicate with funds necessary and sufficient to carry out the terrorist attacks implicated in this case.

665.   As alleged above, HBL acted with the requisite scienter—either knowledge or deliberate indifference.

666.   HBL should accordingly be held liable under 18 U.S.C. § 2333(a).

**Fourth Claim for Relief**

**Civil Liability Under 18 U.S.C. § 2333(a) for**
**Providing Material Support to Terrorist Organizations**
*in Violation of 18 U.S.C. § 2339B*

667.   Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

668.   As stated above, HBL knowingly provided funds to individual leaders or operatives belonging to designated FTOs that were members of the al-Qaeda Terror Syndicate, including al-Qaeda and the Haqqani Network.

669.   HBL also knowingly provided funds to designated SDGTs who raised money for these FTOs.

670.   HBL knew, or was deliberately indifferent, to the fact that these terrorist organizations operated as a syndicate, so that by providing assistance to one of them, it was providing assistance to their collective terrorist enterprise.

671.   HBL knew, or was deliberately indifferent, to the fact that its customers and counter-parties were agents or alter-egos of FTOs, such that it was providing material support to FTOs by offering financial services to its customers.

672.   By knowingly providing material support in the form of financial services to individuals and entities it knew were agents or alter-egos of FTOs, HBL violated 18 U.S.C. § 2339B, which prohibits knowingly providing any material support or resources to a designated FTO.

673.   HBL's knowing provision of material support to individuals and entities it knew were agents or alter-egos of FTOs constitutes acts of international terrorism, because that conduct involved acts that are dangerous to human life, violated the criminal laws of the United States, and objectively appeared to be intended to influence the policy of a government by intimidation or coercion or affect the conduct of a government by mass destruction, assassination, or kidnapping, and transcends national boundaries.

674.   HBL's actions caused Plaintiffs' injuries by providing the members of the al-Qaeda Terror Syndicate with funds necessary and sufficient to carry out the terrorist attacks implicated in this case.

675.   HBL should accordingly be held liable under 18 U.S.C. § 2333(a).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court:

(a) Accept jurisdiction over this action;

(b) Enter judgment against HBL and in favor of all Plaintiffs for compensatory damages (including for physical and emotional pain and suffering, loss of

205

society, companionship, comfort, advice, and counsel, and economic loss) in

amounts to be determined at trial;

(c) Enter judgment against HBL and in favor of Plaintiffs for treble damages

pursuant to 18 U.S.C. § 2333;

(d) Enter judgment against HBL and in favor of Plaintiffs for any and all costs

sustained in connection with the prosecution of this action, including

attorney's fees, pursuant to 18 U.S.C. § 2333;

(e) Grant pre-judgment interest, as authorized by law; and

(f) Grant such other and further relief as justice requires.

PLAINTIFFS DEMAND A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.


Respectfully submitted,

/s/Tejinder Singh

Ryan R. Sparacino
 (pro hac vice forthcoming)
SPARACINO PLLC
1920 L Street, NW, Suite 535
Washington, DC 20036
Tel: 202.629.3530
Ryan.sparacino@sparacinopllc.com

Tejinder Singh
 (SDNY Bar No. TS0613)
GOLDSTEIN & RUSSELL, P.C.
7475 Wisconsin Ave., Suite 850
Bethesda, MD 20814
Tel: 202.362.0636
Fax: 866.574.2033
tsingh@goldsteinrussell.com


Dated: March 17, 2021

206